**Exhibit A**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (SHL) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO STAY THE CONFIRMATION ORDER**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................ 2

ARGUMENT ........................................................................................................ 5

    I.     No Stay Should Be Imposed Because All Four Stay Factors Weigh
          Against Imposition ...................................................................................... 7

          A.     The Stay Movants Have Demonstrated No Likelihood of
                  Success on Their Appeals of the Confirmation Order ................... 7

                  1.     The Plan Contains Only Consensual Non-Debtor
                            Releases............................................................................ 8

                  2.     The Plan was Properly Confirmed Pursuant to Section
                            1129 of the Bankruptcy Code ........................................... 12

          B.     The Movants Fail to Establish That They Would be
                  Irreparably Harmed Absent a Stay ................................................ 17

          C.     The Debtors and All Creditors Would Suffer Significant Harm
                  if the Confirmation Order is Stayed ............................................... 18

          D.     The Public Interest Strongly Disfavors a Stay of the
                    Confirmation Order .................................................................... 21

    II.    The Stay Movants Fails to Establish That the Bond Requirement
          Should be Waived ...................................................................................... 22

    III.   The Court Should Reject Ms. Walker's Iterative Stay Requests and
          Other Unrelated Requests for Relief ......................................................... 23

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

C<small>ASES</small>

P<small>AGE(S)</small>

*In re 461 7th Ave. Mkt., Inc.*,
2021 WL 5917775 (2d Cir. Dec. 15, 2021) .............................................................. 6

*In re 473 W. End Realty Corp.*,
507 B.R. 496 (Bankr. S.D.N.Y. 2014) .................................................................. 6, 18

*In re 491 Bergen St. Corp.*,
2025 WL 1695473 (Bankr. S.D.N.Y. June 16, 2025) ............................................. 21

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp.  (In re Adelphia Commc'ns Corp.)*,
361 B.R. 337 (S.D.N.Y. 2007) ...................................................................... 17, 18, 22

*In re Adelphia Commc'ns Corp.*,
333 B.R. 649 (S.D.N.Y. 2005) ................................................................................. 5

*In re Allen*,
2018 WL 2093327 (Bankr. D.D.C. May 1, 2018) ..................................................... 7

*In re Berg*,
423 B.R. 671 (B.A.P. 10th Cir. 2010) ..................................................................... 13

*In re BGI, Inc.*,
504 B.R. 754 (S.D.N.Y. 2014) ............................................................................ 6, 17

*In re Calpine Corp.*,
2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008) ..................................... 17, 18, 23

*In re Carrington*,
698 F. Supp. 3d 659 (S.D.N.Y. 2023) ....................................................................... 5

*In re Chassix Holdings, Inc.*,
533 B.R. 64 (Bankr. S.D.N.Y. 2015) ...................................................................... 10

*In re Chemtura Corp.*,
2010 WL 4638898 (Bankr. S.D.N.Y. Nov. 8, 2010) ............................................... 21

*In re Davis*,
373 B.R. 207 (Bankr. N.D. Ga. 2007) ...................................................................... 7

*In re DPH Holdings Corp.*,
468 B.R. 603 (S.D.N.Y. 2012) ............................................................................... 12

*ePlus, Inc. v. Katz (In re Metiom, Inc.)*,
318 B.R. 263 (S.D.N.Y. 2004) ............................................................................... 21

*In re General Motors Corp.*,
  409 B.R. 24 (Bankr. S.D.N.Y. 2009) ............................................... 6, 18, 23

*In re Genesis Glob. Holdco, LLC*,
  660 B.R. 439 (Bankr. S.D.N.Y. 2024) ....................................... 10

*In re Grausz*,
  63 F. App'x 647 (4th Cir. 2003) ............................................... 13-14

*Greene v. United States*,
  13 F.3d 577 (2d Cir. 1994) ....................................................... 11-12

*In re Haemmerle*,
  529 B.R. 17 (Bankr. E.D.N.Y. 2015) ...................................... 15

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...................................... 9-10

*In re LATAM Airlines Grp. S.A.*,
  2022 WL 2657345 (Bankr. S.D.N.Y. July 8, 2022) ................. 18

*In re LATAM Airlines Grp. S.A.*,
  2022 WL 2811904 (Bankr. S.D.N.Y. July 16, 2022) ....................... 5, 7, 24

*In re Medaglia*,
  52 F.3d 451 (2d Cir. 1995) ....................................................... 15

*In re Mongiello*,
  2024 WL 729865 (S.D.N.Y. Feb. 21, 2024) ........................... 18

*Moore v. Goord*,
  142 F. App'x 496 (2d Cir. 2005) ............................................. 11

*Mullane v. Central Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950) ............................................................... 15

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................... 7

*In re PG&E Corp.*,
  617 B.R. 671 (Bankr. N.D. Cal. 2020) .................................... 10

*Playboy Enters. Int'l, Inc. v. On Line Ent., Inc.*,
  2004 WL 626807 (E.D.N.Y. Mar. 29, 2004),
  *as amended* (Apr. 1, 2004), *aff'd*, 135 F. App'x 479 (2d Cir. 2005) ........................... 9

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) ................................................... 11

*In re Sabine Oil & Gas Corp.*,
  548 B.R. 674 (Bankr. S.D.N.Y. 2016) ....................................... 14, 17, 18

*In re Sabine Oil & Gas Corp.*,
 551 B.R. 132 (Bankr. S.D.N.Y. 2016) ........................................................ 5

*In re Toscano*,
 799 F. Supp. 2d 230 (E.D.N.Y. 2011) ........................................................ 9

*In re Tribune Co.*,
 477 B.R. 465 (Bankr. D. Del. 2012) ........................................................... 23

*Triple Net Invs. IX, LP v. DJK Residential (In re DJK Residential, LLC)*,
 2008 WL 650389 (S.D.N.Y. Mar. 7, 2008) .............................................. 18

*Truck Ins. Exchange v. Kaiser Gypsum Co.*,
 60 F.4th 73 (4th Cir. 2023) ...................................................................... 11

*Uniformed Fire Officers Ass'n v. de Blasio*,
 973 F.3d 41 (2d Cir. 2020) ......................................................................... 7

*In re Voyager Digit. Holdings, Inc.*,
 649 B.R. 111 (Bankr. S.D.N.Y. 2023) ...................................................... 10

*In re Wash. Mut., Inc.*,
 442 B.R. 314 (Bankr. D. Del. 2011) ......................................................... 10

*In re Williams*,
 216 F.3d 1295 (11th Cir. 2000) ................................................................. 7

*In re Windstream Holdings, Inc.*,
 2020 WL 4481933 (S.D.N.Y. Aug. 3, 2020) ............................................ 18

*In re Wyly*,
 2019 WL 2590035 (Bankr. N.D. Tex. June 22, 2019) .............................. 10

## STATUTES & RULES

11 U.S.C. § 727(a) .................................................................................. 13, 14
11 U.S.C. § 1141(d)(3) ........................................................................... 13, 14
28 U.S.C. § 157(b)(2)(B) ............................................................................. 13
Fed. R. Bankr. P. 8002(d)(2)(F) ................................................................... 7
Fed. R. Bankr. P. 8007 ................................................................................. 5
Fed. R. Bankr. P. 8007(c) ........................................................................... 23

## OTHER AUTHORITIES

7 Collier on Bankruptcy P 1122.03[3] (16th ed. 2021) ............................... 12
8 Collier on Bankruptcy P 1141.05 (16th ed. 2025) ................................... 14

Restatement (Second) of Contracts § 175(1) (1981) ........................................................ 9

Purdue Pharma L.P. and its affiliated debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully submit this

omnibus memorandum of law in opposition to (i) Ellen Isaacs' motions for a stay (Dkt.

Nos. 8338, 8342)[2] (the "**Isaacs Motions**") of the Findings of Fact, Conclusions of Law,

and Order Confirming the Eighteenth Amended Joint Chapter 11 Plan of Reorganization

(Dkt. No. 8263) (the "**Confirmation Order**"); (ii) Amanda Morales' motion for a stay of

the Confirmation Order (Dkt. No. 8408) (the "**Morales Motion**"); (iii) Maria Ecke's

motion for a stay of the Confirmation Order (Dkt. No. 8419)[3] (the "**Ecke Motion**");

(iv) Mary S. Jannotta's motion for leave to file a motion to stay the Confirmation Order

(Dkt. No. 8435) and accompanying motion for a stay of the Confirmation Order (the

"**Jannotta Motion**"); [4] and (v) Rosemary Walker's submissions related to a stay of the

---

[2] Unless otherwise specified, docket numbers reference entries in the above-captioned chapter 11 proceedings.

[3] Ms. Ecke's request for relief is styled as a notice of motion that is nearly identical to Ms. Isaacs' notice of motion at Dkt. No. 8342, with an additional request related to due process. Ms. Ecke did not file any accompanying memorandum of law or basis for her requested relief.

[4] Ms. Jannotta also filed her stay motion on December 22, 2025—over a month after entry of the Confirmation Order, 20 days after the expiration of the statutory stay, and four days after the December 18 deadline to file a stay motion. (Dkt. No. 8345.) The only basis Ms. Jannotta articulates for this delay is "an unusually compressed post-confirmation schedule in a complex case." There is nothing "unusually compressed" about the post-confirmation schedule in this case. The Court should deny Ms. Jannotta's stay motion because it is untimely and meritless.

Confirmation Order (Dkt. Nos. 8387, 8410)[5] (the "**Walker Motions**") (collectively, the "**Stay Movants**").[6]

## PRELIMINARY STATEMENT

1.      Before this Court are motions to stay implementation of a confirmed bankruptcy plan of reorganization that is the result of more than six years of tireless work by the Debtors, the federal government, all fifty states, thousands of municipalities, the Official Committee, every other organized creditor group, and which received the support of more than 99% of voting personal injury victims. If consummated, the plan will deliver billions of dollars for opioid abatement and victim compensation, provide non-monetary relief that could not have been achieved through litigation, and create a new public benefit company dedicated to abating the opioid crisis. Standing in opposition to this extraordinary consensus and beneficial public policy outcome—after what has no doubt been one of the most contentious cases in American legal history—are five individuals, each proceeding *pro se*, who seek a stay pending appeal.

2.      The Stay Movants present no evidence that they will be irreparably harmed without a stay, and have no plausible ground for success on appeal. While they are dissatisfied with the Plan for various reasons, their motions fail to recognize that granting the stay they seek will impose extraordinary costs, delay, and harm on over one

---

[5] Ms. Walker also filed an additional stay motion at Dkt. No. 8448 on December 29, 2025, over 11 days after the Court ordered deadline of December 18 to file stay motions. The motion should be denied as both untimely and meritless for the reasons explained herein.

[6] Cornelius L. Wison-Bey filed two letters requesting additional time to submit evidence in support of his proof of claim. The Debtors do not construe these filings as motions to stay the confirmation order pending appeal, and they will be addressed separately and in due course.

hundred thousand other claimants—including fellow personal injury claimants—who

want the Plan to move ahead and do not want to bear the hundreds of millions of dollars

in losses that a stay would likely impose. Most of the Stay Movants fail to engage with

the relevant legal standard for obtaining a stay, and none can satisfy it.

3. ***No likelihood of success on the merits.*** None of the Stay Movants come

close to establishing any possibility, much less the requisite "substantial possibility," of

success on the merits. The Stay Movants' advance two flawed arguments. *First*, certain

of the Stay Movants contend that the Plan contains nonconsensual third-party releases

that are inconsistent with the Supreme Court's decision in these cases. Not so. Indeed,

four of the five Stay Movants did <u>not</u> opt in to the voluntary releases under the Plan. The

Plan, and the Court's order implementing it, are crystal clear that any creditor who

chooses not to settle with the Sacklers may, after the Effective Date, pursue their direct

causes of action through traditional civil litigation routes, and may still recover against

the Debtors under the plan settlement on account of any allowed claims filed in the

bankruptcy.

4. *Second*, the Stay Movants' offer various meritless arguments that assert

the Plan was improperly confirmed. Several of these arguments were not raised in the

Stay Movants' Plan objections; which means they are waived on appeal and will fail.

The remaining arguments simply recycle Plan objections without engaging with the

Court's decision overruling those objections. They too are unlikely to succeed.

5. ***Movants will not suffer irreparable harm absent a stay.*** The Stay

Movants offer no evidence of any cognizable harm they (or any other creditor) would

suffer in the absence of a stay. Nor could they: the overwhelming and unchallenged

evidentiary record at the confirmation hearing demonstrated that creditors will recover billions of dollars under the Plan; that the Plan is feasible; and that the settlements embedded in the Plan are fair and reasonable. Certain Stay Movants invoke the possibility of their appeals being rendered moot in the event that the Plan is effectuated during the pendency of their appeals—but this argument also fails because Second Circuit authority is clear that the risk of mootness alone is insufficient to show irreparable harm.

6. ***Non-movants will suffer great harm if a stay is issued; the balance of harms favors denial.*** The Debtors' governmental and private creditors would suffer great harm from further delay of implementation of the Plan. As demonstrated by the evidence submitted by the Debtors in connection with this stay opposition, even a three-month stay would delay billions of dollars in distributions and could result in over one-hundred million dollars in lost value. Because the Plan provides that funds will be used for opioid remediation and victim compensation, the Stay Movants themselves may well be harmed by the stay—from both delayed funding for abatement programs and incremental delay in compensation of personal injury victims. Moreover, a stay would delay distributions to other claimants; jeopardize the settlements underpinning the Plan; squander the estates' assets; and risk the Debtors' ability to satisfy certain requirements of the Plan. And where so much of the monetary relief is being directed towards opioid crisis abatement funding, delays could actually be a matter of life or death. That guaranteed material harm and massive set of risks to so many is plainly unwarranted under the facts and the law.

7.     ***The public interest is served by denying the stay motions.***  The Plan is

supported or not objected to by the federal government, all 50 states, thousands of

municipalities, the Official Committee and all organized creditor groups, and over 99%

of voting creditors.  As the Court observed after receiving the testimony of 19 witnesses,

hearing oral argument, admitting over 2,700 exhibits, and reviewing hundreds of pages of

briefing submitted in support of Plan confirmation, the Plan will provide "desperately

needed abatement funding [that] will be used for the treatment and prevention of opioid

use disorder, and will support community-led efforts to reduce overdose deaths and other

tragic opioid-related harms."  Modified Bench Ruling ("**MBR**") at 11, *In re Purdue*

*Pharma L.P.*, Case No. 19-23649 (SHL) (Bankr. S.D.N.Y. Nov. 20, 2025) (Dkt. No.

8270).  Delaying the distribution of these funds is entirely contrary to the public interest.

8.     It is time to promptly effectuate the Debtors' plan of reorganization and

allow for the distribution of desperately needed funds to creditors.  For these reasons and

those that follow, a stay would be entirely unwarranted and destructive. The Debtors

respectfully request that the stay motions be denied.

## **ARGUMENT**

9.     A stay under Bankruptcy Rule 8007 "is the exception, not the rule," *In re*

*Carrington*, 698 F. Supp. 3d 659, 661 (S.D.N.Y. 2023) (quoting *In re LATAM Airlines*

*Group S.A.*, No. 20-11254, 2022 WL 2811904, at *2 (Bankr. S.D.N.Y. July 16, 2022)

("***LATAM II***")), and the movant seeking a stay "carries a heavy burden."  *In re Adelphia*

*Commc'ns Corp.*, 333 B.R. 649, 659 (S.D.N.Y. 2005); *see also In re Sabine Oil & Gas*

*Corp.*, 551 B.R. 132, 142 (Bankr. S.D.N.Y. 2016) (stays pending appeal are considered

"extraordinary relief").  That heavy burden of persuasion is heightened where, as here,

the movant seeks to stay a confirmation order.  *See LATAM II*, 2022 WL 2811904, at *2.

Moreover, to the extent the Stay Movants seek a stay without being required to post any security, that yet further heightens their burden of persuasion. *See id.*; *see also In re 473 W. End Realty Corp.*, 507 B.R. 496, 502 (Bankr. S.D.N.Y. 2014) ("[T]he applicant has the burden of demonstrating why the court should deviate from the ordinary full security requirement").

10. In considering whether to grant a stay pending appeal, courts consider four factors: "(1) whether the stay applicant has made a strong showing that [s]he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re 461 7th Ave. Mkt., Inc.*, 2021 WL 5917775, at *1 (2d Cir. Dec. 15, 2021) (affirming denial of stay of bankruptcy court's order denying conversion from Chapter 11 to Chapter 7). The decision to grant a stay lies within the sound discretion of the bankruptcy court. *In re BGI, Inc.*, 504 B.R. 754, 762 (S.D.N.Y. 2014); *In re Gen. Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009).

11. Because the Stay Movants fail—by a wide margin—to satisfy any of the four criteria for a stay pending appeal, their requests should be denied.

## I. No Stay Should Be Imposed Because All Four Stay Factors Weigh Against Imposition

### A. The Stay Movants Have Demonstrated No Likelihood of Success on Their Appeals of the Confirmation Order

12.   None of the Stay Movants can demonstrate any likelihood of success on the merits of their appeals, much less the requisite "strong showing" of success.[7]  *See Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 49 (2d Cir. 2020); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009) ("It is not enough that the chance of success on the merits be better than negligible." (internal quotations omitted)).  Where, as here, "the proponent of a stay fails to set forth significant irreparable injury, it must clear a higher hurdle in demonstrating its prospects on appeal."  *LATAM II*, 2022 WL 2811904, at *7. The Stay Movants cannot clear that hurdle.  Indeed, other than conclusory assertions, the

---

[7] Courts accordingly routinely deny stay motions where the appeal was untimely filed, because there is <u>no</u> potential for success on appeal.  *See, e.g.*, *In re Allen*, 2018 WL 2093327, at *1 (Bankr. D.D.C. May 1, 2018) (denying stay because "the District Court will be required to dismiss the appeal for lack of jurisdiction because Allen failed to file a timely notice of appeal[.]"); *In re Davis*, 373 B.R. 207, 210 (Bankr. N.D. Ga. 2007) (denying stay because "[i]f the notice is not timely filed, the appellate court is without jurisdiction to hear the appeal" (quoting *In re Williams*, 216 F.3d 1295, 1298 (11th Cir. 2000)).  Ms. Jannotta filed her notice of appeal on December 9, 2025 (Dkt. No. 8370)—a full week after the deadline to file a notice of appeal lapsed.  The Debtors understand that Ms. Janotta filed a motion to extend the deadline to file a notice of appeal.  (Dkt. No. 8369.)  Under Fed. R. Bankr. P. 8002(d)(2)(F) "[t]he bankruptcy court must not extend the time to file the notice if the judgment, order, or decree being appealed . . . confirms a plan."  Therefore, the law requires—and the Debtors respectfully request—that the Court deny Ms. Jannotta's request for an extension of time to file a notice of appeal.  Ms. Isaacs contends that she timely filed her notice of appeal and that there was a clerical delay that led to its late docketing.  (Case No. 7:25-cv-10427, Dkt. No. 7 at 2.)  Ms. Isaacs' notice of appeal is stamped as both filed and entered on December 4, 2025—two days after the deadline to file a notice of appeal.  The Debtors expressly reserve any jurisdictional arguments related to the timeliness of Ms. Isaacs' appeal, but nevertheless believe the stay can be denied because Ms. Isaacs' stay motion can be denied on the merits, obviating the need for the Court to analyze at this juncture whether there was a clerical delay in connection with the docketing of Ms. Isaacs' filing.

Stay Movants do not identify a single clearly erroneous factual finding of the Court or incorrect legal conclusion.

### 1. The Plan Contains Only Consensual Non-Debtor Releases

13.    Several of the few movants principally argue that the Plan contains non-consensual third-party releases prohibited by the Supreme Court's decision in *Harrington*. (Isaacs Mot. (Dkt. No. 8338) at 4; Morales Mot. at 16, 18-20; Jannotta Mot. at 4; Walker Mot. (Dkt. No. 8387) at 1.)  Movants are wrong.  *See* MBR at 11 ("Parties are free to preserve their right to sue the Sackler parties, with such a right preserved unless the party takes the affirmative step of opting into the release.")  The Plan does not contain any nonconsensual third-party releases.  To the contrary, the Plan provides that "to consent to the Third-Party Releases or otherwise be bound by a release under a Shareholder Settlement Agreement" a creditor must execute a "Shareholder Release Consent Mechanism."  (Plan § 1.1 (defining Shareholder Release Consent Mechanism).).  Section 10.7(b) of the Plan, which governs the releases of creditors' direct claims against the Sacklers, is equally clear that releases are only granted under the Plan by "the Releasing Parties"—which the Plan defines as types of creditors who consent to the releases, including, in the case of personal injury claimants, through "electing to opt-in to the Third-Party Releases on [their] applicable ballot."  (Plan §§ 10.7(b); 1.1 (defining "Releasing Parties" and "Opt-In Settling Creditor).)  Ms. Isaacs, Ms. Morales, and Ms. Walker should well know this, because each of them voted on the Plan—Ms. Walker provisionally voted to accept, while Ms. Morales and Ms. Isaacs, voted to reject.  Each also separately chose whether to opt in to release the Sacklers; Ms. Walker provisionally opted in, while Ms. Isaacs and Ms. Morales chose not to opt in.  Ms. Jannotta did not

return a ballot; the result of which is that she did not opt-in to the third-party release and any direct claims she has against the Sacklers are preserved.[8]

14.     Indeed, the very fact that all but one of the Stay Movants did <u>not</u> grant the voluntary third-party releases under the Plan—either by refraining from opting in or <u>doing nothing at all</u> (i.e. not submitting a ballot) is proof positive that the releases are fully <u>consensual</u> and that the movants were not "coerced" into granting a release.  (*See* Isaacs Mot. Dkt. No. 8338 at 4 ("The Plan coerces victims into giving releases.").)  Coercion—which courts treat as analytically identical to "duress"[9]—is a <u>defense</u> to enforcement of an <u>existing</u> contract.  Under that doctrine, to "vitiate a contract," the party asserting coercion must make "a showing of: (1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative."  *In re Toscano*, 799 F. Supp. 2d 230, 243 (E.D.N.Y. 2011); Restatement (Second) of Contracts § 175(1) (1981) (stating duress is present where the victim is "induced by an improper threat by the other party that leaves the victim <u>no reasonable alternative</u>" (emphasis added)).  But here, the Stay Movants who did not opt-in never entered a contract to release the Sacklers, so duress and coercion are simply inapplicable—they never "involuntar[ily] accept[ed] [any] contract terms."  *Id.*[10]

---

[8] For completeness, Ms. Ecke also voted to reject the Plan and did not opt-in to the third-party releases.  Though her submission does not make the above-referenced argument.

[9] *See, e.g.*, *Playboy Enters. Int'l, Inc. v. On Line Ent., Inc.*, 2004 WL 626807, at *3 (E.D.N.Y. Mar. 29, 2004), *as amended* (Apr. 1, 2004) ("[T]he analysis for coercion and duress are the same[.]"), *aff'd*, 135 F. App'x 479 (2d Cir. 2005).

[10] Moreover, because Ms. Isaacs did not opt-in to release the Sacklers, she lacks standing to appeal confirmation of the Plan on behalf of those creditors that did.  *See, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986) ("[N]o party
(….continued)

15. The Stay Movant's invocation of "coercion" seems to be a plea to have been offered a different settlement—one that would give them all the benefits of participating in the third-party settlements without providing the releases to the third parties that are the consideration for those settlements. As an initial matter, to the extent they argue that creditors must opt in to the third-party releases to receive distributions on account of their claims against the Debtors, they are wrong. (*See* Plan §§ 1.1, 10.6(b), 10.7(b).)[11] Instead, as the Court has explained, creditors who <u>do not</u> release their direct claims against the Sacklers are <u>still</u> entitled to "receive pro-rata distributions from the Estate Claims Settlement and other estate value (if they meet the applicable trust distribution procedures)" if their claims are ultimately allowed. (MBR at 26.) Because such creditors have not released their direct claims against the Sacklers, they, of course, do not receive <u>additional</u> distributions from the Direct Claims Settlement—i.e. they do

---

may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation."); *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 497 n.58 (Bankr. S.D.N.Y. 2024) (collecting cases stating same).

[11] Courts routinely confirm plans of reorganization with similar "opt in" structures for consensual settlement of claims. *See, e.g., In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) (confirming plan where creditors who voted to reject the plan could also opt-in to the third-party release, and noting "[a] clearer form of 'consent' can hardly be imagined"); *In re Voyager Digit. Holdings, Inc.*, 649 B.R. 111, 130 (Bankr. S.D.N.Y. 2023) (rejecting objections to third-party releases where "the plan here provides that no creditor or shareholder has released any claims belonging to that person or entity unless that person has affirmatively done so by executing the 'opt-in' release form"); *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (holding that "any third party release is effective only with respect to those who affirmatively consent to it . . ."); *In re Wyly*, 2019 WL 2590035, at *6 (Bankr. N.D. Tex. June 22, 2019) (confirming a plan where the claim holder ballots had a third-party release opt-in, holding "[t]he Third-Party Releases are fully consensual because they are only given by those parties who affirmatively opted-in to such releases"); *In re PG&E Corp.*, 617 B.R. 671, 683 (Bankr. N.D. Cal. 2020) (finding proposed third-party release appropriate where "it requires the non-debtor parties to affirmatively opt-in to a release of their claims").

not receive consideration on account of a contract they declined to enter into.  (*See id.*)

Instead, such creditors "will be able to pursue litigation of their direct claims against the

Shareholder Released Parties" irrespective of whether their claims are allowed in the

bankruptcy.  (*Id.*)  That does not amount to coercion or a "bribe"—it is simply

consideration in exchange for value. In other words, a settlement.  (*See* MBR at 56 ("this

Plan does not compel victims to forfeit their rights to pursue the Sacklers.  Only

claimants that affirmatively opt into the releases provided to the Sackler Parties waive

their rights to pursue such claims.").)[12]

16.     Finally, Ms. Morales asserts that the preliminary injunction may not be

extended through the Effective Date because the Plan contains non-consensual

releases.  This argument is improperly raised for the first time on appeal and has been

waived.[13]  *See, e.g.*, *Moore v. Goord*, 142 F. App'x 496, 498 (2d Cir. 2005) (finding

---

[12] Those Stay Movants that did not elect to release their claims against the
Sacklers lack standing to challenge the legality of the consensual releases given by other
claimants, and their appeal on that ground is doomed to fail.  To have standing to appeal
in bankruptcy cases, a party must be a "person aggrieved" by an order.  *E.g.*, *Truck Ins.
Exchange v. Kaiser Gypsum Co.*, 60 F.4th 73, 81-82 & n.5 (4th Cir. 2023) (citation
omitted), *rev'd on other grounds*, 602 U.S. 268, 269 (2024).  The "person aggrieved" test
typically focuses on whether a bankruptcy court order "diminishes [the person's]
property, increases their burdens, or impairs their rights."  *In re PWS Holding Corp.*, 228
F.3d 224, 249 (3d Cir. 2000) (citation omitted).  Ms. Morales, Ms. Isaacs, Ms. Ecke, and
Ms. Jannotta have not released any direct claims they have against the Sacklers, so their
property rights such claims have not been impaired in any way.  They do not have
standing to assert such a claim, which is meritless, on behalf of any other party.

[13] In her untimely stay motion, Ms. Jannotta indicates that she intends to argue on
appeal several issues that she did not identify in her four-page Plan objection.  While her
stay motion makes the meritless assertion that there are defects with the Plan's
channeling injunction, due process, disclosure, and takes issue with post-solicitation
changes to the Plan, these issues are entirely absent from her confirmation objection.
Because a party cannot raise new issues for the first time on appeal, she is unlikely to
succeed on the merits with respect to these issues and the Debtors decline to address them
further unless requested to do so by the Court.

issues "were waived" where movant "failed to raise them below"); *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994) ("[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal."); *In re DPH Hold. Corp.*, 468 B.R. 603, 619 (S.D.N.Y. 2012) ("Accordingly, by failing to raise the issue before the bankruptcy court, Appellant has waived his right to raise it on appeal.").  In any event, as explained above, the Plan does not contain nonconsensual third-party releases.

## 2. The Plan was Properly Confirmed Pursuant to Section 1129 of the Bankruptcy Code

17.     None of the arguments that the Stay Movants advance in support of their theory that Plan was not properly confirmed have any prospect of success on appeal.

18.     *First*, Ms. Morales appears to assert that her wrongful death claim was improperly classified under the Plan because the personal injury she suffered was different in kind from the personal injuries suffered by other creditors. (Morales Mot. at 7-10, 21.)  But as the Court explained, the nature of the injury she suffered does "not meaningfully alter the priority or legal basis" for her claim.  (MBR at 57); *see generally* 7 Collier on Bankruptcy P 1122.03[3] (16th ed. 2021) (noting that courts "look[] at the nature of the claim (e.g., senior or subordinated, secured or unsecured), and the relationship of the claim to property of the debtor" to determine whether classification was proper).  Moreover, any attempt to granularly divide the personal injury claims against the Debtors would "result in an unworkably complex classification scheme." (MBR at 57.)  Ms. Morales offers no legal authority to support her novel theory that personal injury claims that differ only by their alleged mechanism of injury must be separately classified.

19.    To the extent Ms. Morales argues that her claim against the Debtors cannot be disposed of through the bankruptcy process at all (Morales Mot. at 7-10 (arguing her claim is "non-core")), that too fails.[14]   Adjudication of Ms. Morales' claim against the Debtors is a core proceeding and will be determined through the bankruptcy process whether in bankruptcy court or district court if subject to 157(b)(2)(B).

20.    *Second*, Ms. Morales argues that the exception to discharge for liquidations provided by 11 U.S.C. § 1141(d)(3) applies to these bankruptcy cases. (Morales Mot. at 14-18.)  But that exception only applies if (i) "the plan provides for the liquidation of all or substantially all of the property of the estate;" (ii) and "the debtor does not engage in business after consummation of the plan;" and (iii) "the debtor would be denied a discharge under section 727(a) . . . if the case were a case under chapter 7[.]"  11 U.S.C. § 1141(d)(3); *see also In re Berg*, 423 B.R. 671, 677 (B.A.P. 10th Cir. 2010) ("All three elements of [section] 1141(d)(3) must be established before a Chapter 11 debtor's discharge may be denied" (collecting cases)); *In re Grausz*, 63 F. App'x 647, 650 (4th Cir. 2003) (finding "lower courts did err in not completing the full [section]

---

[14] Like many other pleadings filed by Ms. Morales throughout these cases, this pleading appears to again assert that Ms. Morales' claim is somehow different than the claims of 138,877 other Non-NAS PI Claimants that were entitled to vote on the Plan (Johnson Supp. Decl. ¶ 7, Dkt. No. 8173), and her claim should be adjudicated and paid now.  This Court has repeatedly rejected this line of argument by Ms. Morales and should do so again here. *See, e.g.*, Aug. 16, 2021 Confirmation Hr'g Tr. at 51:16-52:3 [Dkt No. 3581]; Order Den. Mot. for Summ. J. and Payment of Claim (Aug. 18, 2021) [Dkt. No. 3591]; Order Den. Mot. for Relief from Prior Order at 3 (Oct. 29, 2021) [Dkt. No. 4040]; Order on Mots. to Participate in Mediation (Jan. 21, 2022) [Dkt. No. 4302]; Order Den. Mot. for Recons. (Aug. 3, 2023) [Dkt. No. 5801]; Order Regarding Contact with Chambers (Mar. 27, 2024) [Dkt. No. 6274]; Order Den. Mots. for Class Cert. and Related Relief (Jan. 9, 2025) [Dkt. No. 7094]; Mem. of Decision and Order (Oct. 6, 2025) [Dkt. No. 7941].

1141(d)(3) analysis" where only section 1141(d)(3)(C) was satisfied); 8 Collier on Bankr.

P 1141.05 (16th Ed. 2025) (stating section 1141(d)(3), and therefore the discharge

limitations in section 727(a), applies "[i]f the chapter 11 plan provides for the liquidation

of all, or substantially all, the property of the estate *and* the debtor does not continue in

business after confirmation of the plan") (emphasis added). The first two requirements

are not satisfied here. Instead, the Plan plainly provides that on or prior to the effective

date, Purdue's current operating assets will be transferred to a new company that will be

known as Knoa Pharma. (*See* Plan § 5.4(a); DelConte Decl. (Dkt. No. 8148) ¶¶ 4, 7;

Modified Bench Ruling at 27-28 ("Knoa will receive substantially all of the Debtors'

non-cash assets and $135 million of unrestricted cash and cash equivalents").) Knoa will

operate the Debtors' businesses for the public benefit and with the express purpose of

addressing the opioid crisis. (Plan § 5.4(g); DelConte Decl. (Dkt. No. 8148) ¶ 10;

Modified Bench Ruling at 27.) Far from liquidating and ceasing operations, the Debtors

are reorganizing as a public benefit company, and accordingly, the exception to discharge

in 11 U.S.C. § 1141(d)(3) is inapplicable.

      21.     Next, the Stay Movants cursorily invoke "due-process concerns" (Isaacs

Mot. (Dkt. No. 8338) at 4; *see also* Morales Mot. at 10; Jannotta Mot. at 1; Walker Mot.

(Dkt. No. 8387) at 2.) But because the Stay Movants do not provide any elaboration or

legal argument for due process being a basis for appeal, they fail to satisfy their burden of

showing a "strong possibility" of success on the merits. *See In re Sabine*, 548 B.R. 674,

684 (Bankr. S.D.N.Y. 2016) (denying stay pending appeal where movant merely

presented a "pared-down reargument" of certain claims and arguing that other claims

were "colorable"). In any event, due process <u>was</u> satisfied with respect to confirmation

of the Plan. The bedrock of due process is notice and the opportunity to be heard. *See,
e.g.*, *In re Medaglia*, 52 F.3d 451, 455 (2d Cir. 1995) ("The means to that end is 'notice
reasonably calculated, under all the circumstances, to apprise interested parties of the
pendency of the action'" (quoting *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S.
306, 314 (1950))); *In re Haemmerle*, 529 B.R. 17, 23 (Bankr. E.D.N.Y. 2015). Here, in
addition to the most robust noticing program in Chapter 11 history[15], the adequacy of
notice is plainly evident by the consistent participation, objection, and now appeals by the
Stay Movants in this very case. In addition, the Court has provided all interested parties,
including *pro se* individuals, numerous opportunities to be heard throughout these
proceedings, including at the confirmation hearing.[16] *See* Notice of Hearing to Pro Se

---

[15] Ms. Jannotta argues that she is likely to succeed on the merits because of
various alleged inadequacies in the Disclosure Statement. (Jannotta Mot. at 3-4.) Certain
of the alleged disclosure inadequacies simply reflect a misunderstanding of the Plan. For
example, the Channeling Injunction does not bar claims against the Sacklers for
claimants that did not elect to release their claims—it simply channels the claims held by
non-releasing claimants <u>against the Debtors</u> to the applicable creditor trust. (Plan § 10.8.)
The remaining subjects of Ms. Jannotta's alleged inadequacies are thoroughly disclosed.
(*See* Disclosure Statement at 12-13 (explaining that non-releasing claimants' claims will
be disputed and will not receive enhanced consideration from the Sacklers); *id.* at 299
(explaining the operation of the claim reserves); *id.* at 247-48 (explaining operation of the
Personal Injury Trust Distribution Procedures).) In any event, Ms. Jannotta did not object
to the Debtors' Disclosure Statement. Having failed to raise her concerns at that juncture,
the Court should not entertain them now—and they are, for the foregoing reasons,
entirely meritless.

[16] *See, e.g.*, June 20, 2025 Hr'g Tr. at 37:10-41:22 (Dkt. No. 7623) (addressing
Rosemary Walker's first amendment argument regarding contacting the court and
argument against attorneys' fees, advising that Ms. Walker can file anything on docket
and that other arguments will come up for a confirmation hearing where "[e]veryone
reserves their rights to be heard on the confirmation of the plan and the substance of the
plan at that time"); June 18, 2025 Hr'g Tr. at 135:18-136:14 (Dkt. No. 7635) (addressing
Maria Ecke's objection to disclosure statement, stating, "I'm certainly happy to give you
a brief opportunity to address that"); May 22, 2025 Hr'g Tr. at 57:10-59:17 (Dkt. No.
7488) (addressing Maria Ecke's objection to an extension of the preliminary injunction
and advising that members of the Official Committee are available to help unsecured
(….continued)

15

Claimants Who Have Filed Objections to the Plan Regarding Their Participation in the Hearing to Consider Confirmation of the Fifteenth Amended Chapter 11 Plan Filed by the Debtors (Dkt. No. 8202); (MBR at 30 (observing that 13 *pro se* parties were heard), 61 ("[T]he Court permitted any party to object to witness testimony and cross-examine witnesses in person").) In fact, during the Confirmation Hearing, the only person to cross-examine any witness was a *pro se* claimant. (Nov. 14, 2025 Hr'g Tr. at 82:1-8 (noting that "every single witness was made available for live cross-examination" but only a single *pro se* claimant cross-examined any witness).) As Ms. Morales herself recognizes, she was given the opportunity to object to the Plan and present argument to the Court. (Morales Mot. at 16-17.) The Stay Movants received far more process and far more opportunities to be heard than the minimum due under the Constitution.

22. Finally, the Stay Movants seek various forms of relief unrelated to confirmation or the movants' appeals therefrom. (*E.g.*, Isaacs Mot. (Dkt. No. 8342) (requesting forensic review of funds); Morales Mot. at 3, 4, 10-11 (appearing to request relief from the automatic stay); Walker Mot. (Dkt. No. 8387) at 1 (asserting that "cramdown" is not a word that appears in the Federal Rules of Bankruptcy Procedure).) These arguments are irrelevant to the movants' appeals and are accordingly unlikely to succeed on the merits.[17]

---

creditors with questions); March 28, 2025 Hr'g Tr. at 51:5-52:22 (Dkt. No. 7369) (addressing Maria Ecke's objection to mediation and advising that "[t]he mediation is not designed to be with every individual Claimant, because that's an impossibility [and] we've discussed this before").

[17] The Movants do not meaningfully engage with the applicable legal standard for obtaining the ancillary relief they seek, nor do they provide evidence demonstrating that such relief is warranted. Accordingly, the Court should deny such ancillary requests for relief.

23. Because the Stay Movants fail to show any likelihood of success on the merits of their appeals, this prong of the stay inquiry weighs strongly against imposing a stay.

### B. The Movants Fail to Establish That They Would be Irreparably Harmed Absent a Stay

24. No stay is appropriate because the movants have not demonstrated irreparable harm—the "principal prerequisite" for the issuance of a stay. *In re BGI, Inc.*, 504 B.R. at 762; *In re Sabine Oil & Gas Corp.*, 548 B.R. at 681 (same); *In re Calpine Corp.*, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008) (same). None of the movants have demonstrated the requisite harm that is "neither remote nor speculative, but actual and imminent." *In re Sabine Oil & Gas Corp.*, 548 B.R. at 681 (quoting *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 346 (S.D.N.Y. 2007)).

25. Neither Ms. Morales nor Ms. Ecke demonstrate any irreparable harm supporting a stay pending appeal. Ms. Morales explains the acute losses she will suffer from the confirmation of the Plan. The Debtors do not doubt that victims, including the movants, have suffered excruciating losses as a result of America's very real opioid crisis, but they are not consequences of the Plan and will not be mitigated by a stay. (Morales Mot. at 23-24.) Ms. Ecke does not address the four factors at all.

26. For their part, the only potential harm Ms. Isaacs and Ms. Jannotta identify is the risk of mootness if the Plan becomes effective prior to a decision on her appeal. That is insufficient. In the Second Circuit, the clear weight of the authority provides that the "risk of mootness, standing alone, does not constitute irreparable harm." *In re Sabine Oil & Gas Corp.*, 548 B.R. at 682 (citing *In re Gen. Motors Corp.*, 409 B.R. at 31 and

*Triple Net Invs. IX, LP v. DJK Residential (In re DJK Residential, LLC)*, 2008 WL
650389, at *3 (S.D.N.Y. Mar. 7, 2008)); *see also In re Mongiello*, 2024 WL 729865, at
*2 n.3 (S.D.N.Y. Feb. 22, 2024) (canvassing the law in the Second Circuit and
concluding that a majority of courts have held that the mere threat of equitable mootness
is not sufficient); *In re LATAM Airlines Grp. S.A.*, 2022 WL 2657345, at *5 (Bankr.
S.D.N.Y. July 8, 2022) ("[T]he mere threat of equitable mootness is not grounds, per se,
for granting stay relief."); *In re Windstream Holdings, Inc.*, 2020 WL 4481933, at *3
(S.D.N.Y. Aug. 3, 2020) (same); *In re Calpine Corp.*, 2008 WL 207841, at *4 (same).
Indeed, if the hypothetical threat of mootness *were* sufficient (it is not), then any litigant
could show irreparable harm, because the risk of mootness "is present in any post-
confirmation appeal of a chapter 11 plan." *In re Calpine Corp.*, 2008 WL 207841, at *4.
Ms. Isaacs and Ms. Jannotta accordingly fail to carry their burden on the irreparable harm
prong of the stay inquiry.

## C.   The Debtors and All Creditors Would Suffer Significant Harm if the Confirmation Order is Stayed

27.     Under the third prong of the analysis, the Stay Movants "must also
establish that the non-moving party or other parties will not suffer substantial harm if the
stay is granted." *See In re Adelphia*, 361 B.R. at 349; *In re 473 W. End Realty Corp.*, 507
B.R. 496, 507 (Bankr. S.D.N.Y. 2014). None of the Stay Movants even meaningfully
address this prong of the stay inquiry. Nor could any of them hope to satisfy it.

28.     Contrary to the unsupported assertions of the Stay Movants, the Debtors
provide evidence through the declaration of Jesse DelConte, attached as an exhibit hereto,
that imposing a stay of even a few months will force the Debtors and their creditors to
bear extraordinary costs, delay distributions to creditors, and withhold billions of dollars

of funds that will be dedicated to opioid remediation efforts and victim compensation.
(*See generally* Ex. A, Declaration of Jesse DelConte, dated Dec. 30, 2025 ("**DelConte Decl.**").)  The potential harm to the non-movants here is vast.

29.     Mr. DelConte's testimony provides clear evidence of the economic losses to creditors that the estates and creditors would suffer if a stay were imposed.  As the table below shows, he projects that in excess of $35 million in present value will be lost for each month of delay in implementation of the plan.  Just a three-month delay would cause in excess of $100 million in losses from delay in implementation of the Plan.  (*See* DelConte Decl. ¶ 20.)

| Hypothetical Stay Period | Total MDT Distributions Delayed through Stay Period[18] (in millions) | Net Present Value Loss of Distributions Delayed by Stay Period (in millions at 9% Discount Rate) |
|---|---|---|
| 3 Months | $  2,588.2 | $  107.6 |
| 6 Months | $  2,588.2 | $ 213.9 |
| 9 Months | $  2,588.2 | $ 319.0 |
| 12 Months | $  2,941.6 | $ 421.9 |
| 18 Months | $  2,941.6 | $ 618.1 |
| 24 Months | $  3,395.0 | $ 809.0 |

In addition to present value loss, a stay would delay the Effective Date on which the Sacklers are to make the first settlement payment of $1.5 billion.  (*See* DelConte Decl. ¶ 9.)  After years of delay from the appellate process, further loss and delay is simply unjustifiable, tremendously costly, and will cause real harm to the estates and their creditors.

---

[18] This represents the distributions that would have occurred during the hypothetical stay period absent a stay.

30.     Mr. DelConte's testimony also decisively shows that remaining in bankruptcy would pose an existential risk to the Debtors' businesses, jeopardizing their ability to make the cash contributions contemplated under the Plan.  (*See* DelConte Decl. ¶ 28.); *see also* MBR at 52 (noting that "the Debtors' current assets and projected cash generation by Knoa will enable the post-emergence Debtors to meet their annual obligations under the Plan").  Mr. DelConte observes that the uncertainty and delay introduced by a stay could interfere with critical business relationships; negatively impact retention of employees; and cause vendors to cease working with the Debtors' businesses.  (DelConte Decl. ¶ 28.))  Any decline in the Debtors' revenue could translate into less consideration under the Plan and smaller recoveries for creditors.  Settlements with various creditor parties, including the Department of Justice, would be jeopardized, and the viability of Knoa—the post-emergence entity under the Plan that will be "charged with the express purpose of addressing the opioid crisis"—would be at risk.  (MBR at 27.)

31.     This view is uniformly and passionately shared by all of the organized creditors.  On multiple occasions, in the papers and during oral argument, they articulated the need to rapidly move to the conclusion of this case. *See e.g.*, Nov. 14, 2025 Hr'g Tr. 113:10-24 ("Further delay is simply not a viable or responsible option. As has been noted, for many victims and communities, delay has very real and severe consequences each continuing day."); Ad Hoc PI Group Statement in Support of Conf. (Dkt. No. 8151 at 6) ("the Court should approve this [settlement] and allow the Debtors to implement it with all deliberate speed."); Official Committee Statement in Support of Conf. (Dkt. No. 8165 at 6) ("the Official Committee agrees with the over 99% of claimants who have said

through their votes that these cases have gone on too long, and the Plan should be
confirmed.").

32.     Accordingly, the third factor weighs—by hundreds of millions of dollars
and human lives—strongly against imposition of a stay.

### D.     The Public Interest Strongly Disfavors a Stay of the Confirmation Order

33.     The Stay Movants also largely ignore the final prong of the four-part stay
test: whether the public interest favors a stay.  Here, the public interest weighs strongly in
favor of denying the Stay Movants' requests.

34.     As an initial matter, as the Court has observed, "the public interest is in the
efficient administration of the Plan."  *In re 491 Bergen St. Corp.*, 2025 WL 1695473, at
*4 (Bankr. S.D.N.Y. June 16, 2025); *see also ePlus, Inc. v. Katz (In re Metiom, Inc.)*, 318
B.R. 263, 272 (S.D.N.Y. 2004) (same); *In re Chemtura Corp.*, 2010 WL 4638898, at *8
(Bankr. S.D.N.Y. Nov. 8, 2010) (same).  That is particularly so where, as here, "there is
no substantial possibility of success on appeal."  *In re 491 Bergen St. Corp.*, 2025 WL
1695473, at *4.

35.     Moreover, the Debtors' emergence from bankruptcy is decidedly in the
public interest because, among other things, it will yield billions of dollars in creditor
compensation, a substantial portion of which will fund opioid remediation programs.
What's more, the Debtors will reorganize as Knoa Pharma, a company singularly
dedicated to addressing the opioid crisis.  (*See* DelConte Plan Decl. ¶ 7; JX-3610 (Knoa
Operating Agreement) § 2.3; Plan § 5.4(b).)  While no bankruptcy can adequately
compensate for the types of losses incurred as a result of the opioid crisis, this
reorganization will meaningfully address the harms suffered to the extent it can, through

individual compensation and desperately needed funding for opioid remediation programs. Indeed, the uncontroverted testimony of a witness offered by the Multi-State Governmental Entities Group during the Confirmation Hearing established that "[t]he funding from the Purdue Plan is both desperately needed and will be used appropriately to abate the opioid crisis." (Kirk Lane Decl. ¶ 43.) Moreover, the plan provides for critical non-monetary relief such as the creation of a public document repository and a worldwide ban on certain Sacklers from participating in the opioid business.

36.     Allowing the Plan to go forward is plainly in the public interest. Delay, by contrast, cuts directly against the public interest. And the voting and confirmation lineup proves this to an extent likely never before manifest in a chapter 11 case. On one side are all 50 states (through their elected representatives), the federal government, thousands of municipalities, tens of thousands of voters with a 99% acceptance rate, and every organized creditor group—representatives of virtually every American several times over—versus five *pro se* individuals on the other.

## II.     The Stay Movants Fails to Establish That the Bond Requirement Should be Waived

37.     In the rare circumstances where movants have carried their burden to obtain a stay of a complex chapter 11 case pending appeal, courts have conditioned such stays on bonds sufficient to protect other creditors from the significant harm such stays would impose. Fed. R. Bankr. P. 8007(c); *see, e.g., In re Gen. Motors*, 409 B.R. at 34 ($7.4 billion bond); *In re Tribune Co.*, 477 B.R. 465, 483 (Bankr. D. Del. 2012) ($1.5 billion bond); *In re Adelphia*, 361 B.R. at 368 ($1.3 billion bond); *In re Calpine*, 2008 WL 207841, at *7 ($900 million bond). The record before the Court vividly demonstrates that a stay would greatly harm the Debtors and their creditors by delaying

and risking billions of dollars in distributions and causing potentially hundreds of millions of dollars in present value loss. (DelConte Decl. ¶ 19.)  The monetary costs of even a three-month stay would materially exceed $100 million (DelConte Decl. ¶ 20)—and that ignores the real, if less easily measured, costs of further delaying creditors' distributions.  If the Court were to grant the stay motions, the Court should condition such stay on the posting of an appropriate bond.

38.     The Debtors are mindful of the Stay Movants' *pro se* status, that several of the movants are prosecuting their appeals *in forma pauperis*, and that an appropriate bond—at least several hundred million dollars—exceeds their means.  But requiring a significant bond is not punitive.  It reflects the reality of these cases:  by demanding a stay and pursuing an appeal, movants are not engaged in a cost-free exercise to express their dissatisfaction with the legal system or Plan.  To the contrary, these appeals—and seeking a stay pending appeal—force the overwhelming majority of creditors that support the plan to bear material risks, massive costs, and potentially dire consequences that are no less real because the movants are individuals proceeding *pro se*.  In any case, because the stay motions should be denied for the reasons discussed *supra*, the Court can confidently dispose of the stay motions without reaching the issue of whether any bond should be imposed.  *See LATAM II*, 2022 WL 2811904, at *11 (denying motion to stay confirmation order pending appeal and declining to address bond arguments).

### III.    The Court Should Reject Ms. Walker's Iterative Stay Requests and Other Unrelated Requests for Relief

39.     Ms. Walker has filed [four] additional meritless stay requests since this Court rejected her initial request for a stay, which was filed "before the Court had provided its bench ruling or entered an order confirming the Plan."  MBR at 63 n.3.  In

denying Ms. Walker's stay motion, the Court observed that her pleading did "not address any of the four factors that the Court should consider in granting a motion to stay an order pending appeal." *Id.* Her iterative stay requests offer only conclusory assertions that each of the stay factors is satisfied, devoid of any legal analysis or evidentiary support.[19] (*See e.g.*, Walker Mot. (Dkt. No. 8387) at 1.) In her more recent stay motions and other pleadings[20], Ms. Walker misconstrues the Plan's exchange of consideration as an illegal "bribe" and asserts that this warrants a stay. (Walker Mot. at 1 (asserting that

_____

[19] All of the arguments advanced in Ms. Walker's additional stay motions could have been asserted in her initial stay request, which was denied by this Court. Her iterative stay requests allege no new or changed circumstances warranting a different outcome. Rather, they represent an improper attempt to get a second bite at the apple. This Court need not revisit its holdings with respect to Ms. Walker's motion—its denial of Ms. Walker's stay motion is law of the case. (MBR at 63 n.3); *see also Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) ("Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication."); *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991) ("Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation."); 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 (1981) ("Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.").

[20] In addition to her stay motions, Ms. Walker also filed a "Motion Objection to Schedule Order" (Dkt. No. 8393) 31 minutes after the deadline to object to the Court's scheduling order had passed. (*See* Notice of Presentment of Order Setting Deadlines Related to the Order Confirming the Eighteenth Amended Joint Chapter 11 Plan of Reorganization (Dkt. No. 8383 (providing that "unless a written objection to the Proposed Scheduling Order attached hereto is served and filed with proof of service with the Clerk of the Court, and a courtesy copy is delivered to the undersigned and to the chambers of the Honorable Sean H. Lane, so as to be received by December 11, 2025 at 4:00 p.m. (prevailing Eastern Time), there will not be a hearing to consider such Scheduling Order, and such Scheduling Order may be signed and entered by the Court.").) Because no objection was received by 4:00 p.m. on December 11, 2025, no hearing was held and the Court entered the scheduling order on December 11, 2025. (Dkt. No. 8394.) In any event, Ms. Walker does not provide any legal or factual basis for her requested relief.

exchange of "Sackler cash" for releases "is a bribe").)  No cause has been demonstrated

for the Court to revisit its conclusion that her stay motion should be denied.  No new

pertinent facts have come to light since Ms. Walker's prior motion, nor has there been

any intervening change in law that would warrant reconsideration.  The Court should

deny Ms. Walker's successive stay requests.

### CONCLUSION

For the reasons set forth herein, the stay motions should be denied.

Dated:   December 30, 2025
            New York, New York

DAVIS POLK & WARDWELL LLP

/s/ *Benjamin S. Kaminetzky*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Eli J. Vonnegut
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors*
*and Debtors in Possession*