**Exhibit B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

**PURDUE PHARMA L.P.,** *et al.,*
Debtors. [1]

Chapter 11

Case No. 19-23649 (SHL)

(Jointly Administered)

# DECLARATION OF JESSE DELCONTE

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

I, Jesse DelConte, pursuant to 28 U.S.C. § 1746, hereby declare as follows under penalty of perjury:

1.  I am a Partner and Managing Director of AlixPartners, LLP ("**AlixPartners**"), a corporate advisory and restructuring firm that has its principal office at 909 Third Avenue, Floor 30, New York, New York 10022 and which serves as one of the principal advisors to Purdue Pharma L.P. ("**PPLP**") and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, "**Purdue**" or the "**Debtors**"). I specialize in providing leadership to troubled and underperforming companies and advising senior executives, boards of directors, and creditors. I have over 15 years of experience working with distressed companies across numerous industries, including pharmaceuticals, retail/apparel, technology, energy, automotive, industrial and business services, and industrial manufacturing.

2.  During the more than six years that my team and I have been working with the Debtors, we have assisted management and the Debtors' other restructuring advisors on a number of different workstreams. In the course of my work, I have frequent conversations with the Debtors' employees, senior management, including Purdue Pharma's chief executive officer, chief financial officer and general counsel, board members and executive committee members. I attend regular meetings with key executives regarding the Debtors' bankruptcy process and ongoing operations and regularly join board and committee meetings. In addition, I was involved in, and assisted management and the Debtors' other restructuring advisors in connection with, the formulation of the Debtors' plan of reorganization. As a result, I am familiar with, among other things, the Debtors' operations, budgeting processes, and plan of reorganization.

1

3.  I submit this Declaration in support of the Debtors' Opposition to the motions seeking a stay pending appeal of the Court's Order Confirming the Debtors' Eighteenth Amended Plan of Reorganization (ECF Nos. 8338, 8342, 8387, 8408, 8410, 8419, and 8435) (collectively, the "**Motions to Stay**")). My testimony is based on my personal knowledge of the facts set forth below.

4.  My testimony proceeds in four sections. Section I describes the trusts established under Purdue's plan of reorganization ("**Plan**") to remediate the opioid crisis and compensate creditors, the timing and amount of payments that the Debtors' existing shareholders are obligated to make to the estates under the Shareholder Settlement Agreement (defined below) and the Incremental Shareholder Settlement Agreement (defined below); and the amount and timing of distributions of that value to creditors contemplated under the Plan. Section II identifies the distributions to creditors that might be delayed if an order staying the Confirmation Order is entered. Section III identifies the increased professional fees that would likely be incurred if an order staying the Confirmation Order is entered. Section IV describes operational risks that the Debtors' businesses (which inure to the benefit of creditors under the Plan) would likely face if an order staying the Confirmation Order is entered.

**I.   The Remediation and Personal Injury Trusts, the Shareholder Settlement Payments, and Distributions to Creditors Under the Plan**

5.  The Plan will deploy Purdue's assets to help remediate the opioid crisis. The majority of Purdue's value will be dedicated to nine trusts that, together, will fund remediation and compensation efforts. The Debtors' business assets will be transferred to a new entity, Knoa Pharma ("**Knoa**") charged with the express purpose of addressing the opioid crisis. Cash in the Debtors' estates that is not required for other purposes pursuant to the Plan will be transferred to trusts to remediate the opioid crisis and compensate creditors; and Knoa will continue its work

on medicines for opioid overdose reversal and medically assisted treatment. The value distributed under the Plan will include up to approximately $7 billion in funds that will be paid over fifteen years by the Debtors' existing shareholders pursuant to the terms settlement agreements among the Debtors, certain shareholders of the Debtors (including members of the Mortimer Sackler family and Raymond Sackler family (together, the "**Sackler Families**")), and trusts for the benefit of the Sackler Families. This value, in turn, will be transferred to the various trusts established under the Plan, in some cases as early as the Effective Date, for distribution to creditors.

### A. The Plan Establishes Creditor Trusts to Remediate the Opioid Crisis and Distribute Value to Creditors

6. The Plan establishes nine trusts to administer the distribution of value to fund opioid remediation and compensate creditors. These trusts include (1) the Master Disbursement Trust ("**MDT**"); (2) the Government Remediation Trust ("**GRT**"); (3) the Tribe Trust (together with GRT, "**Public Creditor Trusts**"); (4) the Third-Party Payor ("**TPP**") Trust; (5) the Healthcare Provider Trust; (6) the Emergency Room Physician Trust ("**ERP**") Trust (7) the PI Trust; (8) the Public School Trust (together with the TPP Trust, the Healthcare Trust, the ERP Trust, and the PI Trust, the "**Private Creditor Trusts**"); and (9) the Plan Administration Trust ("**PAT**"). GRT, the Tribe Trust, the Healthcare Provider Trust, the ERP Trust, and the Public School Trust are remediation trusts and may only make distributions for the purpose of remediation of the opioid epidemic, including abatement programs (or to pay attorneys' fees and costs) (such trusts, "**Remediation Trusts**"). (*See* 2025 Governmental Settlement Agreement, at p. 31; 2025 Bankruptcy Disclosure Statement, at pp. 95, 155–57, 167.) The PI Trust will make distributions to qualifying personal injury claimants, and the TPP Trust will make distributions,

3

based in part on the number of affected beneficiaries. (Non-NAS PI TDP § 1, NAS PI TDP § 1, TPP TDP § 5(C).)

7. In addition to the Private and Public Creditor Trusts, the Plan establishes the Master Disbursement Trust ("**MDT**"). The Master Disbursement Trust, among other things, will have the right to receive settlement payments under the terms of a settlement agreement ("**Shareholder Settlement Agreement**") among the Debtors, the Sackler Families and trusts for the benefit of the Sackler Families as set forth below in Section I.B. (Plan § 5.6(c).) MDT also will make distributions to the Creditor Trusts as set forth below in Section I.C. (*See* Plan § 5.2).

B. **The Shareholders Will Contribute $6.5 to $7 Billion in Cash Over Time**

8. As noted above, the value to be distributed to creditors will include $6.5 to $7 billion that will be paid over time by the Sackler Families (the "**Shareholder Settlement Payments**"). The Shareholder Settlement Payments include: (i) $6.5 billion in cash payments to be made directly to the MDT; and (ii) $500 million in cash payments to the MDT contingent on the net proceeds of sales of foreign independent associated companies owned by the Sackler Families exceeding a certain level.

9. The amount and timing of the Shareholder Settlement Payments will proceed according to a schedule as set forth in the Shareholder Settlement Agreement and Incremental Shareholder Settlement Agreement. The first settlement payment—totaling at least $1.5 billion—is due to be paid on the Effective Date of the Plan. (*See* Master Shareholder Settlement Agreement, Ex. M [ECF No. 7877].) The remaining shareholder settlement payments to the MDT are due to be paid over the next fifteen years according to a schedule set forth in the Shareholder Settlement Agreement. If the Effective Date is delayed, the Shareholder Settlement Agreement provides that all shareholder settlement payments will be delayed by the same period of time.

4

**C. The Creditor Trusts Will Make Distributions to Remediate the Opioid Crisis and to Compensate Creditors**

10. Distributions to claimants will be made not by MDT, but by the Creditor Trusts discussed above.

11. Each of the Creditor Trusts is charged with (i) holding, managing, and investing funds received from the Debtors and the MDT, as applicable, in each case, for the benefit of its beneficiaries; (ii) holding and maintaining the Creditor Trust Operative Reserve of such Creditor Trust; (iii) administering, processing, resolving, and liquidating Channeled Claims, including Non-Participating Channeled Claims, applicable to such Creditor Trust, in each case as provided in the applicable Creditor Trust Documents; (iv) establishing and administering the applicable Creditor Trust Non-Participating Claims Reserves; (v) establishing and administering the applicable Released Claims Reserves; and (vi) exercising rights over any proposed use of funds in the applicable Released Claims Reserve held in such Creditor Trust to the extent set forth in Exhibit N and Exhibit Z to the Master Shareholder Settlement Agreement. (*See* Plan §5.8(a)(i)-(vi).)

12. Each Creditor Trust has its own trust distribution procedures.

- The purpose of the Healthcare Provider Trust will be to (i) assume all of the Debtors' liability for the Healthcare Provider Channeled Claims, (ii) hold the MDT Healthcare Provider Claim and collect the Initial Healthcare Provider Trust Distribution, (iii) establish the Class 7 Non-Participating Claims Reserve and the Class 7 Released Claims Reserve, (iv) administer Healthcare Provider Channeled Claims, (v) hold and administer the Class 7 Non-Participating Claims Reserve on and after the Effective Date, (vi) hold the Class 7 Released Claims Reserve on and after the Effective Date, and (vii) make Distributions in accordance with the Healthcare Provider TDP. (Healthcare Provider Trust Agreement.) The Plan contemplates that the Healthcare Provider Trust will receive a total of approximately $263.5 million in distributions over time, with an initial payment of approximately $260.8 million on the Effective Date and subsequent payments in the amount specified under § 5.2(e)(iii) of the Plan.

5

- The purpose of the TPP Trust is to expressly assume sole and exclusive responsibility and liability for the Third-Party Payor Channeled Claims channeled to the TPP Trust in accordance with the Master TDP and the Plan, as well as to, among other things, hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and any additional payments due under the MDT TPP Claim or otherwise, in accordance with the Plan Documents, including the Private Entity Settlements and the TPP Trust Documents and administer, process, resolve and liquidate the Third-Party Payor Channeled Claims by making TPP Distributions to TPP Authorized Recipients as provided in the TPP Trust Documents. (TPP Trust Agreement § 2.2.) The Plan contemplates that the TPP Trust will receive a total of approximately $394.9 million in distributions over time, with an initial payment of approximately $388.9 million on the Effective Date and subsequent payments in the amounts specified under § 5.2(e)(iii) of the Plan.

- The ERP Trust is an abatement trust established to (i) assume all of the Debtors' liability for IERP II Claims and Other Channeled Claims; (ii) administer IERP II Claims and Other Channeled Claims; (iii) collect the IERP Trust II Share on account of the PPOC IERP II Claim; and (iv) make IERP Trust II Abatement Distributions to holders of Allowed IERP II Claims, in each case, in accordance with the Plan, the Confirmation Order, and the IERP Trust II Documents. (*See* ERP Trust Distribution Agreement § 1.2.) The Plan contemplates that the ERP Trust will receive a total of $5.8 million in distributions over time, with an initial payment of approximately $5.7 million on the Effective Date and subsequent payments in the amounts specified under the Plan. (Plan § 1.1)

- The Public School Trust will be established to (i) assume all liability for the Public School Channeled Claims, (ii) hold the MDT Public School District Claim and collect the Initial Public Schools Distribution and additional payments due under the MDT Public School District Claim in accordance with the Public Entity Settlements and the Public School Trust Documents (after deduction of any required payments to the Common Benefit Fund and/or in respect of attorneys' fees and expenses of the Public School District Claimants in accordance with Section 5.9(d) and (i) of the Plan), (iii) administer Public School Channeled Claims, (iv) hold and administer the Class 6 Non-Participating Claims Reserve on and after the Effective Date, (v) hold the Class 6 Released Claims Reserve on and after the Effective Date and (vi) make Distributions in accordance with the Public School TDP. (Plan § 1.1.) The Plan contemplates that the Public School Trust will receive a total of approximately $40.6 million in distributions over time, with an initial payment of approximately $25.5 million on the Effective Date and subsequent payments as specified under § 5.2(f)(ii) of the Plan.

- The purpose of the PI Trust is to (i) assume all liability for the PI Channeled Claims, (ii) hold the MDT PI Claim, collect the Initial PI Trust Distribution and any payments due under the MDT PI Claim in accordance with the Plan,

6

the Private Entity Settlements and the PI Trust Documents, (iii) administer PI Channeled Claims, (iv) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents, (v) hold and administer the Class 10(a) Non-Participating Claims Reserve and the Class 10(b) Non-Participating Claims Reserves on and after the Effective Date, (vi) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement, and (vii) carry out such other matters as are set forth in the PI Trust Documents. (Plan § 1.1). The Plan contemplates that the PI Trust will receive a total of approximately $865.8 million in distributions over time, with an initial payment of approximately $804.7 million on the Effective Date and subsequent payments as specified under § 5.2(e) of the Plan.

13. Residual funds remaining after payment of the fixed amounts required to be distributed under the Plan, including to the Private Creditor Trusts, the Public School Trust, the Plan Administration Trust and in satisfaction of obligations under the resolution approved by the Court on November 18, 2020 between PPLP and the DOJ ("**DOJ Resolution**") will go to the Public Creditor Trusts.

14. The total distribution of value from the Debtors' estates to the Public Creditor Trusts, including cash currently on the Debtors' balance sheet, residual cash from Knoa, and payments under the Shareholder Settlement Agreement, is estimated to exceed $5.3 billion over time.

   **D. Under the Plan, Purdue's Businesses Will be Operated by New Entities for the Public Benefit**

15. Under the Plan, PPLP, PPLP's general partner Purdue Pharma Inc. ("PPI"), and several of PPLP's subsidiaries[2] will cease to exist. The Debtors' businesses will be transferred to and operated by a new entity, Knoa. Knoa will be wholly owned by an independent entity intended to be treated as an exempt organization under IRC section 501(c)(4) (the

---

[2] Specifically, Rhodes Associates L.P., Rhodes Technologies, Paul Land Inc., UDF LP, SVC Pharma Inc., SVC Pharma LP, Button Land L.P., Quidnick Land L.P.

7

"**Foundation**"). No federal, state, or local governmental entity will own the equity of Knoa or the Foundation. Knoa will be a private company, and will be required to operate in a responsible manner (i.e., as the Debtors have been required to since the Petition Date), and will be subject to the same laws and regulations as any other U.S. pharmaceutical company. Knoa will, however, be historic and unique because it will be governed by a charter that will require that it deploy its assets to address the opioid crisis. As I set forth in my declaration submitted in support of confirmation of the Plan, the Plan establishes a comprehensive system of safeguards designed to ensure that Knoa will operate the Debtors' businesses for the public benefit. Knoa will be subject to covenants set forth in the proposed Order confirming the Plan. (See Plan § 5.4(b).) These covenants are designed to ensure that Knoa (i) provides all of its products, including opioids, in a safe manner that limits the risk of diversion; (ii) complies with its obligations under the settlement agreements reached among non-federal governmental entities and certain private creditor groups; (iii) pursues and implements certain public health initiatives to develop and distribute medicines to treat opioid addiction and reverse opioid overdoses ("**Public Health Initiatives**"); and (iv) otherwise operates in accordance with Knoa's purpose and takes into account long-term public health interests relating to the opioid crisis and responsible and transparent practices in management of a pharmaceutical business.

16. On the Effective Date, Knoa will receive substantially all non-cash assets of the Debtors and $135 million of unrestricted cash and cash equivalents. In broad overview, the proceeds of Knoa's business will be used to fund the Public Health Initiatives and to make distributions to the Governmental Remediation Trust, the Tribe Trust, and the Foundation. (Plan §§ 1.1, 5.4(c).)

**II.　A Stay Would Delay Distributions to Creditors Under the Plan**

17.　The result of a stay of the Confirmation Order will be a delay in the distribution of funds to the Creditor Trusts and ultimately to creditors. The total amount of funds that may be delayed will depend on the length of the stay order ("**Stay Period**").

18.　In total, it is estimated that approximately $2.6 billion would be paid to creditors on the Effective Date, assuming an Effective Date of December 31, 2025.[3] This includes an estimated $2.3 billion[4] that would be transferred from the Debtors' estates to the various creditor trusts (including in particular an estimated $821.2 million that would be distributed specifically to GRT)[5] for the purpose of funding programs and efforts to abate the opioid crisis. This also includes approximately $804.7 million that would be transferred to the PI Trust for distribution to individual personal injury claimants[6] and approximately $388.9 million that would be transferred to the TPP Trust. In addition, $250 million (consisting of the $225 million DOJ Forfeiture Payment and a $25 million payment on account of the Federal Government Unsecured

---

[3] For the purposes of this estimation and others contained in this Declaration, I have relied on the financial projections contained in the business plan forecasts provided by Purdue's management.

[4] This amount is subject to payments of professional fees as set forth in section 5.8 of the Plan.

[5] The final amount of the initial GRT distribution on the Effective Date is subject to adjustment for, among other things, year-to-date budget to actual adjustments for both operating and non-operating results, items outside of the Debtors' control, including but not limited to, higher than forecasted restructuring-related professional fees and potential cash collateral necessary to secure insurance coverage, and other adjustments.

[6] The $865.8 million excludes approximately $4 million that was advanced in 2021 pursuant to the Bankruptcy Court's order entered on September 15, 2021.

9

Claims) will be transferred to the United States on or around the Effective Date[7] and another $25 million will be transferred to the United States in subsequent payments on account of the MDT Federal Government Claim.  Generally speaking, the longer any Stay Period lasts, the longer the delay in transfer of the funds to the Creditor Trusts.  The consequence is that creditors will be delayed in utilizing the funds for remediation purposes as provided by the Plan and in receiving compensation for personal injuries.  This harm is further compounded when the future value of these payments is adjusted to present value to account for the time value of money.

19.     In July 2023, I provided testimony in support of the Debtors' opposition to the United States Trustee's Motion to Stay Mandate Pending Disposition of Petition for a Writ of Certiorari ("**2023 Declaration**"), in which I illustrated the harm caused by delaying the distribution of remediation and compensation funds.  In that declaration, my team and I calculated the total amount of distributions to the United States and to the Creditor Trusts that would have otherwise been made during six illustrative stay periods (of 3, 6, 9, 12, 18, and 24 months, respectively) assuming an Effective Date of December 31, 2023.  My team and I then calculated the present value loss of these payments due to delay caused by the various stay periods using a discount rate of 9%.  For a 24-month stay scenario, the results of this calculation showed that there would be a net present value loss of distributions of $517.9 million.

20.     As to the harm that will be created by delaying the distribution of funds further if the instant Motions to Stay are granted, my team and I have again prepared six illustrative delay scenarios based on a hypothetical Stay Period of 3 months, 6 months, 9 months, 12 months, 18 months, and 24 months, respectively, with each Stay Period beginning on an assumed effective

---

[7] Under the terms of the DOJ Resolution and the Plan, the DOJ Forfeiture Payment must be made within three business days following the entry of a judgment of conviction pursuant to the Plea Agreement.

date of December 31, 2025. As a basis for this analysis, my team and I relied on financial projections contained in the most recent business plan forecasts provided by Purdue's management. As with my 2023 Declaration, my team and I then calculated the total distributions to the United States and to the Creditor Trusts that would be made on a delayed schedule due to the delay caused by the various Stay Periods. My team and I noted that the entire $7.2 billion of distributions would be delayed under each of the hypothetical Stay Periods listed below. My team and I then calculated the present value loss of these payments due to the delay caused by the various Stay Periods using a discount rate of 9%. My team and I have used the same 9% discount rate that we used in 2023 to simplify comparison. The results of these calculations are summarized in the chart below ($ in millions):

| Hypothetical Stay Period | Total MDT Distributions Delayed through Stay Period[8] (in millions) | Net Present Value Loss of Distributions Delayed by Stay Period (in millions at 9% Discount Rate) |
|---|---|---|
| 3 Months | $ 2,588.2 | $ 107.6 |
| 6 Months | $ 2,588.2 | $ 213.9 |
| 9 Months | $ 2,588.2 | $ 319.0 |
| 12 Months | $ 2,941.6 | $ 421.9 |
| 18 Months | $ 2,941.6 | $ 618.1 |
| 24 Months | $ 3,395.0 | $ 809.0 |

21. Importantly, in calculating the present value loss of delayed distributions during each Stay Period, I have not accounted for any delays in recoveries on causes of action that MDT may pursue under the Plan, such as from potential recoveries against pre-petition insurance policies. Delays in such recoveries would have the effect of increasing the present value loss

---

[8] This represents the distributions that would have occurred during the hypothetical stay period absent a stay.

11

associated with a stay of the Confirmation Order. Therefore, the above present value loss estimates almost certainly underestimate the loss of present value that would result from delaying distribution payments during each of the hypothetical Stay Periods. For the avoidance of doubt, such present value loss calculations <u>do not include</u> other costs and losses that could be associated with a delay of distributions to creditors, including, without limitation, the human costs of a delay, any multiplier effects of abatement as discussed in the testimony of Dr. Gautam Gowrisankaran, professional fees and costs (discussed more below), and risks to the Debtors' business and the future viability of Knoa and its Public Health Initiatives (also discussed more below), among potentially many others.

### III. A Stay Would Increase the Incurrence of Professional Costs by the Estates

22. One element that will positively impact the Debtors' post-emergence financial picture is the significant decrease in assumed litigation expenses. Between September 15, 2019, the date the bankruptcy petitions were filed, and October 31, 2025, the Debtors have incurred approximately $1.3 billion in non-recurring professional fees based on the Debtors' monthly operating reports. In the event the Motions to Stay are granted, and the Debtors are unable to emerge from bankruptcy, the Estates will continue to incur professional fees in connection with the chapter 11 cases. This will include fees and costs <u>exclusive</u> of fees that would be incurred regardless of whether a stay was imposed. In other words, the Estates would continue to incur fees as a result of remaining in chapter 11 above and beyond fees incurred through, for example, litigation of creditor motions for a stay pending appeal, the appeals themselves or post-emergence planning (such incremental chapter 11 costs, "**Incremental Professional Fees**"). The total amount of Incremental Professional Fees incurred by the Estates as a result of a stay of the Confirmation Order will depend on the length of the Stay Period.

23. In my 2023 Declaration, my team and I calculated the Incremental Professional Fees that might be incurred based on a hypothetical stay period of 3 months, 6 months, 9 months, 12 months, 18 months, and 24 months, respectively, assuming a monthly run rate of $5 million. I estimated that a stay period of 18 and 24 months would incur Incremental Professional Fees of $90 million and $120 million, respectively.

24. As I noted in my 2023 Declaration, the actual amount of professional fees incurred could be higher due to the uncertainties associated with remaining in chapter 11. On December 16, 2021, the U.S. District Court vacated the bankruptcy court's 2021 confirmation order for Purdue Pharma's Chapter 11 plan. On June 27, 2024, the U.S. Supreme Court ruled in *Harrington v. Purdue Pharma L.P.* that the bankruptcy code does not authorize a Chapter 11 reorganization plan to include nonconsensual releases of claims against non-debtor third parties. It took approximately thirty months for appeals of the Twelfth Amended Plan to work their way through the court system, and during that period the Debtors incurred approximately $256.6 million in non-recurring professional fees which reflects a run rate of approximately $8.6 million per month. This higher run rate reflects the true costs incurred by the Estate due to the delay of the Effective Date of the Plan and underscores the need to avoid delaying the Effective Date of the Plan any further.

25. In calculating the Incremental Professional Fees that the Estates might be expected to incur if the Effective Date of the Plan is delayed past December 31, 2025, my team and I continue to assume a monthly run rate of $5 million. This figure is lower than the aforementioned $8.6 million monthly average for the thirty-month delay period, for each of the Debtors' legal and financial advisors, as well as the legal and financial advisors of the Debtors'

13

various other stakeholders that are retained through the Bankruptcy Court. The results of these projections are provided in the chart below ($ in millions).

| Assumed Stay Period | Projected Incremental Professional Fees Incurred During Assumed Stay Period (in millions) |
|---|---|
| 3 Months | $ 15.0 |
| 6 Months | $ 30.0 |
| 9 Months | $ 45.0 |
| 12 Months | $ 60.0 |
| 18 Months | $ 90.0 |
| 24 Months | $ 120.0 |

26.     It bears emphasis, however, that the Estates incurred on average approximately $17 million in non-recurring professional fees and costs each month during the course of these chapter 11 cases, and it is possible that, due to uncertainties of remaining in chapter 11, that the above Incremental Professional Fees projections could be significantly higher. Under the Plan, with exception of payments to the PI Trust, the TPP Trust, the DOJ, and the Initial NewCo Cash distribution (and for certain other legal fees and costs), the value of the Debtors will be transferred for the purpose of remediating the opioid crisis. Accordingly, any incremental value expended on professional fees during any Stay Period is value that otherwise would be transferred for purposes of remediation in the absence of a stay.

### IV.     A Stay Would Increase Operational and Other Risks to the Debtors' Businesses

27.     As described above, the Plan provides that PPLP will be dissolved and the Debtors' assets, including their operational businesses, will be transferred to Knoa. Knoa will then operate these businesses in a responsible manner for the benefit of creditors. Among other

things, Knoa's business will be used to fund the Public Health Initiatives and to make distributions to the Public Creditor Trusts.

28. Continuing to remain in bankruptcy could also present an existential risk to the Debtors' business and, therefore, Knoa's future viability. Throughout the pendency of the chapter 11 cases, the Debtors have continually promised their various stakeholders, such as their employees, customers and vendors, that although the timeline to emergence was long, there was a light at the end of the tunnel: the Debtors would emerge from bankruptcy and transition to their new life as a public benefit company. Based on my experience with the debtors during the prior appellate process from 2024 through 2024, the uncertainty and delay that would be introduced by a stay will risk upsetting those expectations with potentially disastrous effects on the financial viability of the Company and the ability to make the level of cash distributions contemplated in the plan. For example, customers who have continued to work with the Debtors could decide to decline to do business with the Debtors as a result of ongoing reputational or other concerns that would have been abated by emerging from chapter 11. Moreover, continuing to remain in bankruptcy could have negative consequences for morale and the retention of employees. Confirmation of the Plan and the expectation that the Debtors' assets will soon be transferred to a new operating company that will operate in the public interest would provide important finality and give employees and business partners confidence in the long-term viability of the company.

29. Moreover, operating a complicated pharmaceutical company in bankruptcy requires a significant amount of time and focus from numerous employees across the Debtors' businesses. Emergence will help relieve the pressure on the Debtors and their employees, and

15

will enable the Debtors' employees to turn their full attention to Knoa and its public health mission.

30. Finally, one central feature of Knoa, which will operate as a public benefit company, is not only that Knoa will provide cash for remediation, but also, as noted above, that it will continue to develop and bring to market three opioid overdose and rescue medications at or below cost. A stay of the Confirmation Order could jeopardize Knoa's ability to bring certain of these medicines to market at all, and could delay Knoa's ability to provide these potentially life-saving medicines at or below cost.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 30, 2025

*/s/ Jesse DelConte*
Jesse DelConte