# OPIOID BANKRUPTCY UNWIND & VICTIM RECOVERY ACT

**Section 1. Short Title.**

This Act may be cited as the "Opioid Bankruptcy Unwind & Victim Recovery Act."

**Section 2. Findings and Purpose.**

(a) Findings.

1. The opioid crisis produced catastrophic casualties and long-term harms to individuals, families, and communities.

2. A number of bankruptcy plan structures and settlements have, in practice, limited victims' access to compensation, constrained evidence routes (including affidavit deletions), and insulated non-debtors and advisers in ways that frustrate victims' rights.

3. Public reporting and filings in the record of opioid-related bankruptcies document adviser payments, transfers, and settlement mechanics that warrant coordinated forensic review.

4. Victims and surviving families require not only monetary compensation but durable medical, rehabilitative, and research infrastructure to address chronic pain syndromes and the clinical aftermath of legally prescribed opioids.

5. A narrowly tailored, forensic, and victim-governed remedial program is necessary to restore victims' claims, to preserve recoverable assets, and to prevent further dissipation of funds.

(b) Purpose. The purposes of this Act are to: (1) preserve and forensically trace potentially recoverable assets in opioid-related bankruptcy cases; (2) authorize limited, retroactive avoidance and clawback of transfers and payments that materially frustrated victims' recoveries; (3) create a Victim-Led Recovery Fund to administer compensation, treatment, and research; (4) establish a national forensic audit program and a Special Master with coordinated authority across opioid-related bankruptcy cases; and (5) recommend and facilitate legislative oversight and remedial authority where necessary.

**Explanatory Note:** This Section provides the constitutional and policy justification for narrow remedial authority and sets the scope for later sections.

**Section 3. Definitions.** For purposes of this Act:
 (1) "Covered Case" means any bankruptcy case in which the primary claims relate to opioid manufacturers, distributers, or prescribers and that were filed on or after [date] and before [date], and any related cases as the Secretary of Treasury or Attorney General may designate by rule.
 (2) "Covered Assets" means: (A) all funds, cash, or securities received, held, or ultimately attributable to settlements or distributions in Covered Cases; (B) payments to advisers or consultants (including but not limited to McKinsey & Company) that, in whole or part, were used to facilitate marketing, claims administration, or settlement design in Covered Cases; (C) transfers to non-debtors, insiders, or offshore entities that can be traced to proceeds or benefits of opioid-related operations; and (D) other determinable assets identified by forensic analysis.
 (3) "Special Master" means the national forensic officer appointed under Section 6 of this Act.
 (4) "Victim-Led Recovery Fund" means the entity established under Section 7 to administer compensation, treatment, and research for covered victims.
 (5) "Forensic Audit" means a coordinated, legally authorized tracing, imaging, and accounting of transfers, payments, and holdings related to Covered Assets.
 (6) "Victim" or "Victim Beneficiary" means any individual whose injury, death of a family member, or loss is caused in whole or in part by opioid products, as determined pursuant to the Victim-Led Recovery Fund's eligibility rules and any court proceedings.

**Explanatory Note:** These definitions narrow the Act to opioid-related bankruptcy cases and give a workable definition of recoverable assets, including adviser payments. The dates and exact designations can be tailored.

---

**Section 4. Jurisdiction, Coordination, and Preservation Authority.**
 (a) **Jurisdiction.** Notwithstanding any other provision of law, the district courts (including bankruptcy courts acting under their existing statutory authority) of the United States shall have jurisdiction to implement preservation, forensic, and avoidability measures authorized by this Act with respect to Covered Cases and Covered Assets. The district courts may coordinate with state courts in matters of common law avoidance.
 (b) **Preservation Order (Emergency).** Upon motion by the Special Master, the United States Trustee, a party in interest, or ex officio, a district court or bankruptcy court may enter an emergency preservation order freezing distributions, transfers, and disbursements from identified trust accounts, payor accounts, or distribution vehicles pending resolution of forensic questions to prevent dissipation of Covered Assets. Such an order may be entered on an ex parte basis only to the extent required to preserve assets, and must be set for expedited hearing within not more than [14] days.
 (c) **Nationwide Coordination.** The Judicial Conference and the relevant district courts and bankruptcy courts shall coordinate with the Special Master to effectuate forensic collection and preserve assets across multiple jurisdictions. Courts may adopt uniform protocols under this Act to facilitate cross-jurisdictional forensic work.

**Explanatory Note:** This section gives courts authority to act urgently and nationwide, while preserving constitutional due process (ex parte only narrowly and with quick hearing). It uses existing bankruptcy and district court jurisdiction.

---

**Section 5. Avoidance, Clawback, and Remedial Standards.**
 (a) **Limited Avoidance Authority.** In addition to existing avoidance powers under the Bankruptcy Code (11 U.S.C. §§ 544, 548, 550), for Covered Cases the court shall have authority to avoid, set aside, or claw back transfers or payments that the Special Master (or creditor standing) shows by a preponderance of the evidence:

1. Were structured, timed, or concealed for the purpose of frustrating victims' recovery; or

2. Materially contributed to the design of claims-administration procedures that effectively foreclosed victims' access to proof of their claims (for example, where adviser payments are shown to have funded processes that eliminated affidavits or hidden assets), and where the transferee knew or should reasonably have known of such purpose.

(b) **Safe Harbor — Good Faith Transferees.** Transfers shall not be avoided if the transferee proves that it acted in good faith and took for reasonably equivalent value without actual knowledge of the fraudulent purpose or concealment. The Special Master shall recommend narrow standards and the courts shall interpret "good faith" objectively.
 (c) **Priorities and Distribution of Clawed Funds.** Recovered funds shall be held in the Victim-Led Recovery Fund pending judicial determination of priorities. Recovered funds shall be allocated to (in order): (1) victim compensation and treatment programs, (2) forensic and administrative costs (including Special Master fees) insofar as the court determines equitable, and (3) other claims as the court may direct consistent with the Fund's victim-led governance and the objectives of this Act.

**Explanatory Note:** This provision borrows from existing avoidance doctrines but creates a narrow, targeted basis for avoidance tied to concealment and to facilitation of procedural foreclosures. It includes a safe harbor for innocent transferees to respect due process and commerce.

---

**Section 6. Appointment, Powers, and Duties of a National Special Master.**
 (a) **Appointment.** The Attorney General, upon petition from any district court (or the Judicial Conference), shall appoint a Special Master (or a panel of Special Masters) with national forensic authority to carry out the purposes of this Act. The Special Master shall be a recognized forensic accountant or attorney with complex bankruptcy and forensic investigation experience.
 (b) **Powers.** The Special Master shall have, as to Covered Cases and Covered Assets, the power to:

1. Issue subpoenas and requests for documents and testimony for parties and non-parties (subject to notice and appropriate judicial approval);

2. Direct forensic imaging of electronic repositories, mailboxes, servers, and financial accounts;

3. Coordinate cross-jurisdictional discovery and tracing across district and bankruptcy courts;

4. Recommend to courts the avoidance, freezing, or receivership of suspicious transfers or accounts pending final determination;

5. Prepare public, forensically validated reports summarizing findings and recommendations for remedial action; and

6. Coordinate with the Department of Justice, state attorneys general, Congressional oversight committees, and the National Institutes of Health where relevant.
 (c) **Duties.** The Special Master shall:

7. Prepare an initial forensic report to the appointing court and to Congress within [180] days of appointment identifying priority areas for recovery and any immediate asset preservation needs;

8. Provide interim public reporting of major findings and a final public report after completion of forensic tracing; and

9. Take steps to ensure protected, confidential handling of privileged materials, while providing non-privileged findings publicly.
 (d) **Funding & Fees.** Reasonable fees of the Special Master may be paid from preserved funds or by congressional appropriation; the Special Master shall submit a budget and an estimate of costs which the court or Congress may approve.

**Explanatory Note:** The Special Master is the engine of forensic inquiries and must have subpoena power, cross-jurisdictional authority, and transparent reporting obligations. Protections for privilege are included.

---

**Section 7. Victim-Led Recovery Fund and Governance.**
 (a) **Establishment.** The Victim-Led Recovery Fund ("the Fund") shall be established as a nonprofit corporation governed by an independent board the majority of whose seats shall be held by victim representatives selected by a transparent process. The Fund shall receive recovered assets, disgorged adviser payments, and other preserved funds for the benefit of victims. The Fund is subject to court oversight and audit.

 (b) **Board Composition & Governance.** The Fund's board shall include: (1) a majority of victim representatives chosen by an open, verifiable selection process; (2) independent public-health experts; (3) an ethics officer; and (4) representatives of victim-led community organizations. No more than two board seats may be held by corporate or professional adviser representatives. The Fund shall adopt transparent bylaws, financial controls, and an annual reporting regime.
 (c) **Priority Uses.** Recovered assets shall be used for: (1) compensation to victims prioritized by medical need and loss; (2) medically supervised detoxification and multi-disciplinary pain management programs; (3) NIH-partnered research and the victim-led registry (see Section 8); (4) clinician training and anti-stigma programs; (5) administrative and forensic costs as determined by the court; and (6) other survivor-centered services. The Fund must adopt policies to ensure equitable distribution, geographic access, and annual reporting.
 (d) **Court Oversight & Remedies.** Distribution from the Fund shall occur under the court's oversight to ensure fairness and compliance with applicable law. Courts retain power to remedy any misallocation or breach of fiduciary duty by the Fund.

**Explanatory Note:** The Fund is victim-governed to avoid professional capture. The majority-victim board is an essential reform to governance.

---

**Section 8. NIH Research Program & Victim Registry.**
 (a) **Research Program.** Congress urges and, to the extent able, directs the Secretary of HHS and the Director of NIH to establish and fund a longitudinal research initiative: the "Opioid Prescription Aftermath & Chronic Pain Syndromes Program" (the Program). The Program shall: (1) establish a nationwide victim-led registry; (2) fund multicenter clinical research into chronic pain syndromes post-prescription opioid exposure; (3) develop clinical guidance for safe tapering, detoxification, and management of severe pain episodes; (4) fund clinician-training initiatives and telehealth access; and (5) coordinate with the Victim-Led Recovery Fund for clinical service delivery.
 (b) **Registry & Governance.** The registry shall be victim-centered, require informed consent, include data-use safeguards and IRB oversight, and be governed by a board with victim-majority representation. De-identified data shall be shared for research following appropriate privacy protections.
 (c) **Transition Mechanism.** If NIH funding is not immediately available, the Special Master shall work with the Victim-Led Recovery Fund and HHS to stand up an initial pilot program using preserved funds pending federal funding.

**Explanatory Note:** This creates a public-health remedy linked to the statutory halt/unwind. It avoids medical mandates; instead it requests NIH action and provides an interim mechanism.

---

**Section 9. Interim Emergency and Transitional Provisions.**
 (a) **Immediate Freeze.** Upon enactment, the Attorney General or any affected party may file in

the district court a request for an emergency nationwide preservation order. The court shall favor preservation where the Special Master shows a credible risk of dissipation.
 (b) **Sunset; Review.** The emergency preservation authority is subject to judicial review, and the court shall periodically review the Special Master's budget and scope. The Secretary and Congress shall review progress and may extend or modify this Act's application.
 (c) **Statute of Limitations.** For causes of action under this Act (avoidance and rescission of Covered Asset transfers), the statute of limitations shall be tolled from the date of enactment until [180] days after the Special Master's final report, except where already governed by applicable bankruptcy law.

**Explanatory Note:** This provides an emergency mechanism and a reasonable tolling provision to permit forensic work.

---

**Section 10. Interaction With Bankruptcy Code and Constitutional Protections; Safe Harbors.**
 (a) **Bankruptcy Code Conserved.** Nothing in this Act shall be construed to abridge the substantive protections of the Bankruptcy Code except as explicitly provided; the Act supplements existing avoidance remedies and coordinates national action.
 (b) **Constitutional Protections.** All actions under this Act shall be subject to constitutional due process and Takings Clause constraints; courts must provide notice and an opportunity to be heard when property rights are affected.
 (c) **Safe Harbor for Good-Faith Claims.** The court shall not avoid transfers where transferees in good faith and for value can show absence of knowledge and no material facilitation of concealment. The Special Master and the courts shall promulgate narrow rules defining "good faith" in the context of this Act.

**Explanatory Note:** Guardrails to respect constitutional limits and existing law.

---

**Section 11. Transparency, Reporting & Oversight.**
 The Special Master shall file interim reports to the appointing court and to Congress. The Victim-Led Recovery Fund shall publish annual audited financial statements and distribute an annual report on program outcomes, with privacy protections for individuals. Congress shall establish oversight hearings within 180 days of the Special Master's initial report.

**Section 12. Enforcement, Penalties, & Criminal Referral.**
 Courts may impose civil contempt sanctions for violations of preservation orders. Where forensic findings suggest willful obstruction, falsification of evidence, or other criminal activity, the Special Master or court shall refer matters to the Department of Justice for criminal investigation and prosecution.

**Section 13. Appropriations.**
 Congress shall appropriate such sums as necessary to carry out the activities under Sections 6

and 8, including funding the Special Master, the forensic audits, and initial NIH pilot grants. Recovered funds may be used to reimburse reasonable forensic costs subject to court approval.

**Section 14. Severability.**

 If any provision of this Act or its application is held invalid, the remainder shall not be affected.

**Section 15. Effective Date.**

 This Act takes effect upon enactment; emergency preservation authority shall be effective immediately.

---

# Implementation Guidance & Rationale (Short)

1. **Narrowness and Constitutionality.** The Act is carefully limited to opioid-related bankruptcy cases and to "Covered Assets" that can be forensically traced. Avoidance authority is rooted in existing Bankruptcy Code doctrines and augmented only to the extent needed to recover assets used to frustrate victims' rights. A good-faith safe harbor reduces risk of unconstitutional retroactivity claims against innocent transferees.

2. **Special Master as National Coordinator.** Appointing a Special Master avoids the jurisdictional paralysis of multiple local actions and ensures uniform forensic methods, standards for evidence, and public reports. Judicial appointment gives the Special Master subpoena power and a clear chain of accountability.

3. **Victim-Led Governance.** The majority-victim board of the Fund prevents professional capture and ensures recovery funds address medical, rehabilitative, and compensatory necessities. Court oversight preserves fiduciary accountability.

4. **NIH Partnership.** NIH/CDC participation anchors the medical remedy in science and provides a national research approach to chronic pain syndromes and the aftermath of prescribed opioid exposure. Victim-led governance is emphasized in clinical as well as legal remedy.

5. **Temporary & Tailored Unwind.** The Act is not a blanket "shut down" of bankruptcy; it authorizes targeted unwind and clawback where forensic evidence supports recovery, and it reserves to courts the exercise of discretion to balance harms.