**Exhibit D**

**Opening Consolidated Brief filed by Ellen Isaacs**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Chapter 11
Case No. 25-CV-10427(xxx)3

on appeal from SDNY 19-23649(shl)

**Ellen Isaacs, Pro Se — Appellant**
v.
**Purdue Pharma L.P., et al., Apellees**

# Opening Consolidated Brief

By: Ellen Isaacs, Pro Se Appellant
Dated: February 3, 2026

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT — A CONSTITUTIONAL FIVE-ALARM FIRE (AND A PROCEDURAL VOLCANO)........................................................................................................ 7

II. IN MEMORY OF PATRICK "RYAN" WROBLEWSKI………………………………………….. 8

III. JURISDICTIONAL STATEMENT……………………………………………………………….. 9

IV. ISSUES PRESENTED……………………………………………………………………………….. 10

V. STATEMENT OF THE CASE………………………………………………...………………. 17

VI. STATEMENT OF FACTS……………………………………………………………………………. 18

A. The Affidavit Amputation………………………………………………………………………... 18

B. Engineered Notice & Impossibility to Cure……………………………………………………… 18

C. Technological Failures & Pro Se Silencing……………………………………………………. 18

D. Structural Capture & Ethical Alarms…………………………………………………………… 18

E. Human Impact / Victim Testimony — Patrick "Ryan" Wroblewski…………………………………. 18

1. The Aftermath of "Overcorrection" and the Marginalization of Living Victims…………………….. 19

2. Appellant's Attestation Regarding Medical History and Consequences………………………………19

F. Mediation Exclusion of Pro Se Parties……………………………………………………………...19

VII. SUPPLEMENTAL ALLEGATIONS & AMPLIFIED EVIDENCE………………………………..20

A. Congressional & Nationwide Significance — Fact Sheet & Timeline………………………………..20

B. McKinsey & Company — Public Record and Relevance……………………………………………..20

VIII. ARGUMENT……………………………………………………………………………………….21

Overview…………………………………………………………………………………………………21

A. Fifth Amendment Procedural Due Process — The Amputation of Affidavit Proof…………………..21

B. Section 1127 — Same-Day Material Modification……23

C. Mullane — Notice That Makes Cure Impossible Is No Notice……24

D. Harrington — The Supreme Court's Ruling and Its Post-Harrington Relevance……25

E. Structural Error & Appearance of Impropriety — No Harmless Cure……26

F. Fifth Amendment Equal Protection — Structural Disparity……27

G. Marginalization as Constitutional Harm……27

H. Volcanic Failure to Adjudicate the Motion to Dismiss — Blew the Top Off, Cast Ash Across the Veil, and Sent the Proceeding Beyond Return……28

I. Seventh Amendment & Stern — Jury Rights Cannot Be Engineered Away……29

J. §1112(b) — Cause, Bad Faith, and Dismissal……30

K. Bankruptcy Rules, Good Faith, Fraudulent Transfers, and Professional Payments……31

L. Cumulative Error & Remedy……32

IX. RELIEF REQUESTED……33

A. Immediate Relief — Reversal, Vacatur, Remand……33

B. Nationwide Preservation, Stay, and Forensic Audit……33

C. Appointment of a National Special Master (Scope & Powers)……34

D. Forensic Asset Tracing and Clawback (Advisers, Offshore Transfers)……34

E. NIH Research Program; Victim-Led Registry and Clinical Initiative……34

F. McKinsey Priority & Expedited Disclosure……35

G. Mediation Remedies and Production of Mediation Record……35

H. Judicial-Conduct Referral, Preservation & Interim Relief……35

I. Immediate Interim Relief (Freeze, Special Master, Expedited Subpoenas)……36

X. CONCLUSION — HUMAN CHARGE……36

CERTIFICATE OF COMPLIANCE & SERVICE……37

FOOTNOTES & RECORD LOCATORS……37

# TABLE OF AUTHORITIES

## Cases

Bagwell v. Am. Century Prods., Inc., 512 U.S. 821 (1994)

Bolling v. Sharpe, 347 U.S. 497 (1954)

Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009)

Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989)

Harrington v. Purdue Pharma L.P., 144 S. Ct. 2078 (2024)

Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982)

Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1 (1978)

Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306 (1950)

Murchison v. Pennsylvania, 349 U.S. 133 (1955)

Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982)

Stern v. Marshall, 564 U.S. 462 (2011)

Tumey v. Ohio, 273 U.S. 510 (1927)

## Statutes & Rules

11 U.S.C. § 1112(b) (cause for dismissal or conversion)

11 U.S.C. § 1127 (plan modification)

11 U.S.C. § 1129(a)(3) (good faith requirement)

11 U.S.C. § 1129(a)(7) (best interests test / creditor priority)

11 U.S.C. §§ 544, 548, 550 (avoidance and recovery of fraudulent transfers)

28 U.S.C. § 158(a)(1) (district court jurisdiction of bankruptcy appeals)

28 U.S.C. § 455(a) (judicial disqualification)

Judicial Conduct and Disability Act, 28 U.S.C. §§ 351–364

Fed. R. Bankr. P. 2002 (notice)

Fed. R. Bankr. P. 7065 (incorporates Fed. R. Civ. P. 65 for TRO/PI)

Fed. R. Bankr. P. 9019 (compromise and settlement approval)

## Record Materials & Court Orders (select / representative)

Joint Motion for Appointment of PI/TPP Claims Administrators and Authorization of PI/TPP Claims Procedures, Dkt. 7310 (Mar. 19, 2025) (In re Purdue Pharma L.P.)

Order Authorizing PI/TPP Administration, Dkt. 7382 (Apr. 15, 2025) (In re Purdue Pharma L.P.)

Modified Bench Ruling Confirming the 18th Amended Plan, Doc. 8270 (In re Purdue Pharma L.P.)

Appellant's Second Amended Objection and Addendum (Ellen Isaacs) (record locators: Second Amended Objection / Addendum)

Appellant's Fact Sheet and Purdue Pharma Timeline (record locators: Fact Sheet; Timeline)

Appellant's Emergency Motion; Motion to Dismiss under 11 U.S.C. § 1112(b); Emergency Hearing Request — Dkts. 7972, 8002, 8085, 8088, 8089 (Oct. 23–24, 2025) (bankruptcy docket)

Confirmation Hearing Transcripts (Nov. 2025) — technology / pro se participation excerpts (record locator: confirmation transcripts)

PI Trust deficiency notices and mailing logs (dated Oct. 10–15; received Oct. 27–31) —

claim-administration record (record locator: claim-administration materials)

Prime Clerk / Kroll distribution records and trust accounting (trust distribution logs) (record locator: distribution records)

McKinsey public docket and public reporting regarding advisory engagements and payments (public McKinsey docket materials)

## Other Authorities & Authorities on Procedure / Policy

Judicial Conduct and Disability Act (procedures and authority for judicial-conduct complaints), 28 U.S.C. §§ 351–364

Federal contempt authority (civil & criminal contempt doctrines and standards)

NIH and CDC research guidance on registries and multicenter clinical research (administrative guidance — relevant to proposed NIH research program)

Model legislative framework: proposed "Opioid Bankruptcy Unwind & Victim Recovery Act" (Appendix / statutory proposal submitted with brief.

## I. PRELIMINARY STATEMENT — A CONSTITUTIONAL FIVE-ALARM FIRE (AND A PROCEDURAL VOLCANO)

**This is a Constitutional Five-Alarm Fire.** The record reveals a tribunal's administrative machinery weaponized to purge the only practicable routes of proof for thousands of grieving families and then to declare the system whole. The Supreme Court itself undercut the foundation of an earlier confirmation: on **June 27, 2024**, in *Harrington v. Purdue Pharma L.P.*, the Court reversed the prior confirmation insofar as it purported to insulate non-debtors. That decision must guide the review of every subsequent plan modification, procedure, and claims-administration device adopted in the wake of *Harrington*. [1]

The Debtors and the Unsecured Creditors' Committee filed the Joint Motion to implement PI/TPP claims procedures on **March 19, 2025 (Dkt. 7310)**; the Court heard the Motion **April 10, 2025**; and the operative Order was entered **April 15, 2025 (Dkt. 7382)**. [2] The implemented regime, however, completed a document-centric claims machine that — in implementation — **eliminated the affidavit pathway** relied upon by grieving families whose medical and pharmacy records had been lawfully destroyed. This removal was not disclosed as a contemplated material change; it was effectuated across the administrative veil in a manner that extinguished claimants' ability to be heard.

Most egregiously, **Judge Lane refused to hear Appellant's fully-briefed Emergency Motion and §1112(b) Motion to Dismiss** — filings docketed as **Dkts. 7972, 8002, 8085, 8088, 8089** (Oct. 23–24, 2025) — and then confirmed the Plan while those dispositive challenges remained unresolved. That refusal **blew the top off the process, cast ash across the veil, and sent the**

**proceeding beyond return**: a procedural eruption that buried Appellant's principal defenses and converted finality into a legal fiction. [12]

Appellant therefore seeks relief the Constitution and equity demand: reversal of the affidavit-elimination effects; vacatur of Plan provisions dependent on that modification; remand for plenary Article III proceedings (or a neutral tribunal) with restoration of affidavit remedies (or suitable substitutes); preservation of assets; appointment of an independent Special Master with national forensic powers; expedited forensic tracing and clawback of recoverable assets (including adviser payments); referral to DOJ, OIG, and Congressional committees; and a recommendation that Congress enact narrowly tailored remedial legislation to unwind and remedy systemic defects. The Court must act to restore the law and justice to those wronged. [3]

---

**II. IN MEMORY OF PATRICK "RYAN" WROBLEWSKI**

Patrick "Ryan" Wroblewski (Apr. 3, 1985 — Nov. 1, 2018) was a son, father, brother, master carpenter, and a man whose life mattered beyond any docket. Ryan's life and death are the human heart of this appeal. [5]

Appellant has been **double-whammied**: she lost her son and she continues to live with permanent physical harm arising from lawful prescription and a violent, protracted detoxification beginning circa 1999–2001, a physical and psychological injury she bears daily. Because her claims arise from a period in which medical and pharmaceutical records have been destroyed by ordinary retention rules, affidavits were the only practicable path to proof. The court's

implemented architecture removed that path and thereby silenced both the deceased's narrative and the living mother's enduring pain. [6]

This fight is for Ryan and for the living — the many who endure chronic, daily pain yet find the medical system, and now the claims process, indifferent to their suffering. The confirmation hearing on **November 12, 2025** followed the seventh anniversary of Ryan's death and crystallizes the urgency of remedial action. [11]

---

**III. JURISDICTIONAL STATEMENT**

This Court has jurisdiction under 28 U.S.C. § 158(a)(1) to hear appeals from final orders of the Bankruptcy Court. The Joint Motion (Dkt. 7310), the April 10 hearing, and the April 15 Order (Dkt. 7382) produced the operative claims framework and materially determined claimants' evidentiary rights; Appellant timely appealed. [2]

---

## IV. ISSUES PRESENTED

1. **Whether the Bankruptcy Court's effective excision of affidavit-based proof — implemented by orders and claim-administration mechanics adopted on April 15, 2025 (Dkt. 7382) after the Joint Motion of March 19, 2025 (Dkt. 7310) — violated Appellant's Fifth Amendment procedural-due-process rights by depriving her of notice and a meaningful opportunity to be heard, where (a) affidavits were the only practicable evidentiary route for many claimants whose records had been destroyed, (b) the change was implemented without individualized findings or a disclosed plan modification, and (c) the implementation operated retroactively and catastrophically to extinguish reliance rights?**

   *Why this matters / legal hook:* Due process requires notice reasonably calculated and an opportunity to be heard before the State (or its tribunals) deprives a person of a protected interest. *Mullane v. Central Hanover Bank & Trust Co.*, *Logan v. Zimmerman Brush Co.*, and *Memphis Light* supply the governing standards. The record shows the affidavit pathway was effectively removed in implementation, with no process for individualized consideration and no reasonable notice that would allow archival record retrieval or alternative proof — a deprivation that is systemic, retroactive, and irreparable. (See Joint Motion Dkt. 7310; Apr. 15 Order Dkt. 7382; confirmation transcripts; affidavit-excision evidence.)

2. **Whether the April 15, 2025 implementation of the PI/TPP regime (and any resulting operational elimination of affidavits) constituted an impermissible, material modification of the Plan in violation of 11 U.S.C. § 1127 because it substantively altered claimants' substantive rights and was effectuated without the notice,**

**hearing, and opportunity to object that §1127 requires?**

*Why this matters / legal hook:* §1127 protects parties against post-confirmation or pre-confirmation substantive changes that materially affect their rights without statutory process. The elimination of the affidavit mechanism is a substantive evidentiary change that altered the nature of claims; legal precedent (e.g., *In re Dow Corning*) requires disclosure and objection opportunities for material modifications.

3. **Whether the PI Trust's mailing and notice practices — including deficiency notices dated Oct. 10–15 that were not received until Oct. 27–31, 2025 — and the resulting compression of cure periods (from 30 days into approximately 9–11 business days) violated *Mullane* by making performance or cure practically impossible and therefore rendered any subsequent confirmation and releases constitutionally defective?**

   *Why this matters / legal hook: Mullane* requires notice "reasonably calculated" to reach interested parties so they may present objections or cure defects. Where notice is intentionally or negligently timed so that cure is impossible, due process is violated. The record's mail logs and timing evidence show acute prejudice to archival claimants.

4. **Whether the Plan's opt-in release architecture and the coercive claims-administration mechanics adopted post-*Harrington* fail the Supreme Court's *Harrington* standard because they effectuate non-debtor releases without genuine, informed, and uncoerced consent — particularly where the consent environment was precluded by affidavit elimination, compressed cures, and material concealment of adviser payments and assets?** *Why this matters / legalhook: Harrington* (June 27, 2024) forbids broad non-debtor releases absent genuine consent. Where the procedure

surrounding opt-in releases is coercive — by removing claimants' only practicable proof method and obscuring asset architecture — "consent" is legally hollow and the releases should be invalidated.

5. **Whether Appellant's Fifth Amendment equal-protection interest was violated by the structure of plan implementation and claims administration that produced systemic disparity between institutional creditors (who retained counsel, records, and bargaining power) and individual, pro se, grieving, or medically marginalized claimants (who were deprived of affidavits, given compressed cure windows, and excluded from mediation)?**

   *Why this matters / legal hook:* The Fifth Amendment's equal-protection component constrains federal action. Structural design that predictably burdens one class (individual victims dependent on lost records and affidavits) while favoring institutions transgresses equal-treatment principles and supports relief.

6. **Whether the Bankruptcy Court's failure to adjudicate Appellant's fully-briefed dispositive motions (Appellant's Emergency Motion and §1112(b) Motion to Dismiss, docketed Oct. 23–24, 2025 as Dkts. 7972, 8002, 8085, 8088, 8089) prior to confirmation — and the Court's decision to confirm while those motions remained pending — constitutes a "volcanic" procedural failure amounting to structural error that renders the confirmation void *ab initio* or, alternatively, warrants vacatur and remand for plenary adjudication?**

   *Why this matters / legal hook:* A court cannot confirm a plan while dispositive challenges to the plan's legitimacy campe unadjudicated. Where motions attack fraud, bad faith, and jurisdictional defects — and where confirmation proceeds notwithstanding

— the failure is structural, non-harmless, and may render confirmation void. The record supports a finding that the court's omission deprived Appellant of her fundamental adjudicative rights.

7. **Whether the 16-month mediation process that preceded confirmation — during which pro se claimants were excluded from meaningful participation or afforded only cursory, second-hand access to sessions, drafts, and supporting data — violated the fairness requirements of Federal Rule of Bankruptcy Procedure 9019 and constitutional due process by producing a compromise negotiated without parity of access and thereby producing an unfair, non-consensual result?**

   *Why this matters / legal hook:* Rule 9019 requires fairness in compromise; Mullane and related due-process cases require meaningful opportunity to participate. Systematic exclusion from mediation of those whose rights are directly affected fatally undermines fairness and vitiates any compromise outcome that depended on that mediation.

8. **Whether the Plan, the confirmation, and the order(s) at issue transgress Article III and Seventh Amendment limits — including *Northern Pipeline*, *Granfinanciera*, and *Stern* — by effectively extinguishing state-law tort claims and jury rights through a claims-administration process that deprives claimants of the factual record and procedural mechanisms necessary to vindicate jury-eligible rights in Article III courts?**

   *Why this matters / legal hook:* Article III and Seventh Amendment doctrine constrain bankruptcy adjudicatory power with respect to common-law torts and jury rights. By foreclosing the factual development needed for Article III adjudication (e.g., by

eliminating affidavits), the confirmation risks unconstitutionally usurping jury-determinative functions.

9. **Whether the Plan and its implementation — including allocations and priority decisions — were proposed and effectuated in bad faith or in a manner that violates the "good faith" and creditor-priority mandates of Chapter 11 (11 U.S.C. § 1129(a)(3), § 1129(a)(7)), by advantaging governmental and institutional payees at the expense of individual victims who were procedurally silenced?**

   *Why this matters / legal hook:* Section 1129 requires good faith and protection of creditors' best interests. A pre-committed allocation that structurally subordinates victims while insulating non-debtors and professionals may breach the statutory good-faith and fair-treatment requirements.

10. **Whether the record supports causes for avoidance, disgorgement, and clawback under the avoidance provisions of the Bankruptcy Code (11 U.S.C. §§ 544, 548, 550) and allied state-law fraudulent-transfer doctrines, including whether adviser payments (e.g., payments to McKinsey & Company) or other transfers were structured or timed to frustrate creditors and warrant recovery and turnover?**

    *Why this matters / legal hook:* The Second Amended Objection and public reporting identify adviser payments, offshore transfers, and potential concealment (~$10.8B alleged). Statutory avoidance provides a lawful means to recover assets for victims if transfers were fraudulent or preferential; immediate forensic tracing is essential to determine recoverable funds.

11. **Whether the professional fees, consultant payments, and adviser engagements (including McKinsey & Company) that participated in marketing, claims**

**architecture, or settlement design are subject to equitable disgorgement or turnover where those payments materially facilitated concealment of assets, design of coercive claims procedures, or unjust enrichment?**

*Why this matters / legal hook:* Equitable doctrines permit disgorgement where payments further unjust enrichment or materially aided the creation of deceptive or coercive architectures. The public McKinsey docket and Appellant's filings suggest such facilitation, supporting tracing and remedial relief.

12. **Whether the cumulative effect of the procedural errors, suppression of pro se participation, affidavit excision, late-mailing schemes, adviser concealment, and judicial non-adjudication constitutes structural bias or an appearance of impropriety under 28 U.S.C. § 455 that requires disqualification or vacatur because impartial adjudication was compromised?**

    *Why this matters / legal hook:* §455 and structural-error doctrines address actual or apparent partiality. The convergence of personnel movements, post-bench employment, exclusion of pro se parties, and unexplained process choices creates a reasonable basis to question impartiality and to seek structural remedies.

13. **Whether Appellant is entitled to broad equitable relief — including appointment of a national Special Master with authority to conduct a coordinated forensic audit, a limited nationwide stay of opioid-bankruptcy distributions to preserve recoverable assets, and a judicial recommendation that Congress enact narrow remedial legislation (an "Opioid Bankruptcy Unwind & Victim Recovery Act") to enable coordinated clawback and the transfer of recovered assets to a victim-led recovery fund — in light of the record's national scope and the inadequacy of piecemeal local**

**remedies?**

*Why this matters / legal hook:* Where the record depicts nationwide patterns of concealment and process design that render local relief inadequate, courts may harness equitable powers (11 U.S.C. § 105), appoint neutral fact-finders, stay distributions, and recommend legislative solutions. This issue asks the Court to exercise its broad remedial discretion to preserve victims' rights and to recommend systemic correction.

14. **Whether Appellant's Fifth and (to the extent state actors are implicated) Fourteenth Amendment protections for bodily integrity and access to courts were violated by a process that simultaneously tightened clinical care options (physician opt-out, Medicare constraints) and eliminated the only practicable legal routes for vindication — thereby compounding constitutional harms and justifying structural, medical, and legal remediation?**

    *Why this matters / legal hook:* The Fifth Amendment protects procedural fairness in federal adjudications; where federal process compounds medical abandonment and injures bodily integrity, the constitutional calculus requires remediation. To the extent state actors (e.g., state Medicaid agencies, state pharmacy records) materially participated in the record destruction or regulatory shifts, parallel Fourteenth Amendment concerns may arise.

15. **Whether the failure to preserve the mediation record, the claim-administration logs, bank and wire transfer records, and adviser invoices — and the absence of an immediate preservation order — creates imminent risk that (a) recoverable assets will be dissipated, and (b) meaningful appellate relief will become moot, thereby justifying immediate emergency preservation, forensic imaging, and appointment of**

**a forensic Special Master?**

*Why this matters / legal hook:* The availability of effective relief depends on evidence and assets; courts routinely enter preservation orders where evidence or assets are endangered. The record supports immediate preservation as necessary to maintain the Court's remedial capacity.

(As in the Table of Contents; issues 1–12, including additional statutory and Rule issues and the pivotal issue whether confirmation is void *ab initio* because of the refusal to adjudicate dispositive motions.) [3][7][12]

---

**V. STATEMENT OF THE CASE**

*(Expanded, with chronology.)* After Judge Drain's original confirmation (2021) and the Supreme Court's *Harrington* reversal (June 27, 2024), Debtors and committees restructured settlement and claims mechanics. The March 19, 2025 Motion (Dkt. 7310), the April 10 hearing, and the April 15 Order (Dkt. 7382) implemented a regime that, in practice, excised affidavit remedies. Over the following months, mediators and plan proponents engaged in a 16-month mediation culminating in the Plan. The mediation record shows systemic exclusion of pro se claimants from meaningful participation — denied parity of access to sessions, settlement drafts, and supporting data — preventing them from discovering the affidavit excision and related mechanisms. Meanwhile Appellant filed fully-briefed dispositive motions (Emergency Motion and §1112(b) Motion) and requested an emergency hearing on Oct. 23–24, 2025 (Dkts. 7972,

Case 7:25-cv-09648-NSR Document 40 Filed 02/03/26 Page 19 of 53

8002, 8085, 8088, 8089). Judge Lane refused to adjudicate those motions prior to confirmation and the Plan was confirmed while those dispositive challenges remained pending. The refusal is a procedural eruption that materially denied Appellant due process and must be treated as structural error. [2][12][FN-MEDREC]

---

**VI. STATEMENT OF FACTS**

A. **The Affidavit Amputation.** Affidavits were the only practicable route for many victims whose medical records were destroyed. The implemented PI/TPP regime eliminated the functional efficacy of affidavits without any disclosed or reasoned basis. [2]

B. **Engineered Notice & Impossibility to Cure.** Notices dated Oct. 10–15 were not received until Oct. 27–31, rendering cure practically impossible for archival records and violating *Mullane*. [7]

C. **Technological Failures & Pro Se Silencing.** Confirmation transcripts reveal inability to see or hear pro se litigants and systematic truncation of their participation. [8]

D. **Structural Capture & Ethical Alarms.** The Second Amended Objection documents revolving-door movements, professional facilitation, post-bench employment, and indications of capture. [3][11]

E. **Human Impact / Victim Testimony.** Ryan's story and Ellen's injury (from lawful prescription and violent detoxification) are recounted with sworn detail. Appellant's reliance on affidavits was compelled by destroyed records. [5][6]

1. **Aftermath of Overcorrection.** Policy shifts created living victims abandoned by the medical system and the claims process.

2. **Appellant's Attestation Regarding Medical History and Consequences.** Appellant attests that after decades of stable care a change in PCP and medication protocol upended her stability. For over three years she has endured daily severe pain and anxiety; she has exhausted hospital and clinic options and reports that clinicians — constrained by Medicare reimbursement rules, regulatory pressures, and liability concerns — have opted out of Medicare, restricted practice, or retired rather than treat patients with histories of prescription-related dependence. Appellant further attests that friends and colleagues, unable to obtain competent, humane care for relentless pain, have committed suicide. These sworn facts demand medical and research remedies alongside legal relief. [FN-MED2]

F. **Mediation Exclusion of Pro Se Parties.** Over 16 months of mediation, pro se participants were excluded from meaningful participation; this exclusion prevented discovery of affidavit excision and converted mediation into a mechanism that furthered concealment and procedural foreclosure. This exclusion is independently fatal to any fairness finding under Rule 9019 and to the confirmation's constitutional legitimacy. [FN-MEDREC]

## VII. SUPPLEMENTAL ALLEGATIONS & AMPLIFIED EVIDENCE

Appellant's Second Amended Objection documents a three-decade timeline, regulatory capture metrics (≈500% quota increase; ~600 FDA recusals), alleged concealment of approximately $10.8 billion, and adviser involvement. These facts supply the evidentiary predicate for forensic tracing, avoidance, and clawback. [3]

A. **Congressional & Nationwide Significance.** The Fact Sheet and Timeline document the national scope and the need for legislative correction. [6]

B. **McKinsey & Company — Public Record and Relevance.** Public filings show McKinsey's advisory role to opioid manufacturers and subsequent compensation. The McKinsey public docket contains materials directly relevant to adviser payments and plan design; the Court should prioritize the McKinsey record for expedited forensic review and disclosure. [9]

C. **Public Accountability; Judicial-Conduct Referral.** The combined record — *Harrington*, mediation exclusion, affidavit deletion, late mailing trap, and Judge Lane's refusal to adjudicate dispositive motions — gives rise to substantial concerns about adjudicative integrity. Appellant requests preservation and referral to the Circuit Judicial Council and DOJ/OIG for independent review. [FN-JUD2]

## VIII. ARGUMENT

### OVERVIEW

**The confirmation of the Plan and the claims-administration mechanics implemented on April 15, 2025 produced a cluster of interlocking legal defects that are constitutional, statutory, and equitable. The April 15 regime (a) implemented an evidentiary architecture that in practice excised affidavits — the only practicable means for many victims to prove aged claims after records were destroyed; (b) compressed cure and notice into impossibility by late mailings; (c) excluded pro se claimants from 16 months of mediation where plan mechanics were negotiated; and (d) concluded with confirmation while fully-briefed dispositive motions remained pending unadjudicated. In combination these defects are structural, non-harmless, and require reversal, vacatur, remand, forensic tracing, appointment of a Special Master with national authority, preservation of assets, and referral to investigative and legislative authorities. Each defect independently would justify relief; together they are fatal. [2][3][7][12]**

### A. FIFTH AMENDMENT PROCEDURAL DUE PROCESS — THE AMPUTATION OF AFFIDAVIT PROOF

**Legal standard. Procedural due process requires notice and a meaningful opportunity to be heard "at a meaningful time and in a meaningful manner."** ***Mullane v. Central Hanover***

***Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 16 (1978). When an adjudicative process functions as the sole forum for vindicating legally cognizable interests, the court must afford a procedure that actually permits vindication of those interests. When an implemented evidence rule extinguishes the only practicable method to prove a claim, the deprivation is not merely procedural — it is effectively a substantive bar to constitutionally adequate process.**

**Application to the record. Appellant's personal injuries and wrongful-death claims arise from conduct and clinical treatment occurring in the 1999–2001 timeframe, when ordinary medical and pharmacy record retention policies have resulted in destruction or unavailability of primary documentary proof. In that circumstance affidavits — sworn, corroborated witness proof — were the only practical route to prove causation and damages. The Joint Motion (Mar. 19, 2025) and the April 15 Order (Dkt. 7382) implemented a claims architecture premised on documentary proof.[2] Yet, and crucially, in implementation the affidavit pathway was deleted in practice: the operative rules as applied eliminated affidavits as a viable route of proof for many claimants. There is no record of individualized hearings or findings supporting a blanket exclusion of affidavit proof, and affected claimants received no notice calibrated to permit them to vindicate their rights by acquiring substitute evidence or seeking timely relief.[2][3]**

**The constitutionally dispositive facts are these: (1) Appellant had a protected interest in having her claims heard and proved; (2) the affidavit route was the only practicable means for many victims to prove claims; (3) the implemented mechanics eliminated that route without notice or individualized consideration; and (4) the elimination was retroactive in**

**consequence and irreparably prejudicial. Under *Mullane* and *Logan*, such a deprivation is unconstitutional. The Court must therefore reverse the portion of the April 15 implementation that eliminated affidavit proof, or (at minimum) vacate and remand for a process that restores an affidavit or equivalent remedial mechanism. [2][3]**

**Remedy. Restoration of an affidavit pathway (or an equivalent assisted-evidence regime), remand for individual consideration where appropriate, and a Court directive that the Special Master (or a neutral tribunal) implement procedures that permit aged-claim proof consistent with due process.**

---

**B. SECTION 1127 — SAME-DAY MATERIAL MODIFICATION**

**Legal standard. Section 1127 and related case law require that plan amendments that materially affect parties' rights be effectuated with statutory protections: disclosure, an opportunity to object, and a process to evaluate material modifications. *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002).**

**Application to the record. The affidavit pathway is not a technical rule; it is a substantive evidentiary mechanism by which claimants establish entitlement. The effective deletion of affidavits — accomplished not by transparent plan amendment but by implementation choices that occurred across the administrative veil — was in substance a material modification of claim handling. It was implemented without the notice protections of §1127 and without meaningful opportunity to object. That procedural posture violates §1127's**

**protections and, for the same reasons that counsel for reversible constitutional error in Part A, requires vacatur. [2][7]**

**Remedy. Vacatur of any portions of the Plan or confirmation that depends on the contested modification and remand for §1127–compliant procedures (notice, opportunity to object, and adjudication).**

---

**C. MULLANE — NOTICE THAT MAKES CURE IMPOSSIBLE IS NO NOTICE**

**Legal standard. Notice must be "reasonably calculated" to reach interested parties so they may act; notice that renders compliance or cure practically impossible is constitutionally defective. *Mullane*, 339 U.S. at 314; *Memphis Light*, 436 U.S. at 16.**

**Application to the record. The Trust's mailings dated Oct. 10–15 that were not delivered until Oct. 27–31 materially undermined any realistic ability to produce archival documentation. For records that routinely require state subpoenas, FOIA requests, or other months-long retrievals, a nine- or ten-day cure period is practically impossible. The combination of affidavit elimination and compressed cure timelines converted notice into an instrument of exclusion. *Mullane* is fatal to any claim that this was constitutionally adequate notice. [7]**

**Remedy. Vacatur or remand for *Mullane*-compliant notice: issuance of new deficiency and cure notices, extended cure windows calibrated to archival realities (60–180 days), and a renewed opportunity for affidavit proof or assisted-evidence procedures.**

**D. HARRINGTON — THE SUPREME COURT'S RULING AND POST-HARRINGTON SCRUTINY**

**Legal standard. *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2078 (2024), reiterates that bankruptcy courts may not effectuate broad non-debtor releases absent genuine, informed consent and that the bankruptcy process cannot be used as a vehicle to extinguish third-party liability without lawful authority.**

**Application to the record. The Plan mechanics implemented after *Harrington* — the opt-in design, the document-centric adjudication healthily excluding affidavits, and the compressed cure notices — must be scrutinized under *Harrington*'s mandate. Where consent is solicited in an environment deliberately or negligently designed so that claimants cannot meaningfully evaluate or prosecute their claims, any purported consent is legally hollow. The post-*Harrington* context also raises an inference of heightened risk that the later devices were intended to reproduce disallowed outcomes by procedural artifice; the Court should apply heightened skepticism and remedial relief accordingly. [1][3]**

**Remedy. Set aside non-debtor releases obtained under these coercive conditions; at minimum, remand the matter for counsel-supervised reconsent or for Article III adjudication of third-party liability where consent cannot be shown to be genuine.**

**E. STRUCTURAL ERROR & APPEARANCE OF IMPROPRIETY**

**Legal standard. Structural defects — those defects that affect the framework within which the trial proceeds and not merely trial error — demand automatic reversal. See *Tumey v. Ohio*, 273 U.S. 510 (1927); *Murchison v. Pennsylvania*, 349 U.S. 133 (1955). An appearance of partiality that would create reasonable doubt about impartial adjudication likewise necessitates disqualification under 28 U.S.C. § 455(a) and may require vacatur. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009).**

**Application to the record. The record demonstrates multiple structural red flags: (1) revolving-door personnel movements and post-bench employment of actors connected to the plan architecture; (2) extended mediation that excluded pro se parties; (3) in-implementation elimination of affidavit pathways; (4) late-mailing manipulations that rendered cure impossible; and (5) Judge Lane's refusal to adjudicate fully-briefed dispositive motions prior to confirmation. Collectively these facts give rise to a reasonable appearance that the adjudicative environment was tainted by partiality or by processes that undermined impartial adjudication. Under §455 and structural-error precedent, such a confluence compels vacatur and remand to a neutral tribunal. [11][12][FN-MEDREC]**

**Remedy. Vacatur of confirmation; remand for proceedings before an Article III tribunal or a different, unconflicted bankruptcy judge; immediate preservation and referral to the Judicial Council for independent review.**

**F. FIFTH AMENDMENT EQUAL PROTECTION — STRUCTURAL DISPARITY**

**Legal standard. The Fifth Amendment's due process clause includes an equal-protection component applicable to federal actions. *Bolling v. Sharpe*, 347 U.S. 497 (1954). Structural arrangements that systematically discriminate among similarly situated claimants in a way that lacks a rational basis or adequate justification can violate equal protection.**

**Application to the record. The Plan architecture predictably privileges institutional claimants — who retain counsel, records, and bargaining power — while simultaneously dispossessing individual victims whose only practicable proof route was affidavits. Because the Plan's administrative design created that predictable structural disparity without legitimate justification, the Fifth Amendment's equal-protection guarantees are implicated. Even under rational-basis review the structural deprivation lacks adequate justification given the centrality of human dignity and finality interests the Code seeks to protect. [7]**

**Remedy. Structural relief designed to restore parity: restoration of affidavit/assisted-evidence mechanisms, Mullane-compliant notice, and allocation adjustments ensuring that individual victims have parity in proof and in access to compensation and medical treatment.**

---

**G. MARGINALIZATION AS CONSTITUTIONAL HARM**

**Legal standard and rationale. Constitutional protections for bodily integrity, access to courts, and equal treatment require courts to consider not just discrete procedural errors but the compounded effect of process upon a vulnerable class. Procedures that**

**simultaneously deprive claimants of their evidentiary route and leave them medically marginalized aggravate constitutional injury and support structural remedies.**

**Application to the record. Appellant's sworn attestation (and the Fact Sheet/Timeline) documents the lived reality of those chronically injured after lawful prescription: clinicians reluctant to treat, physicians leaving Medicare panels, deficient protocols for detox and chronic pain, and community despair (including suicides). When the claims process strips the legal voice of these living victims, the constitutional harm is compounded: the State and the court system have, by action or omission, both denied medical relief and closed off legal remedies. This concurrence of medical abandonment and procedural exclusion elevates the constitutional stakes and supports remedial actions that integrate medical and legal relief (e.g., NIH program, victim-led fund). [6][FN-MED2]**

**Remedy. Court-ordered medical remediation: allocation of preserved/recovered funds to medically supervised detoxification, multi-disciplinary pain management, clinician training, and a victim-led governance mechanism to distribute clinical services and compensation.**

---

**H. VOLCANIC FAILURE TO ADJUDICATE THE MOTION TO DISMISS — BLEW THE TOP OFF, CAST ASH ACROSS THE VEIL, AND SENT THE PROCEEDING BEYOND RETURN**

**Legal standard. Courts must adjudicate dispositive motions that challenge the core legitimacy of a proceeding before final disposition in a manner that protects parties' due**

process rights. When confirmation proceeds over fully-briefed dispositive objections that, if sustained, would obstruct confirmation, the failure is structural.

Application to the record. Appellant filed fully-briefed motions (Emergency Motion and §1112(b) Motion) and requested an emergency hearing (Dkts. 7972, 8002, 8085, 8088, 8089). The Bankruptcy Court did not adjudicate those motions prior to confirmation. This omission cannot be tolerated as a mere calendaring error: the motions attacked fraud, bad faith, and structural defects that would have defeated confirmation. The Court's confirmation in the face of a live, fully-briefed attack destroyed the adversary testing necessary for legitimate disposition and therefore renders confirmation void or voidable as a matter of structural error. [12]

Remedy. Vacatur and remand for adjudication of the pending dispositive motions. In light of the structural impact, the Court should treat the failure as structural error non-susceptible to harmlessness.

---

## I. SEVENTH AMENDMENT & *STERN* — ARTICLE III/JURY RIGHTS

Legal standard. The Seventh Amendment and *Stern* / *Granfinanciera* protect jury rights and Article III adjudication. The bankruptcy court's power to finally adjudicate state-law tort claims is limited; where the process deprives claimants of the factual development necessary to vindicate jury rights, the confirmation cannot stand.

Application to the record. By eliminating affidavits and rendering evidentiary development practically impossible, the Plan foreclosed pathways by which claimants could develop the

**factual record necessary for Article III adjudication and jury trial. *Stern* and *Granfinanciera* counsel that bankruptcy processes may not be used to extinguish jury rights in this manner. The result is a constitutionally suspect confirmation. [12]**

**Remedy. Vacatur and remand with explicit instructions preserving claimants' rights to Article III adjudication or to meaningful jury trial alternatives.**

---

**J. SECTION 1112(b) — CAUSE, BAD FAITH, AND DISMISSAL**

**Legal standard. Section 1112(b) authorizes dismissal for cause, including gross mismanagement or conduct contrary to the bankruptcy laws, and courts routinely dismiss where the bankruptcy process is abused. See 11 U.S.C. § 1112(b).**

**Application to the record. The Second Amended Objection documents concealment of assets, adviser facilitation, and process engineering that converted bankruptcy into a shield for non-debtors while depriving victims of compensation and process. Those factual allegations, if credited, establish cause for dismissal or conversion (or in the alternative, remedial measures including appointment of a Special Master and clawback authority). [3]**

**Remedy. At minimum, remand for full hearing under §1112(b) and appointment of an independent officer (Special Master or trustee) to investigate and protect creditors' rights; if the facts warrant, dismissal or conversion as the equitable remedy**

---

**K. BANKRUPTCY RULES, GOOD FAITH, FRAUDULENT TRANSFERS, AND PROFESSIONAL PAYMENTS**

**Legal standard. Rule 2002 requires adequate notice; Rule 9019 requires fairness in compromises; §§544, 548, and 550 empower avoidance and turnover of fraudulent transfers; §1129(a)(3)/(a)(7) requires good faith and protection of creditor interests.**

**Application to the record. The late mailing scheme violates Rule 2002 and *Mullane*; exclusion of pro se parties from mediation violates the fairness inquiry of Rule 9019; the Plan's allocation and optics raise §1129 good-faith issues; and allegations of adviser payments and structured transfers (including payments to McKinsey) create a prima facie case for avoidance and clawback under §§544/548/550. The combined statutory and Rule defects justify remedial measures: forensic tracing, disgorgement of adviser fees, and clawback to a victim-led fund. [7][8][9][13]**

**Remedy. Immediate forensic subpoenas and production, appointment of Special Master, preservation of funds, and a proceeding to adjudicate avoidance/clawback claims; disgorgement and equitable distribution of recovered assets to victims.**

**L. CUMULATIVE ERROR & REMEDY**

**Doctrine. Courts assess whether errors are individually and cumulatively harmless. Structural or repeated error that undercuts the fundamental fairness of a proceeding requires reversal. See *Tumey/Murchison/Caperton*.**

**Application. The individual defects — affidavit excision, *Mullane* defect, mediation exclusion, judicial non-adjudication, adviser concealment — are each serious; together they create a synergistic collapse of the bankruptcy adjudicative apparatus. No single remedial tweak will suffice. A comprehensive remedial program is mandated: reversal and vacatur of affected Plan provisions; remand to Article III or neutral tribunal; appointment of a national Special Master with forensic and subpoena power; worldwide preservation and freezing of distributions pending tracing; expedited avoidance proceedings; referral to DOJ/OIG and the Circuit Judicial Council; and an explicit recommendation that Congress enact narrowly tailored remedial authority to facilitate coordinated clawback and the creation of a victim-led recovery fund. [FN-CLOS]**

## IX. RELIEF REQUESTED

Appellant respectfully requests the following relief:

### A. Immediate Relief — Reversal, Vacatur, and Remand

Reverse the April 15, 2025 affidavit elimination and vacate Plan provisions dependent on that change; Remand for proceedings before a neutral Article III tribunal with directions to restore affidavit-related routes (or equivalents) and Mullane-compliant notice. [2][3]

### B. Nationwide Preservation, Stay, and Forensic Audit

Enter a limited **nationwide preservation order** (stay) temporarily enjoining distributions, transfers, or dissipation from any trust, TopCo, payor, or distribution account that would materially impair recovery of Covered Assets; direct preservation of mediation records, claim administration logs, deficiency mailings, trustee accounting, bank/wire records, and adviser invoices pending forensic sampling and coordinated audit. The record (Second Amended Objection and Addendum) establishes imminent risk of dissipation and concealment. [3][FN-PRES]

### C. Appointment of a National Special Master (Scope & Powers)

Appoint (or recommend appointment of) a Special Master with national forensic authority to: (a) collect and image documentary and electronic evidence; (b) trace

transfers, adviser payments and offshore movements; (c) issue expedited subpoenas; (d) recommend receiverships or temporary custodial measures; and (e) produce a public forensic accounting and interim reports to the Court, DOJ, and Congress. The Special Master should have authority to coordinate forensic work across opioid bankruptcy cases and to recommend temporary asset preservation protocols. [FN-SM]

**D. Forensic Asset Tracing & Clawback (Advisers, Offshore Transfers)**

Require immediate disclosure of adviser invoices, engagement letters, and payments (including payments to McKinsey), and treat adviser payments as potential Covered Assets subject to tracing and clawback under §§ 544, 548, 550 where documentary or forensic evidence supports recovery. [9][13]

**E. NIH Research Program; Victim-Led Registry & Clinical Initiative**

Preserve and allocate recovered or preserved funds to establish an NIH-partnered "Opioid Prescription Aftermath & Chronic Pain Syndromes Program" with a victim-led registry, IRB oversight, multi-center clinical research, physician training, and local clinical access; if immediate NIH action is infeasible, direct the Special Master to stand up pilot services via a victim-led nonprofit pending NIH funding. This remedy addresses the living victims' medical abandonment and injuries identified in the record and Appellant's attestation. [FN-NIH]

**F. McKinsey Priority & Expedited Disclosure**

As above, prioritize the McKinsey public docket and require disclosure to the Special Master of any non-privileged communications and payments showing transfers to or from McKinsey and opioid manufacturers or Sackler-related entities. [9]

**G. Mediation Remedies & Production of Mediation Record**

Order production of the full mediation record (session notes, drafts, emails, and supporting data), vacate Plan provisions agreed in mediation sessions that excluded pro se parties, and remand for renewed, court-supervised, inclusive mediation or Article III adjudication with parity for pro se participants. [FN-MEDREC]

**H. Judicial-Conduct Referral & Preservation**

Preserve the full documentary and transactional record and refer the matter to the Circuit Judicial Council under the Judicial Conduct and Disability Act (28 U.S.C. §§ 351–364) and to DOJ/OIG for independent inquiry into the extraordinary judicial inaction and any potential criminal conduct revealed by the record. [FN-JUD2]

**I. Immediate Interim Relief**

Enter a TRO-style interim order freezing distributions and transfers, compelling imaging and preservation, appointing a Special Master, and granting expedited subpoena authority. [FN-PRES][FN-SM]

**X. CONCLUSION — HUMAN CHARGE**

The record in this appeal presents a constitutional emergency: a process that, in the aggregate, extinguished victims' routes to be heard and permitted the dissipation and concealment of value that should have been devoted to victims. The Court should not permit administrative artifice or professional facilitation to harden into impunity. Reversal, vacatur, remand, forensic discovery, appointment of a national Special Master, a victim-led NIH research program, a nationwide preservation/stay, and prompt referral to Congress and enforcement authorities are required. The People deserve a forensically validated accounting and — where the record supports it — an unwinding, clawback, and restoration of assets to a victim-governed recovery fund. [FN-CLOS]

Respectfully submitted,

/s/ Ellen Isaacs

Ellen Isaacs, Pro Se Appellant

(on behalf of the Estate of Patrick Ryan Wroblewski and Family)

**CERTIFICATE OF COMPLIANCE & SERVICE**

Prepared in Times New Roman 12-pt, double spaced, 1-inch margins; drafted to fit within forty (40) double-spaced pages when formatted as instructed. I hereby certify that a true and correct copy of this brief has been served in accordance with ECF rules on all parties of record.

Dated: February 3, 2025

/s/ Ellen Isaacs

---

**FOOTNOTES & RECORD LOCATORS**

1. *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2078 (2024).

2. Joint Motion for Appointment of PI/TPP Claims Administrators and Authorization of PI/TPP Claims Procedures, Dkt. 7310 (Mar. 19, 2025); Order Authorizing PI/TPP Administration, Dkt. 7382 (Apr. 15, 2025). (Record locators: see docket.)

3. Appellant's Second Amended Objection and Addendum (documenting alleged concealment, professional facilitation, and process engineering); Appellant's Fact Sheet and Timeline (record locators: submitted materials).

4. Doc. 8270, Modified Bench Ruling Confirming the 18th Amended Plan (In re Purdue Pharma L.P.).

5. “Remembering Patrick ‘Ryan’ Wroblewski” — Appellant’s memorial narrative and sworn account (filed by Ellen Isaacs).

6. Appellant’s Purdue Pharma Fact Sheet and Timeline.

7. Confirmation hearing transcripts and claim-administration materials documenting deficiency notices (dated Oct. 10–15 but received Oct. 27–31) and related claim procedures.

8. Confirmation hearing transcripts (Nov. 2025) reflecting technological limitations and pro se participation issues.

9. Documentary and public reporting showing McKinsey & Company’s advisory work and related payments; public McKinsey docket materials.

10. Reserved.

11. Record evidence of revolving-door movements, post-bench employment, and personnel transitions creating an appearance of impropriety; Appellant’s Second Amended Objection and Fact Sheet.

12. Appellant’s Emergency Motion, §1112(b) Motion to Dismiss, and Emergency Hearing Request (Dkts. 7972, 8002, 8085, 8088, 8089) (Oct. 23–24, 2025). The record shows

these motions were fully briefed and pending at confirmation and that the Bankruptcy Court did not adjudicate them before confirming the Plan.

[FN-MEDREC] Mediation record and correspondence showing pro se requests for parity of participation (on file).

[FN-MED2] Appellant's attestation describing medication change, clinical deterioration, clinician opt-out from Medicare, exhausted care options, and suicides among acquaintances (sworn memorial, on file).

[FN-SM] Special Master: proposed scope and powers described in Relief Requested.

[FN-PRES] Preservation request: freeze on distributions and imaging/forensic holds as described.

[FN-NIH] Proposed NIH Program: "Opioid Prescription Aftermath & Chronic Pain Syndromes Program."

[FN-JUD2] Judicial Conduct and Disability Act, 28 U.S.C. §§ 351–364; 28 U.S.C. § 455(a).

**PURDUE PHARMA BANKRUPTCY FACT SHEET**

**Ellen Isaacs - Mother of Patrick "Ryan" Wroblewski (d. 11/1/2018)**

**THE CRISIS BY THE NUMBERS**

📊 **NATIONAL IMPACT**:

- **500,000+** Americans dead from opioid overdoses since 1999

- **$1.5 trillion+** economic cost to the United States

-**Millions** of families destroyed

- **30 years** of regulatory failures across 6 presidential administrations

💰 **FINANCIAL SCOPE**:

- **$6+ billion** Sackler family settlement originally proposed

- **$10+ billion** in total opioid settlements nationwide

- **Billions** potentially misallocated to government intermediaries instead of victims

- **Unknown billions** in Sackler assets potentially shielded from accountability

**KEY EVENTS REQUIRING INVESTIGATION**

🏛️ **JUDICIAL CONCERNS**

**Judge Robert Drain**:

- Approved controversial bankruptcy plan (Sept 2021)

- Plan granted Sackler family broad immunity from lawsuits **Joined Skadden, Arps, Slate, Meagher & Flom** - the same firm representing theSacklers in criminal proceedings

**Judge Shelley Chapman**:
- Also departed SDNY bench around same timeframe

❓ **Questions**:

- Were employment discussions happening during the case?

- Were departures coordinated as the settlement unraveled?

- Are there judicial ethics violations?

🏥 **REGULATORY FAILURES (1995-Present)**

**1995 - FDA Approval of OxyContin**:

- FDA official Curtis Wright involved in approval process

- Wright subsequently employed by Purdue Pharma

- Unusual approval circumstances warrant scrutiny

**Six Presidential Administrations with Apparent Failures**:

1. Clinton (1993-2001)

2. Bush (2001-2009)

3. Obama (2009-2017)

4. Trump (2017-2021)

5. Biden (2021-2025)

6. Current Administration (2025)

**AGENCIES WITH APPARENT CONFLICTS OF INTEREST**

**Federal Level**:

✓ Food and Drug Administration (FDA)

✓ Drug Enforcement Administration (DEA)

✓ Department of Health and Human Services (HHS)

✓ Centers for Medicare & Medicaid Services

✓ Federal Insurance Office

-✓ Members of Congress, Senate, House of Representatives

**State/Local Level**:

✓ State attorneys general offices

✓ County governments

✓ Municipal entities

✓ Various tribunals

**Pattern**: Government entities receiving settlement funds may have conflicts between victim justice and revenue generation.

**UPCOMING CRITICAL DATE**

**November 12, 2025 - Confirmation Hearing**

- New bankruptcy restructuring plan to be confirmed

- Follows Supreme Court reversal of original plan

**Concerns about new plan**:

- Continued misallocation of funds

- Government intermediaries maintaining control

- Lack of victim oversight

- Inadequate accountability measures

**November 1, 2025 - 7th Anniversary**

- Patrick "**Ryan**" Wroblewski's death Ellen Isaacs continues fight for justice despite recovering from major surgery

**ELLEN ISAACS' QUALIFICATIONS**

**35 Years of Legal & Fraud Detection Experience**:

Case 7:25-cv-09682-NSR Document 94 Filed 02/03/26 Page 4 of 63

- Pro se litigant handling complex cases

- Mortgage underwriting (front-end fraud detection)

- Forensic mortgage fraud investigations (post-2007/2008 crisis)

- Document analysis and pattern recognition

- **7 years** investigating systems that failed her son

**DEMANDS**

🔍 **INVESTIGATIONS REQUESTED**:

1. **Department of Justice** - corruption and conflicts of interest

2. **Congressional Oversight Committees** - regulatory failures

3. **State Attorneys General** - local government conflicts

4. **Judicial Conference of the United States** - judicial ethics

5. **Inspector General Offices** - FDA, DEA, HHS, CMS

6. 💡 **PROPOSED SOLUTION**:

**VICTIM-LED FOUNDATION** with direct control over:

- All Purdue Pharma bankruptcy funds

- Future Sackler asset clawbacks

- Related opioid settlement funds

**Foundation Priorities**:

✓ Treatment and recovery services

✓ Research into addiction and pain alternatives

✓ Direct support for harmed families

Case 7:25-cv-09682-NSR Document 41 Filed 12/02/26 Page 45 of 53

✓ Prevention and education programs

**Rationale**: 30 years of government oversight = 30 years of failure. Victims must control the solution.

**THE BOTTOM LINE**

"**Government agencies and intermediaries have had 30 years to address this crisis, and hundreds of thousands of Americans have died. Victims and their families must have direct control over how these funds are used. Not one more death. Not one more family destroyed**."

Ellen Isaacs, mother of Patrick "Ryan" Wroblewski

**DOCUMENTATION AVAILABLE**

- Detailed timeline of events (1995-2025)

- Legal filings prepared for submission

- Analysis of bankruptcy proceedings

- Pattern documentation across agencies

- Supporting evidence from public records - **Much of the underlying facts are already documented in**:

- **Published books on Purdue Pharma**

**Pharma**: Greed, Lies and the Poisoning of America (Gerald Posner)

**Unsettled** (Ryan Hampton)

**Empire of Pain** (Patrick Radden) Keefe)

**Dopesick** (Beth Macy)

**Pain Killer** (Barry Meier)

- Investigative journalism: New York Times, Washington Post, The Guardian, NPR, KFF

- Documentary series:

Hulu's **Dopesick** (Danny Strong, Producer

Netflix's **Painkiller**

- Court documents and public records

**Ellen's contribution**: Connecting the dots across 30 years of systemic failure.

**CONTACT**

**Ellen Isaacs**
Weidman, Michigan
Advocate for opioid crisis victims
Mother of Patrick "Ryan" Wroblewski (1985-2018)
ryansopc@gmail.com

**Mission**: Justice, accountability, and victim-led solutions to end 30 years of corruption and prevent future deaths.

"**I made a promise to my son the last night I saw him alive. I promised to find out why this happened and to make sure no other parent has to experience this pain.Despite my own health challenges, I will not rest until every party responsible is held accountable**".

**PURDUE PHARMA BANKRUPTCY TIMELINE**

**Critical Events Warranting Investigation**

Prepared by: Ellen Isaacs, Weidman, MI

Date: October 26, 2025

**PERSONAL TRAGEDY**

November 1, 2018

Patrick "Ryan" Wroblewski dies from opioid-related harm, leaving behind his daughter Raven and his mother Ellen Isaacs, who promises to find answers and accountability.

**REGULATORY FAILURES (1995-2025)**

****1995****

FDA approves OxyContin under unusual circumstances:
- FDA official Curtis Wright participates in approval process
- Wright subsequently leaves FDA and joins Purdue Pharma
- This pattern raises questions about conflicts of interest at the regulatory level

****1995-2025 (30 Years)****

The opioid crisis escalates across six presidential administrations (Clinton, Bush, Centers for Medicare & Medicaid Services
- Federal Insurance Office
- State, county, and municipal oversight bodies

**BANKRUPTCY PROCEEDINGS BEGIN**

****September 2019****

Purdue Pharma files for Chapter 11 bankruptcy protection in the Southern District of New York, assigned to Judge Robert Drain.

****2019-2021****

Judge Drain oversees complex bankruptcy proceedings involving:
- Thousands of victim claimants
- State and local governments

- Federal agencies
- The Sackler family's liability and assets

**CONTROVERSIAL SETTLEMENT APPROVED**

****September 2021****

Judge Robert Drain approves bankruptcy plan granting:

- Broad immunity to the Sackler family from future civil litigation

- Release from liability for non-bankrupt third parties

- Settlement structure that victims' advocates immediately challenge as unjust

**Key concern**: Billions in Sackler family assets potentially shielded while victims receive minimal compensation.

**APPEALS AND LEGAL CHALLENGES**

****2022-2023****

**Multiple appeals filed challenging**:

F Third-party releases protecting the Sacklers

- Adequacy of victim compensation

- Process and fairness of bankruptcy proceedings

**SUPREME COURT INTERVENES**

****June 27, 2024****

U.S. Supreme Court rules in *Harrington v. Purdue Pharma L.P. and Ellen Isaacs v. Purdue Pharma:

**REVERSES** Judge Drain's approval** of the bankruptcy plan
- Holds that bankruptcy courts cannot grant immunity to non-bankrupt parties (the Sacklers) without consent of affected parties

- Major victory for victims' advocates

- Sends case back for restructuring

**SUSPICIOUS JUDICIAL DEPARTURES**

****April 2024**** (Shortly after Supreme Court arguments, before ruling)

**Judge Robert Drain**:
- Departs from the Southern District of New York federal bench

- Joins **Skadden, Arps, Slate, Maegher, and Flom as counsel**.

**Skadden Arps represents the Sackler family in the criminal proceedings related to Purdue Pharma**

**Timeline Questions**:

- Why did Judge Drain leave the bench just as his signature ruling was being overturned?

- Was his employment at Skadden Arps arranged before or after the Supreme Court arguments?

- Did he have discussions with Skadden Arps while still presiding over the case?
- Were there any judicial ethics violations?

****2024**** (Similar timeframe)

**Judge Shelley Chapman** also departs the SDNY bench.

**Questions raised**:
- Were these departures coordinated?

- Were both judges aware the Supreme Court would reverse the plan?

- Did either judge have knowledge that influenced their timing?

**CURRENT PROCEEDINGS**

****October 2025****

New bankruptcy restructuring plan developed following Supreme Court reversal.

**November 1, 2025** Seventh anniversary of Ryan Wroblewski's death.

**CONFIRMATION HEARING** is scheduled for **November 12, 2025** on the Thirteenth revised Purdue Pharma bankruptcy plan.

**Key concerns about new plan**:

- Potential for continued misallocation of billions in settlement funds

- Lack of victim control over fund distribution

- Government intermediaries with conflicts of interest maintaining control

7- Inadequate accountability measures

**PATTERN OF CONCERNS SPANNING 30 YEARS**

Six Presidential Administrations:

1. Clinton (1993-2001) - OxyContin approved 1995

2. Bush (2001-2009) - Crisis escalates

3. Obama (2009-2017) - Crisis intensifies

4. Trump (2017-2021) - Emergency declarations, but continued failures

5. Biden (2021-2025) - Bankruptcy proceedings

6. Current Administration (2025) -

**Confirmation hearing pending**

**Consistent Failures Across All Administrations:**

- Inadequate FDA oversight and approval processes

- DEA enforcement failures

- HHS policy failures

- Medicare/Medicaid fraud and billing issues

- Federal Insurance Office conflicts

- State and local government prioritization of settlement funds over victim justice

**ELLEN ISAACS' ADVOCACY TIMELINE**

**November 1, 2018 - Present**

Seven years of investigation using:

- 35 years of experience as pro se litigant

- Mortgage fraud detection expertise (pre-2008 crisis)

- Forensic investigation skills (post-2008 crisis)

- Document analysis across bankruptcy filings

****2024-2025****

**Despite recovering from major surgery, Ellen Isaacs:**

- Prepares legal filings

- Analyzes bankruptcy documents

- Connects patterns across agencies

- Advocates for victim-led accountability

**DEMANDS FOR INVESTIGATION**

**Agencies that should investigate**:

- **Department of Justice - conflicts of interest, potential corruption**

- **Congressional Oversight Committees - regulatory failures**

- State Attorneys General - local government conflicts

- Judicial Conference of the United States - judicial ethics (Drain, Chapman)

- Inspector General offices for: FDA, DEA, HHS, CMS

- Government Accountability Office - fund allocation and mismanagement

**PROPOSED SOLUTION**

**Victim-Led Foundation** with full control over:

- All bankruptcy settlement funds

- Future clawbacks from Sackler assets

- Related opioid settlement funds

- Distribution priorities:

- Treatment and recovery services

- Research into addiction and pain alternatives

- Direct family support

- Prevention and education

**Rationale**: 30 years of government control has resulted in 30 years of failure. **Victims must lead the solution.**

**KEY QUESTIONS DEMANDING ANSWERS**

1. What was the timeline of Judge Drain's employment discussions with Skadden Arps?

2. Were there judicial ethics violations in the original bankruptcy approval?

3. Why did Judge Chapman also depart at the same time?

4. How much money has been misallocated from opioid settlements?

5. Which government officials have conflicts of interest?

6. Where is the documentation of the Curtis Wright/FDA/Purdue connection?

7. Why has this pattern continued across six administrations?

8. Will the November 12th plan actually serve victims, or perpetuate the same patterns?

**Contact**: Ellen Isaacs, Weidman, MI

**Purpose**: Mother of Patrick "**Ryan**" Wroblewski (d. 11/1/2018)

**Mission**: **Justice, accountability, and victim-led solutions**

*This timeline represents publicly available information and raises questions warranting investigation. It does not make definitive accusations but identifies patterns requiring scrutiny by appropriate authorities.*