UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROSEMARY WALKER, Appellant, Pro Se,
v.
PURDUE PHARMA L.P., et al., Appellees.
Case No. 25-CV-9681

**ROSEMARY WALKER'S CONSOLIDATED REQUEST FOR RECORD-BASED REVIEW, ACCOUNTING, AND ADJUDICATION OF UNRESOLVED PLAN ISSUES**

Purpose. This filing consolidates Walker's principal unresolved record issues and distinguishes established record facts
from matters that still require production or adjudication. It does not convert an unanswered question into an established
fact.

**I. IMMEDIATE ACCOUNTING OF PLAN FUNDS IS REQUIRED**

"The roughly $880 million provided by the Debtors-Appellees was disbursed to the various creditor trusts together
with approximately $1.1 billion in Sackler payments, and there is no practical way to trace current location of all dollars contributed by the Debtors-Appellees."

Walker requests a transaction-level accounting of the approximately $1.1 billion in Sackler payments and the approximately $880 million in Debtor funds: source, recipient, transfer date, account or trust, present balance, distributions, reserves, administrative charges, and supporting records. Rule 2004 permits examination concerning property, financial condition, estate administration, and chapter 11 plan-funding matters. Rule 2004(c), through Rule 9016, permits compelled production. Rule 2015(a)(2) requires records of receipts and disposition of money and property received. Where procedurally applicable, Rule 9014 and Part VII discovery procedures provide additional mechanisms.

The assertion that there is no practical way to trace the money is itself a reason for immediate record-based review, not a substitute for accounting.

**II. TIER 1, TIER 2, AND NAS COUNTS AND DOLLAR RECONCILIATION REMAIN MATERIAL**

"Qualified and Allowed Non-NAS PI Tier 1 Claims $16,294"
"Qualified and Allowed Non-NAS PI Tier 2 Claims $8,147"
"Qualified and Allowed NAS PI Claims $25,653"
"A second payment may be made once all contingencies are resolved. The availability and amount of any second
payment will be determined by the Trustee based on the number of Qualified and Allowed Claims, the resolution of

all outstanding contingencies, and the remaining Trust Assets available for distribution after satisfaction of all administrative obligations.” The published dollar amounts do not answer the number of Qualified and Allowed Tier 1, Tier 2, and NAS claims. Walker requests the actual counts, aggregate dollars attributable to each category, amounts paid, amounts reserved, remaining Trust assets, and the reconciliation controlling any second payment. Walker also requests that the exact transcript exchange with Edgar C. Gentle concerning how many Tier 1, Tier 2, and NAS claims existed be placed before the reviewing court. Walker recalls Mr. Gentle responding, "I don't know." That quotation should be used only with the exact transcript page and lines once verified; the underlying numerical question
must nevertheless be answered.

**III. PURDUE-SPECIFIC PI PROOF AND THE DISTRIBUTION STRUCTURE REQUIRE REVIEW**

“the main requirement here is showing a proof of a Purdue prescription. That is kind of the baseline to get into the TDP.” Walker requests review of the disparate structure under which Purdue PI claimants were required to establish Purdue-specific prescription exposure and medical evidence while the Plan separately directs billions of dollars to 25-CV-9681 -
broader opioid victim and abatement purposes. The question is not whether broader opioid harms exist; it is whether a Purdue Pharma bankruptcy may impose Purdue-specific causation and prescription proof on Purdue PI victims while distributing materially larger Plan value through categories that are not limited by the same Purdue-brand proof requirement.
Walker further preserves the health-care-business / patient-protection issue and requests adjudication of whether the checked-box designation of "None of the above" adequately resolved that statutory question where Purdue PI claimants were treated as patients for purposes of medical evidence and HIPAA authorization.

**IV. A CHECKED BOX IS NOT THE ENTIRE CONSENT RECORD**

“We'll accept notices from someone saying hey, you know, now that I understand things better, I previously opted either in or not opted in, I would like to change that. So it's a last chance to change what we already did.” “And a new fixed deadline.” The confirmation record itself recognized that a claimant could later understand the election differently and change it.
Walker therefore requests review of whether an opt-in or non-opt-in checkmark, standing alone, constituted informed affirmative consent where the Plan parties and Court later established a new March 1, 2026 deadline for changing the prior election.
Walker's medical-record comparison illustrates the evidentiary problem: a checked "NO CHANGE IN MEDICATIONS" box does not erase the underlying medication history or require the physician to rewrite "OxyContin" on every visit. Likewise, a release-election checkmark cannot be isolated from the notices, explanations, later understanding, attempts to change the election, and unresolved claim status.

**V. DUE PROCESS AND THE FIRST AMENDMENT RIGHT TO PETITION CANNOT BE NULLIFIED BY PROCEDURAL SEQUENCING**

"How do I know if I want to give this up if I don't know if it actually gets me anything?"
Walker preserves the contention that her late-claim, release-election, distribution, and implementation objections were not finally adjudicated before operative Plan consequences were imposed. The reviewing court should determine whether Walker received notice and a meaningful opportunity to be heard before rights and financial interests were affected, and whether later reliance on effectiveness, mootness, or procedural posture improperly prevented adjudication of issues Walker had already presented.
Walker invokes the First Amendment right "to petition the Government for a redress of grievances." Walker does not claim a constitutional right to prevail. She requests review of whether properly presented objections and motions were actually adjudicated rather than rendered practically unreviewable by the sequence of confirmation, effectiveness, and later mootness arguments.

**VI. WALKER REPEATEDLY WARNED BEFORE CONFIRMATION AND EFFECTIVENESS THAT THE RICHARD SACKLER SETTLEMENT DOCUMENTATION WAS NOT COMPLETE**

This issue is not limited to a May 20, 2026 filing. Walker raised the Richard Sackler documentation problem during the confirmation proceedings and continued asking whether the required documents had actually been signed before the Plan became effective.
"Have these things been resolved or not?" "Well, that's the subject of ongoing discussions, and I expect to get an update on that in the very near future." "So prior to confirmation?"
The Debtors then described negotiations with Richard Sackler and his counsel concerning the path from the existing state of affairs to "full completion of all remaining credit support and collateral documents" underlying the master settlement agreement and Sackler settlement. The Debtors further described a commitment by Dr. Sackler "to complete and execute the remaining documentation for the settlement," a timeline for completion, Court supervision, and an enforcement mechanism. Those words describe future completion and execution, not already completed execution. "Ms. Walker had it right in the sense of saying you want as many uncertainties to be addressed as possible." 25-CV-9681 - Walker continued raising the same question in a later hearing: "And then did Richard Sackler sign the document that the hearing was adjourned the other day?" "So did Richard Sackler sign the documents?"
The Court stated that a hearing concerning mechanics of reaching the Effective Date, "including the signing of various documents," had been canceled after the parties said it was unnecessary. On the critical factual question of "exactly who signed what," the Court stated:
"I don't have in front of me, other than I have what the plan says needs to be done in order for the case to --." Walker immediately tied that unanswered execution question to effectiveness: "So how can you set an effective date if the Sacklers haven't signed the document? That would have to happen before an effective date is set." The May 1 record itself continued to describe incomplete implementation: Richard Sackler had not received Wells Fargo confirmation of a transfer and would provide evidence "promptly upon receipt"; another Confession of Judgment had been executed with the wrong name on the signature line and "will be re-executed and delivered as soon as possible." On May 20 Walker again stated the basis of her confirmation objection:

"WHY DID MS WALKER OBJECT TO THE CONFIRMATION JUDGE LANE? RIGHT RICHARD SACKLER & LIN GAO HAD STILL NOT SIGNED THE DOCUMENTS THAT INVOLVE CASH AS I UNDERSTAND."
The reviewing issue is therefore whether confirmation and effectiveness could properly proceed while material credit-support, collateral, signature, transfer, re-execution, or other Sackler-settlement implementation requirement remained incomplete, subject to future performance, or unverified - after Walker repeatedly raised the precise problem.
A commitment to execute remaining documents later is not the same factual event as execution. Walker requests a document-by-document completion accounting identifying each required Richard Sackler or Lin Gao instrument, required signatory, execution date, delivery date, transfer confirmation, cure or re-execution, and docket evidence establishing satisfaction of the applicable Plan and Confirmation Order requirements before effectiveness or identifying any item completed afterward.

**VII. THE UCC'S CONTINUING REPRESENTATIVE ROLE REQUIRES REVIEW**

"The Official Committee has been the point of contact for individuals reaching out about the status of their claims for the past half-decade" "the Official Committee would be remiss in its duties not to mention it." The Official Committee continued appearing after the Effective Date through counsel as the Official Committee of Unsecured Creditors. Section 1103(c) authorizes a committee to investigate, participate in plan matters, advise those represented, and perform services in the interest of those represented. Walker does not contend that UCC counsel is her personal attorney. She requests review of whether the Committee's continuing conduct fulfilled its representative obligations to unsecured creditors as a group, including Purdue PI creditors, while taking positions concerning claims, releases, distributions, appeals, and implementation of the Plan.

**VIII. REQUESTED RELIEF**

Walker requests the reviewing court grant relief within its jurisdiction sufficient to obtain and adjudicate the unresolved record issues, including remand, supplementation of the record, direction for findings, or other procedurally proper relief.

Specifically, Walker requests determinations concerning: (1) the complete accounting of approximately $1.1 billion in Sackler payments and approximately $880 million in Debtor funds; (2) the actual Tier 1, Tier 2, and NAS claim counts and category-by-category dollar reconciliation; (3) the Purdue-specific PI proof and health-care-business patient-protection issues; (4) whether a release-election checkmark established informed affirmative consent in the complete record; (5) whether Walker received a meaningful opportunity to obtain adjudication of her preserved objections before Plan consequences and later mootness arguments intervened; (6) whether confirmation and 25-CV-9681 - effectiveness proceeded while material Richard Sackler / Lin Gao settlement documents, signatures, transfers, cures, or confirmations remained incomplete or unverified, and exactly when each was completed; and (7) whether the UCC's

continuing conduct satisfied its statutory representative role toward unsecured creditors as a group. Walker further requests that no unresolved factual issue be treated as established against her merely because the Plan became effective before the issue was adjudicated.

**CORE PROCEDURAL AUTHORITIES**

Fed. R. Bankr. P. 2004: Examination concerning property, financial condition, estate administration, and chapter 11 plan-funding matters; Rule 2004(c) provides for compelled attendance and production through
Rule 9016. Fed. R. Bankr. P. 2015(a)(2): Records concerning receipts and disposition of money and property received.
Fed. R. Bankr. P. 9016: Makes Civil Rule 45 applicable in bankruptcy cases for subpoenas.
Fed. R. Bankr. P. 9014 and applicable Part VII rules: Procedures for contested matters and discovery where applicable.
11 U.S.C. § 1103(c): Functions of an official committee, including investigation, participation in plan matters, advising those represented, and other services in the interest of those represented.
Constitutional issues preserved: Due process and the First Amendment right to petition. Walker seeks adjudication and meaningful access to review, not a guaranteed favorable outcome.
Appellate limitation. The District Court and Court of Appeals are asked to exercise their own appellate authority. Walker does not characterize either appellate court as conducting an original Rule 2004 examination; she requests remand, supplementation, findings,
production, or other relief within the reviewing court's jurisdiction sufficient to permit adjudication of the preserved issues.

The court website is still not accessable to disabled pro se pauper women.




rosemary helen ziziros walker 8.16.26 2:50pm
CERT OF SERVICE i promise i emailed davis polk akin & mdt