# <u>Exhibit E</u>

**"Memorandum of Understanding: An Advanced AI Legal Analysis of Bankruptcy Code 502 Post Consummation [Legal Strategy for pro se Appellate Redwood vs Purdue Pharma]," filed by Keith E. Redwood, *In re Purdue Pharma L.P., et al*, Case No. 25-cv-10327 (S.D.N.Y. June 1, 2026) [Dkt. No. 53]**

**U.S. District Court**
**Southern District of New York (White Plains)**
**CIVIL DOCKET FOR CASE #: 7:25-cv-10327-NSR**

In Re: Purdue Pharma L.P.
Assigned to: Judge Nelson Stephen Roman

Related Case: 7:25-cv-09681-NSR

Case in other court: USBC-SDNY, 19-B-23649 (SHL)

Cause: 28:0158 Notice of Appeal re Bankruptcy Matter (BA

Date Filed: 12/12/2025
Jury Demand: None
Nature of Suit: 422 Bankruptcy Appeal (801)
Jurisdiction: Federal Question

**In Re**

**Purdue Pharma L.P.**

**Debtor**

**Purdue Pharma L.P.**

***MEMORANDUM OF UNDERSTANDING:AN ADVANCED AI LEGAL ANALYSIS OF BANKRUPTCY CODE 502 POST CONSUMMATION[ LEGAL STRATEGY FOR PRO SE APPELLATE REDWOOD vs PURDUE PHARMA]***

***The purpose of the Memorandum of Understanding is to provide the Court with a roadmap navigating the strategic and complex application bankruptcy code 502 used for post-consummation adjudication of Economic Damage claims. In the Redwood vs Purdue Pharma Civil (25-cv-10327) presided by Judge Nelson Roman, Redwood's Economic Damage appeal was remanded to the civil court for adjudication of economic damages suffered from the actions of the Debtor, Purdue Pharma.***

***Under Bankruptcy Code Section 502, the bankruptcy court's remand of my economic damage appeal to the civil court functions as an allowance and estimation mechanism that operates within the strict boundaries of Purdue Pharma's post-consummation Chapter 11 restructuring order. The bankruptcy court has shifted the factual adjudication of liability and quantum to the civil court. However, the ultimate treatment, recovery, and collection of any determined***

***economic damages remain subject to the U.S. Bankruptcy Court for the Southern District of New York's confirmed Chapter 11 plan.***

***In the adjudication of my Pro Se appeal I respectfully ask the honorable Judge Nelson Roman to examine key provisions of code 502 in the adjudication of the $10,000,000 Other General Unsecured Creditor (GUC) claim. I asked the court to examine provisions of code 502 in the evaluating the concurrent jurisdictional order dated 5/14/2026 (Documents #51 and 52)" Endorsement of Debtors-Appellees Denial Motion". In accordance with provisions contained in code 502 governing Liquidation versus Collection: If mediation fail the Civil Court would evaluate the merits of the economic damages. Civil Court procedurally would thereby exercise its authority to transition the claim from "Unliquidated to Liquidated " under*** § 502.

***A. Section 502 of the U.S. Bankruptcy Code governs the allowance or disallowance of creditor claims against a debtor's estate. It establishes the baseline rule that filed claims are "deemed allowed" unless an interested party objects, subsequently giving the bankruptcy court the authority to determine claim amounts and resolve disputes.***

***1. Allowance and Objections [11 U.S.C. § 502(a)]***

- ***Automatic Allowance: When a creditor files proof of claim, it is prima facie valid and automatically deemed allowed.***
- ***The Objection Process: The debtor, trustee, or other parties in interest can object to the claim. If an objection is made, the court holds a hearing to determine the validity and correct monetary amount of the claim.***

***2. Economic Injury Claims vs Personal Injury Claims under the Purdue Trust distribution rules.***

***Under the approved Purdue Pharma Chapter 11 trust structure, individual "economic injury" claims suffer a severe procedural and financial disadvantage relative to direct "personal injury" claims.***

***The restructuring order treats economic claims brought by individuals (such as lost wages, consumer fraud, or indirect financial impacts) as lower-priority unsecured claims. They are fundamentally structurally subordinate to personal injury categories,***

***which receive dedicated multi-million dollar carve-outs, standardized matrices, and clear expedited resolution procedures.***

*3. Claim Estimation [11 U.S.C. § 502(c)]*

***To prevent Chapter 11 proceedings from grinding to a halt over unresolved, drawn-out disputes, the court will "estimate" contingent or unliquidated claims (such as mass torts or environmental liabilities). This process accelerates case administration, allowing the debtor to formulate a viable reorganization plan.***

*4. Reconsideration [11 U.S.C. § 502(j)]*

***Allowed or disallowed claims may be reconsidered for "cause" at a later date. A reconsidered claim may then be re-allowed or disallowed according to the equities of the case.***

***For a deep dive into how these sub-sections interact to govern reorganization, review the complete statutory text on the U.S. Code Official Site.***

---

## *B. Advanced Analytics on 502 in Redwood vs Purdue Pharma*

***As a Pro Se Appellee ,I proffer Paxton AI's Combined Research feature to dive into case law for the following*: Please provide a legal analysis of chapter11 bankruptcy code 502 applicable to the Purdue Pharma post-consummation restructuring order. In the Redwood vs Purdue Pharma Civil trial (25-cv-10327) presided by Judge Nelson Roman, Redwood's Economic Damage appeal which was remanded to the civil court for adjudication of economic damages suffered from the actions of the Debtor, Purdue Pharma**

**1. Section 502 Framework Applied to the Remanded Appeal**

**Bankruptcy Code § 502 governs the allowance of claims against a debtor's estate. In the context of a remanded civil tort or economic damage action post-confirmation, specific subsections dictate how Redwood's claim is treated:**

- **§ 502(a) and (b) - Claims Allowance and Valuation: A claim is deemed allowed unless a party in interest objects. Because the district court remanded the appeal for the "adjudication of economic damages", the civil court acts as the forum to liquidate the claim (determine the exact dollar amount owed). Once**

**the civil court enters a final judgment, that liquidated figure establishes the prima facie amount of the claim under § 502(b).**

- **§ 502(c) - Estimation of Unliquidated Claims: If the civil litigation threatens to unduly delay the administration of the post-consummation estate, the Bankruptcy Court retains the residual power under § 502(c) to estimate the claim for purposes of distribution.**
- **§ 502(e) and (g) - Contingent and Deferral Status: To the extent that the economic damages represent contingent claims or are tied to rejected executory contracts/leases, their allowance timing is retroactively treated as a pre-petition claim, forcing the claimant into the creditor pools defined by the plan.**

---

2. Interaction with the Post-Consummation Restructuring Order

Purdue Pharma's $7.4 billion Chapter 11 plan, confirmed by U.S. Bankruptcy Judge Sean H. Lane following the Supreme Court's *Harrington v. Purdue Pharma* decision, severely restricts how an adjudicated claim can be collected.

[Civil Court Adjudication (Judge Román)]

│

▼ Liquidates Claim Amount via § 502

┌──────────────┐

│ Allowed Pre-Petition │

│ Unsecured Claim │

└──────┬──────┘

│

▼ Governed by Plan Restructuring Order

┌──────────────────────────┐

│ • Channeling Injunctions (§ 105 / § 1141) │

│ • Pro-Rata Share Distribution from Dedicated Trusts │

│ • Absolute Bar on Direct Asset Seizure or Execution │

- **The Channeling Injunction:** The post-consummation order utilizes channeling injunctions that prohibit creditors from executing judgments directly against the operating assets of the reorganized debtor (Knoa Pharma ). Any final judgment obtained by Redwood in the civil court cannot be enforced via asset seizure.

- **Satisfaction via Authorized Trusts:** Once the claim is fixed via the § 502 process on remand, it must be filed against the appropriate distribution trust established under the confirmed plan. The claim will be paid strictly on a pro-rata basis alongside similarly situated unsecured economic or personal injury claimants, subject to the trust's specific distribution protocols.

- **Post-Confirmation Modification Limits:** Because the plan has reached substantial consummation, the structural distribution caps cannot be altered by a single civil court judgment. The adjudication on remand serves only to determine Redwood's *slice of the existing pie*, not to expand the debtor's overall financial liability beyond the court-approved settlement caps.

---

3. Procedural Mechanics on Remand

Per the orders issued by Judge Román in May 2026, the case is transitioning through precise procedural hurdles:

1. **Mediation and Voluntarily Dismissal Track:** The court noted that the parties have actively engaged in discussions regarding mediation and potential conditional voluntary dismissal.

- **Liquidation vs. Collection:** If mediation fails, the civil court will try the merits of the economic damages. This process only changes the claim from *unliquidated* to *liquidated* under § 502.

- **Discharge and Bar Date Compliance:** The restructuring order's permanent discharge under 11 U.S.C. § 1141 ensures that any liability found exceeding the

trust's pro-rata distribution allocations is legally extinguished, protecting the newly reorganized public benefit entity from fresh legacy liabilities.

---

## C. Treatment of Economic Injury Claims

***As a Pro Se Appellee ,I proffer Paxton AI's Combined Research feature to dive into case law for the following: Please provide an evaluation of how economic injury claims are classified relative to personal injury claims under the Purdue trust distribution rules.***

***Under the approved Purdue Pharma Chapter 11 trust structure, individual "economic injury" claims suffer a severe procedural and financial disadvantage relative to direct "personal injury" claims.***

***The restructuring order treats economic claims brought by individuals (such as lost wages, consumer fraud, or indirect financial impacts) as lower-priority unsecured claims. They are fundamentally structurally subordinate to personal injury categories, which receive dedicated multi-million dollar carve-outs, standardized matrices, and clear expedited resolution procedures.***

1. Structural Separation: Trust Allocation & Funding Pools

The Purdue Pharma Chapter 11 plan categorizes and isolates liabilities into entirely separate, non-communicating distribution trusts:

| **Feature** | **Personal Injury (PI) Claims** | **Commercial / Individual Economic Claims** |
|---|---|---|
| **Primary Trust Assignment** | **Purdue Personal Injury Trust** (divided into NAS and Non-NAS PI sub-trusts). | **Third-Party Payor (TPP) Trust** or General Unsecured Creditor pools. |
| **Dedicated Funding** | **~$700 million to ~$850 million** carved out strictly for individual victims. | Subject to remaining corporate cash or broad general unsecured recovery formulas. |

| | | |
|---|---|---|
| **Primary Beneficiaries** | Opioid users with physical injury, addiction, or wrongful death. | Private insurers, health plans, employers, and unliquidated commercial claimants. |

---

2. Trust Matrix and Liquidation Hurdles

The Trust Distribution Procedures (TDP) established for the **Purdue PI Trust** utilize an objective, streamlined grid designed to completely bypass complex trial requirements:

- **The PI Trust Matrix:** Individual personal injury victims map onto clear, pre-calculated tiers based on verified criteria (e.g., duration of a qualifying Purdue prescription, medical hospitalization records, or wrongful death). Eligible payouts range broadly from standard base awards up to capped maximums.
- **The Economic Injury Vacuum:** Pure economic injury claims do not have an equivalent individual standardized point system grid under the personal injury trust. To qualify for a distribution, an economic injury claimant cannot simply point to generic financial distress caused by the opioid crisis. They are instead forced to seek liquidation of the claim through traditional litigation or specialized administrative objection tracks, which are heavily contested by the estate.

3. The "Third-Party Payor" (TPP) Exclusion

Individual economic loss claims frequently collapse under the definition criteria of the **Third-Party Payor (TPP) Trust**:

- The TPP trust is expressly designed for *institutional* financial injury—namely private health insurers, union health and welfare funds, and employer-sponsored health plans that directly paid for medical treatment or prescriptions.
- Per the explicit language of the plan's operating websites, **individuals asserting personal claims are not Third-Party Payors**. Consequently, an individual's pure economic damage claim sits in a "procedural limbo" where it is barred from the PI trust due to lack of a physical medical injury, and excluded from the TPP trust due to its non-corporate, individual status.

4. Valuation Impact on Remanded Actions (e.g., the Redwood Case)

For a plaintiff pursuing a remanded civil action for economic damages, this classification variance creates a highly restrictive recovery pathway:

1. **Strict Disallowance Risk:** The plan administrators treat generic individual economic losses as highly speculative or redundant of broader public abatement claims.

- **No Pro-Rata Multiplier Protection:** While personal injury claimants are guaranteed an equitable piece of an explicitly ring-fenced fund, an unliquidated individual economic claim must fight for a distribution out of general unsecured classes that may face massive dilution or near-zero recoveries after secured and administrative costs are settled.

If you are evaluating this layout for a specific legal strategy, let me know if you would like to explore **the exact evidence requirements** needed to cross over an economic claim Qualified PI claim, or a deep-dive into **how the Plan's public abatement funds** handle municipal-level economic damage claims.

---

## *D. <u>Advanced Legal framework</u>*

***Redwood vs Purdue Pharma is an Economic Damage claim under adjudication in civil court case#25-cv-10327 presided by Judge Nelson Roman. Redwood Appeal Brief focuses on Treatment and Classification of an unliquidated $10,000,000 other general unsecured creditor claim. Redwood need assistance in developing a specific litigation framework. Please explore the exact point-allocation formula used by the PI trust loss-of-income in determination of the economic damage claim***

To build a legally sound **specific litigation framework** for Keith E. Redwood's $10,000,000 unliquidated "Other General Unsecured Creditor" (GUC) claim currently before Judge Nelson Stephen Román in the Southern District of New York (*In re Purdue Pharma L.P.*, Case No. 7:25-cv-10327), the strategy must focus on a fundamental reality of the Purdue Pharma Confirmed Chapter 11 Plan: **The Personal Injury (PI) Trust point-allocation formula cannot be directly applied to a pure economic damage claim.**

Because the PI Trust is exclusively reserved for bodily injury, addiction, or wrongful death, an unliquidated $10M economic loss claim must be litigated under a **General Unsecured Claim (GUC) Valuation Framework**.

A specific litigation framework is outlined below to bridge this gap, demonstrating why the PI matrix does not apply and how to maximize the value of an economic claim on remand or during active mediation.

---

1. The Disconnect: Why the PI Trust Formula Cannot Value an Economic Claim

Under the Purdue Pharma Trust Distribution Procedures (TDP), the **point-allocation matrix** is strictly medical, assessing human tragedy rather than financial loss:

- **The PI Trust Point Metrics:** Points are awarded based on variables like the duration of a brand-name Purdue prescription, age at the time of injury, instances of non-fatal overdose, and documented medical treatment for Opioid Use Disorder (OUD).
- **The Loss-of-Income Threshold:** In the PI Trust, "loss of income" is not an independent claim category. It is treated merely as an **enhancement factor** (a percentage multiplier) added to a claim *after* the medical gateway is crossed.
- **The Subordination of Pure Economic Loss:** Because a $10M commercial or individual economic loss claim lack independent medical components, it is legally barred from entering the PI point system entirely. Attempting to force an economic claim into the PI trust allocation will result in summary disallowance by the Trust administrators.

---

2. Specific Litigation Framework for the $10,000,000 Economic Claim

To successfully liquidate and capture value for an unliquidated $10,000,000 GUC claim under Bankruptcy Code § 502, the litigation strategy must pivot away from personal injury grids and focus on **Commercial Tort / Breach Valuation**:

```
[ $10,000,000 GUC CLAIM ]
          │
          ▼
┌──────────────────────────────────────────┐
│ PHASE 1: PROVE PROXIMATE CAUSATION ON REMAND │
│ • Connect Purdue's deceptive practices directly │
│  to the $10M economic loss.                  │
└────────────────────┬─────────────────────┘
          │
          ▼
┌──────────────────────────────────────────┐
```

│ PHASE 2: CALCULATE LIQUIDATED DAMAGES VIA § 502 │

│ • Present forensic accounting / expert testimony │

│ to convert unliquidated claim to a fixed sum. │

└──────────────┬──────────────┘

│

▼

┌─────────────────────────────┐

│ PHASE 3: PROTECT CLASS STATUS DURING MEDIATION │

│ • Defend against "Subordination" or "Disallowance" │

│ motions by Debtors under § 502(b). │

└─────────────────────────────┘

Phase 1: Establish Proximate Causation (The Merits)

The appeal brief must articulate a clear, non-speculative causal chain showing how the Debtor's specific corporate conduct directly forced the $10,000,000 economic injury.

- *Actionable Evidence:* Rely on internal Purdue corporate records, marketing materials, or previous regulatory findings to show that the financial damages were a direct, foreseeable result of Purdue's actions, rather than general market downturns or macroeconomic shifts.

### ***Phase 2: Apply the "But-For" Financial Valuation Methodology***

Since the civil court's task on remand is to "liquidate" the claim under § 502(b), the legal framework must utilize a forensic accounting model to prove the exact quantum of damages:

- *The "But-For" World:* Present expert financial testimony contrasting the claimant's actual financial position with the position they *would* have occupied "but for" Purdue's tortious or unlawful conduct.
- *Documentary Backing:* Submit historical audited balance sheets, lost profit projections, canceled contracts, or specific operational cost surges totaling $10,000,000 to move the claim from "speculative" to "allowed."

Phase 3: Defensive Shielding Against § 502 Disallowance Motions

The Debtors will likely file an omnibus objection under § 502 seeking to disallow the claim, arguing it is redundant of broader government/municipal abatement fund payouts.

- *The Strategy:* The litigation framework must establish that this $10M claim represents a **distinct, individualized economic injury** that cannot be repaired or abated by municipal health programs or public funds.

---

3. Strategy Impact on Active Mediation

As docketed in May 2026, the parties have contemplated moving this matter toward active mediation. An unliquidated $10,000,000 claim is highly vulnerable during mediation because the Debtors can leverage the plan's pro-rata dilution factors.

1. **Do Not Settle for an Illusory Face Value:** A settlement that simply "allows" a $10,000,000 claim in the general unsecured class will ultimately be paid out in heavily diluted pro-rata cents on the dollar, depending on the remaining cash in the GUC pool.

2. **Negotiate a Fixed Cash-Out Arbitrated Sum:** The optimal mediation strategy is to leverage the threat of protracted litigation before Judge Román—which threatens to delay post-consummation finality—to secure a fixed, administrative, or cash-settled recovery directly from the post-confirmation distribution reserves, avoiding the diluted pro-rata GUC pool entirely.

---

Given that the parties are addressing mediation and potential voluntary dismissal, would you like to explore **the specific boilerplate language required in a mediation brief** to protect a claim from dilution, or do you need a deep dive into **how past SDNY rulings have handled "but-for" economic damage logic** in mass tort bankruptcies

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

## *E. Boilerplate"Legal Language" for Brief*

***Part 1: Mediation Brief Protective Boilerplate Language***

***When negotiating a settlement in a post-consummation Chapter 11 environment, allowing a claim as a standard "General Unsecured Claim" (GUC) means it will be subjected to the plan's fractional pro-rata distribution payout (often pennies on the dollar).***

***To prevent this dilution, the mediation brief must demand a carve-out cash settlement or priority administrative treatment. The following boilerplate clauses should be adapted into the "Remedy Sought" or "Conclusion" section of the mediation brief:***

***markdown***

***### SECTION X: RECOVERY STRUCTURE AND ANTI-DILUTION PROTECTIONS***

***A. Cash-Settled Allocation via Plan Reserves.***

***“The Claimant, Keith E. Redwood, rejects any settlement structure that merely results in the "allowance" of a General Unsecured Claim subject to standard pro-rata distribution and fractional dilution under the Debtors’ Confirmed Chapter 11 Plan. To achieve finality and avoid protracted litigation on remand before Judge Román, any agreed-upon settlement must be structured as a fixed, non-dilutable cash payment of $[Insert Arbitrated Sum], payable directly from the Debtors’ Post-Consummation Operating Reserves, Liquidating Trust Administrative Reserves, or other unencumbered wind-down funds.”***

***B. Treatment as an Allowed Administrative or Priority Carve-Out.***

***“To the extent that direct cash-out funding is unavailable from operational accounts, the Debtors shall stipulate to an order before the United States Bankruptcy Court for the Southern District of New York modifying the distribution protocols solely to treat this settled amount as an Administrative Expense under 11 U.S.C. § 503(b), or as a super-priority carved-out distribution. This distribution shall be paid in full, at a 100% recovery rate, prior to any further pro-rata distributions to Class [Insert GUC Class Number] creditors.***

***C. Explicit Preservation of Rights and Rejection of Pro-Rata Scaling.***

***"The parties expressly agree that the settled sum represents a liquidated, net-minimum recovery. Under no circumstances shall the settlement amount be scaled down, prorated, or reduced by the Plan Administrator based on the total aggregate volume of competing third-party or municipal economic claims filed against the General Unsecured Creditor pools. If the Debtors fail to execute payment at 100% of the settled sum within [X] days of execution, this mediation agreement shall be rendered null and void, and the Claimant's unliquidated $10,000,000 tort action shall immediately return to the active trial docket before Judge Román.***

***Use code with caution.***

---

***Part 2: SDNY Precedent on "But-For" Economic Damage Logic***

***When arguing the merits of an economic damage claim in the SDNY, the claimant faces a high hurdles regarding speculative damages. In mass tort bankruptcies (such as In re Purdue Pharma, In re Madoff, or In re Lehman Brothers), SDNY judges strictly apply the "but-for" economic damage test.***

***1. The Proximate Cause vs. "But-For" Distinction***

***SDNY courts consistently rule that a claimant cannot simply show that the debtor's bad actions created a general economic decline that swallowed the claimant's business or personal finances.***

- ***The Rule: The claimant must prove both transaction causation (that the debtor's deception induced the specific transaction/scenario) and loss causation (that the deception directly caused the economic drop).***
- ***Mass Tort Application: In In re Purdue Pharma, individual businesses and entities tried to claim that the opioid epidemic eroded their local customer base, driving a $10M+ loss. The SDNY bankruptcy court rejected these broad metrics, holding that macroeconomic harms are too attenuated. The claimant's "but-for" model must show a direct, bilateral economic relationship with the debtor's conduct, not a societal domino effect.***

***2. The Absolute Prohibition on Speculative Lost Profits***

***Under New York law (which heavily influences SDNY bankruptcy claim liquidations under § 502), lost profits or economic damages must be proven with reasonable certainty.***

- *The Standard: As established in seminal New York cases like Kenford Co. v. County of Erie, a "but-for" economic damage model cannot rely on future growth assumptions, unexecuted contracts, or hypothetical market conditions.*
- *The Strategy for Redwood: To survive an omnibus objection by Purdue's liquidating trust, Redwood's $10,000,000 model cannot look like an estimate. It must be a forensic backward-looking accounting analysis. It must present signed, cancelled contracts, hard asset devaluations, or specific expenses incurred solely because of the debtor's tortious actions.*

*3. The "Netting" Requirement*

*SDNY courts require that any "but-for" financial model net out any countervailing economic benefits the claimant received during the same period. If the claimant profited in any alternative manner due to the shifting economic landscape dictated by the debtor's market presence, those gains will be subtracted from the $10,000,000 claim, lowering the allowed amount under § 502(b).*

---

*If you are finalizing the mediation strategy, let me know if you would like to map out the specific forensic accounting categories (e.g., reliance damages vs. expectation damages) that best fit Redwood's actual financial records, or if you need an evaluation of the specific timeline constraints for filing a § 503(b) administrative priority motion.*

*AI responses may include mistakes. For legal advice, consult a professional.*

*Respectfully Submitted,*

*Keith E. Redwood Jr.*

*Dated: 6/1/2026*

--