# Exhibit A

**Brief of the Debtors-Appellees**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Ben Kaminetzky
Eli J. Vonnegut
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors-Appellees*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:**<br><br>**PURDUE PHARMA L.P., *et al.*,**<br><br>**Debtors-Appellees.**[1] | **Case Nos. 25-cv-09681; 25-cv-10158; 25-cv-10282; 25-cv-10327; 25-cv-10420; 25-cv-10427; 25-cv-10433; 25-cv-10646; 26-cv-00045** |

# BRIEF OF THE DEBTORS-APPELLEES

[1] The Debtors-Appellees ("**Debtors**") in these cases, along with the last four digits of each Debtor-Appellee's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PAGE

JURISDICTIONAL STATEMENT ..... 1
COUNTER-STATEMENT OF ISSUES ON APPEAL ..... 2
STANDARD OF REVIEW ON APPEAL ..... 2
PRELIMINARY STATEMENT ..... 3
STATEMENT OF THE CASE ..... 7
I. The Debtors-Appellees Filed Chapter 11 Cases To Preserve Value and Equitably Resolve their Opioid Liabilities ..... 7
II. After Years of Effort, Purdue and Its Creditors Secure Approval for a Landmark Plan Resolving Purdue's Liability and Dedicating Billions to Abatement and Compensation ..... 9
A. Purdue and Its Creditors Investigate Claims Against the Sacklers and Mediate Disputes Among Creditors, the Debtors, and the Sacklers ..... 9
B. The Bankruptcy Court Confirms the 2021 Plan; Certain Creditors Challenge the Nonconsensual Third Party Releases on Appeal ..... 12
III. The Parties Reengage in Mediation After *Harrington* ..... 13
IV. The Parties Reach a Renewed Set of Settlements and Plan of Reorganization ..... 15
A. The Parties Reach New Shareholder Settlements Providing for Voluntary Settlements of Third Party Claims ..... 15
B. The Renewed Plan of Reorganization Builds on the Successes of the 2021 Plan ..... 17
V. The Bankruptcy Court Confirms the Renewed Plan of Reorganization, Which Becomes Effective on May 1, 2026 ..... 21
A. Solicitation of the Revised Plan and Voting ..... 21
B. The Bankruptcy Court Holds the Confirmation Hearing and Confirms the Plan ..... 23
C. Purdue Pharma is Sentenced Pursuant to the Court-approved Resolution with the Department of Justice ..... 25
D. The Plan Becomes Effective and is Consummated on May 1, 2026, Ending Purdue's Operations and Commencing Knoa Pharma's Public Health Efforts ..... 25
VI. Nine Individuals Proceeding *Pro Se* Appeal the Confirmation Order ..... 27

ARGUMENT ........ 30

I. The Bankruptcy Court Correctly Determined that the Releases Under the Plan are Fully Consensual ........ 31

A. The Plan's Third-Party Releases Are Fully Consensual ........ 31

B. The Plan Did Not "Coerce" Creditors to Opt-In by Providing Third-Party Settlement Consideration Only to Those Creditors That Elected to Participate in the Third-Party Settlements ........ 34

C. Appellants that Did Not Grant the Third Party Releases Lack Standing To Challenge Releases That They Did Not Give and That Do Not Bind Them ... 36

II. The Plan Was Properly Confirmed Pursuant to Section 1129 of the Code ........ 38

A. Appellants' Personal Injury Claims are Properly Classified with Other Personal Injury Claims ........ 38

B. The Bankruptcy Court Correctly Determined that Creditors Receive Far More than They Stand to Receive in a Liquidation, Satisfying the "Best Interests" Test of 11 U.S.C. § 1129(a)(7) ........ 41

III. The Plan is Constitutional ........ 43

A. The Plan's Claims Allowance Procedures Do Not Violate the Seventh Amendment ........ 43

B. Appellants Were Provided Process Far Exceeding the Constitutional Minimum ........ 46

IV. Appellants' Remaining Arguments Do Not Provide a Basis to Disturb the Confirmation Order ........ 48

V. The Appeals of Ms. Jannotta, and Ms. Isaacs Should be Dismissed as Untimely ........ 49

VI. The Appeals Are Equitably Moot ........ 50

CONCLUSION ........ 54

# TABLE OF AUTHORITIES

CASES

PAGE(S)

**Federal Cases**

*2 River Terrace Apartment 12J, LLC v. Ehrenberg*,
2022 WL 992715 (E.D.N.Y. Mar. 31, 2022) .......... 52

*In re 2U, Inc., et al.*,
No. 24-11279 (Bankr. S.D.N.Y. Sept. 6, 2024) .......... 32

*In re 307 Assets LLC*,
665 B.R. 214 (S.D.N.Y. 2024) .......... 3, 52, 54

*In re 307 Assets LLC*,
2025 WL 2751373 (2d Cir. Sept. 29, 2025) .......... 3

*In re Acorda Therapeutics, Inc., et al.*,
No. 24-22284 (Bankr. S.D.N.Y. Aug. 7, 2024) .......... 32

*Ad Hoc Comm. of Kenton Cnty. Bondholders v. Delta Air Lines, Inc.*,
309 F. App'x 455 (2d Cir. 2009) .......... 3

*In re Adelphia Commc'ns Corp.*,
367 B.R. 84 (S.D.N.Y. 2007) .......... 2

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) .......... 41

*In re AMR Corp.*,
2022 WL 1556398 (S.D.N.Y. May 16, 2022) .......... 3

*In re AMR Corp.*,
2023 WL 2770228 (2d Cir. Apr. 4, 2023) .......... 3

*In re Archibald,*
2024 WL 2093644 (S.D.N.Y. May 9, 2024) .......... 30

*In re Centric Brands Inc.*,
2023 WL 2139556 (S.D.N.Y. Feb. 21, 2023) .......... 52, 53–54

*In re Celsius Network LLC*,
2025 WL 3527112 (S.D.N.Y. Dec. 9, 2025) .................................................. 53

*In re Charter Commc'ns, Inc.*,
691 F.3d 476 (2d Cir. 2012) ........................................................................ 3, 54

*In re Chassix Holdings, Inc.*,
533 B.R. 64 (Bankr. S.D.N.Y. 2015) ........................................... 31–32, 33–34

*In re Chateaugay Corp.*,
10 F.3d 944 (2d Cir. 1993) ............................................................................ 52

*In re Chateaugay Corp.*,
89 F.3d 942 (2d Cir. 1996) ............................................................................ 39

*In re Chateaugay Corp.*,
111 B.R. 67 (Bankr. S.D.N.Y. 1990) ............................................................. 45

*In re Chateaugay Corp.*,
988 F.2d 322 (2d Cir. 1993) .......................................................................... 51

*In re E. C. Ernst, Inc.*,
2 B.R. 757 (S.D.N.Y. 1980) .......................................................................... 34

*Flynn v. James*,
513 F. App'x 37 (2d Cir. 2013) ..................................................................... 44

*In re Genesis Glob. Holdco, LLC*,
660 B.R. 439 (Bankr. S.D.N.Y. 2024) ........................................................... 37

*Gordon v. Gazes (In re 22 Fiske Place, LLC)*
2022 WL 2819093 (S.D.N.Y. July 18, 2022) ........................................... 33, 48

*In re Haemmerle*,
529 B.R. 17 (Bankr. E.D.N.Y. 2015) ............................................................. 47

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024) ............................................................................... *passim*

*In re Kirwan Offs. S.a.R.L.*,
792 F. App'x 99 (2d Cir. 2019) ............................................................... 45–46

*Katchen v. Landy*,
382 U.S. 323 (1966) ....................................................................................... 46

*Langenkamp v. Culp*,
498 U.S. 42 (1990) ..... 46

*In re Latam Airlines Grp., S.A.*,
55 F.4th 377 (2d Cir. 2022) ..... 44

*In re Latam Airlines Grp., S.A.*,
643 B.R. 741 (S.D.N.Y.) ..... 44

*In re Leslie Fay Cos., Inc.*,
207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..... 42

*In re Manville Forest Prods. Corp.*,
896 F.2d 1384 (2d Cir. 1990) ..... 2

*In re Medaglia*,
52 F.3d 451 (2d Cir. 1995) ..... 46

*In re Metromedia Fiber Network, Inc.*,
416 F.3d 136 (2d Cir. 2005) ..... 51

*Mullane v. Central Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950) ..... 46–47

*New York Life Ins. Co. v. Singh*,
2016 WL 11395019 (E.D.N.Y. Jan. 12, 2016) ..... 37

*New York Life Ins. Co. v. Singh*,
2016 WL 1451534 (E.D.N.Y. Apr. 12, 2016) ..... 37

*In re Nortel Networks Corp. Secs. Litig.*,
539 F.3d 129 (2d Cir. 2008) ..... 44

*In re PG&E Corp.*,
617 B.R. 671 (Bankr. N.D. Cal. 2020) ..... 34

*In re Purdue Pharma L.P.*,
69 F.4th 45 (2d Cir. 2023) ..... 13

*In re Purdue Pharma L.P.*,
633 B.R. 53 (Bankr. S.D.N.Y. 2021) ..... 10, 20

*In re Purdue Pharma, L.P.*,
635 B.R. 26 (S.D.N.Y. 2021) ..... 12

*In re Purdue Pharma L.P.*,
675 B.R. 632 (Bankr. S.D.N.Y. 2025) ........................................................ *passim*

*In re Purdue Pharma L.P.*,
2026 WL 190569 (Bankr. S.D.N.Y. July 1, 2026) ........................................ 48

*In re Quigley Co.,*
391 B.R. 695 (Bankr. S.D.N.Y. 2008) ........................................................ 34

*In re Quigley Co., Inc.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007) ........................................................ 37

*In re Regan,*
2024 WL 2132569 (N.D.N.Y. May 13, 2024) ............................................. 31

*In re Residential Cap., LLC*,
519 B.R. 890 (Bankr. S.D.N.Y. 2014) ........................................................ 46

*In re Residential Cap., LLC,*
2016 WL 7477558 (S.D.N.Y. Dec. 28, 2016) ............................................. 31

*In re Roman Cath. Diocese of Rockville Ctr.*,
650 B.R. 765 (Bankr. S.D.N.Y. 2023) ........................................................ 45

*In re Roman Cath. Diocese of Rockville Ctr., New York,*
2024 WL 2262708 (S.D.N.Y. May 17, 2024) ............................................. 45

*In re Sabine Oil & Gas Corp.*,
555 B.R. 180 (Bankr. S.D.N.Y. 2016) ........................................................ 41

*Siemon v. Emigrant Savs. Bank* (*In re Siemon*),
421 F.3d 167 (2d Cir. 2005) ................................................................ 1–2, 49–50

*Sterling v. Carlebach* (*In re Sterling*)
690 F. App'x. 747 (2d Cir. 2017) ........................................................... 2, 50

*Stern v. Marshall*,
564 U.S. 462 (2011) ................................................................................ 46

*In re Voyager Digit. Holdings, Inc.*,
649 B.R. 111 (Bankr. S.D.N.Y. 2023) .................................................. 32, 34

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) .......................................................... 34

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) ........................................................ 39

*In re W.R. Grace & Co.*,
729 F.3d 332 (3d Cir. 2013) ........................................................ 39

*Warth v. Seldin*,
422 U.S. 490 (1975) ........................................................ 37

*In re Windstream Holdings, Inc.*,
2022 WL 14199458 (2d Cir. 2022) ........................................................ 51

*In re Wyly*,
2019 WL 2590035 (Bankr. N.D. Tex. June 22, 2019) ........................................ 34

**Constitutional Provisions**

U.S. Const. amend. V ........................................................ 7, 44, 46

U.S. Const. amend. VII ........................................................ 7, 43, 44

**Federal Statutes**

11 U.S.C. § 1122 ........................................................ 39

11 U.S.C. § 1123 (a)(4) ........................................................ 29

11 U.S.C. § 1129 ........................................................ *passim*

28 U.S.C § 157 ........................................................ 1, 45

28 U.S.C. § 158 ........................................................ 1

28 U.S.C. § 1334(a) ........................................................ 1

**Federal Rules and Regulations**

Fed. R. Bankr. P. 8002 ........................................................ 1, 50

Fed. R. Bankr. P. 8018(a)(4) ........................................................ 30

Fed. R. Bankr. P. 8003(a)(2) ........................................................ 30

Fed. R. Bankr. P. 9019 ........................................................ 6

**Other Authorities**

7 Collier on Bankruptcy (16th ed. 2021) ........................................................ 40

8 Collier on Bankruptcy (Richard Levin & Henry J. Sommer eds., 16th ed. 2025)
........................................................ 36

Press Release, *Opioid Manufacturer Purdue Pharma Sentenced for Fraud and Kickback Conspiracies*, Dep't of Justice (Apr. 28, 2026), https://www.justice.gov/usao-nj/pr/opioid-manufacturer-purdue-pharma-sentenced-fraud-and-kickback-conspiracies ........................................................ 25

Restatement (Second) of Contracts (A.L.I. 1981)................................................ 37

# JURISDICTIONAL STATEMENT

Judge Sean H. Lane of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") had subject matter jurisdiction to enter the Findings of Fact, Conclusions of Law, and Order Confirming the Eighteenth Amended Joint Chapter 11 Plan of Reorganization (A.008314) (the "**Confirmation Order**") pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(a). This Court has appellate jurisdiction over the timely appeals pursuant to 28 U.S.C. § 158(a)(1), which confers jurisdiction to hear appeals "from final judgments, orders, and decrees" of bankruptcy courts. 28 U.S.C. § 158(a)(1).

Respectfully, this Court lacks jurisdiction over the untimely appeals.[1] Bankruptcy Rule 8002 specifies that "a notice of appeal must be filed with the bankruptcy clerk within 14 days after entry of the judgment, order, or decree being appealed." Fed. R. Bankr. P. 8002(a)(1). The Confirmation Order was entered on November 18, 2025. (A.008314.) The deadline for appeals from the Confirmation Order therefore lapsed on December 2, 2025. Fed. R. Bankr. P. 8002(a)(1). Accordingly, any appeals filed after that deadline are untimely, and this Court is, respectfully, without jurisdiction to hear such appeals. *Siemon v. Emigrant Savs.*

[1] Ms. Jannotta filed her notice of appeal on December 9, 2025 (A.008641)—a full week after the deadline lapsed. Ms. Isaacs filed her notice of appeal on December 4, 2025 (A.008639)—two days after the deadline to file a notice of appeal.

*Bank* (*In re Siemon*), 421 F.3d 167, 169 (2d Cir. 2005) ("[I]n the absence of a timely notice of appeal . . . the district court is without jurisdiction to consider the appeal."); *Sterling v. Carlebach* (*In re Sterling*), 690 F. App'x. 747, 748 n.1 (2d Cir. 2017) (affirming dismissal of pro se appeal filed "16 days after the entry of the bankruptcy court's order.").

## COUNTER-STATEMENT OF ISSUES ON APPEAL

1. Whether the releases under the Eighteenth Amended Joint Chapter 11 Plan of Reorganization (A.008081) (the "**Plan**") are lawful, fully consensual third-party releases.
2. Whether the Bankruptcy Court properly confirmed the Plan on the basis of an extensive and virtually uncontested factual and legal record.

## STANDARD OF REVIEW ON APPEAL

A bankruptcy court's factual findings may be disturbed only if this Court concludes that they were "clear error." *In re Adelphia Commc'ns Corp.*, 367 B.R. 84, 90 (S.D.N.Y. 2007). Under this standard, a district court should disturb a bankruptcy court's factual findings only where it is "left with the definite and firm conviction that a mistake has been committed." *Id.* at 90 (quoting *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990)). Under the "clear error" standard of review, "there is a strong presumption in favor of a trial court's findings of fact" where, as here, they are "supported by substantial evidence." *In re DPH*

*Holdings Corp.*, 468 B.R. 603, 611 (S.D.N.Y. 2012) (internal quotation marks omitted). Legal conclusions are reviewed *de novo*. *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012). The Court reviews the Bankruptcy Court's approval of settlements under a Plan "extremely deferentially" for abuse of discretion. *Ad Hoc Comm. of Kenton Cnty. Bondholders v. Delta Air Lines, Inc.*, 309 F. App'x 455, 457 (2d Cir. 2009); *In re AMR Corp.*, 2022 WL 1556398, at *5 (S.D.N.Y. May 16, 2022), *aff'd* 2023 WL 2770228 (2d Cir. Apr. 4, 2023) (quoting *In re Schneider*, 2015 WL 1412364, at *3 (E.D.N.Y. Mar. 26, 2015)). The decision to dismiss an appeal as equitably moot is committed to the sound discretion of this Court. *In re 307 Assets LLC*, 665 B.R. 214, 219 (S.D.N.Y. 2024), *aff'd,* 2025 WL 2751373 (2d Cir. Sept. 29, 2025) (affirming dismissal of appeal as equitably moot).

## PRELIMINARY STATEMENT

The confirmed Plan is the capstone of more than seven years of work by thousands of elected officials, fiduciaries, victims' advocates, professionals, and employees, and it has already delivered billions of dollars of value for opioid remediation and victim compensation. More than 99% of tens of thousands of voting creditors support the Plan. Beyond monetary relief, the Plan provides other, critical, non-monetary relief designed to, among other things, help governments and private parties remediate the opioid crisis. While nine *pro se* Appellants remain unsatisfied with this outcome—and certainly, nothing that the Bankruptcy Code ("**Code**") offers

could undo the losses that they have suffered—the Plan is consistent with the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) ("***Harrington***") and satisfies every other requirement of the Code.

It is hard to imagine that any bankruptcy plan has been subjected to as much judicial and creditor scrutiny as this one. The settlements at the heart of the Plan are the product of over five years of intense negotiation among stakeholders including multiple divisions of the Department of Justice and representatives of all fifty states, thousands of other government entities, and many thousands of private parties, guided by several of the world's finest mediators. These efforts resulted in dozens of settlements among a variety of creditor constituencies. Every single organized creditor group, and over 99% of voting creditors, supported confirmation of the Plan, including:

- the United States;
- all 50 U.S. states, including related territories and the District of Columbia,
- the DOJ-appointed Official Committee of Unsecured Creditors ("**UCC**");
- the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("**AHC**");
- the Multi-State Governmental Entities Group ("**MSGE**");
- the Ad Hoc Group of Hospitals;
- Emergency Room Physicians;

- representatives of babies born with Neonatal Abstinence Syndrome (the "**NAS Committee**");
- the Ad Hoc Group of Individual Victims ("**Ad Hoc PI Group**");
- Public Schools;
- Ratepayers;
- Third-Party Payors; and
- Native American Tribes.

Tellingly, over 99% of voting personal injury claimants ("**PI Claimants**") voted in favor of the Plan. (*See* A.010042 (Supplemental Declaration of Craig E. Johnson, Ex. A) (the "**Johnson Decl**.").) These tens of thousands of PI Claimants have claims against the Debtors' property that are indistinguishable from the rights of the Appellants (save one whose claim has been disallowed as not timely filed). Not a single represented party has appealed.

The small number of Appellants have voiced various grievances about the Plan and the bankruptcy process in general—first at the Bankruptcy Court, which correctly overruled their objections, and now in this Court where they mostly retread those same objections. In essence, the Appellants advance two arguments: that the releases under the Plan are not in fact consensual, and thus are not consistent with *Harrington*; and that the Plan does not satisfy other requirements of the Code or the U.S. Constitution. Both arguments are meritless.

First, the third-party releases under the Plan are fully consensual. The only third-party releases that were effectuated through the Plan were voluntarily given by PI Claimants and third-party payors—who had the option to elect to release their claims against the Sacklers (and receive enhanced consideration) by affirmatively checking a designated box on their Plan ballot. Any claimants that did not affirmatively provide a release did not release any claim they may hold against the Sacklers. There is hardly better evidence of the consensual nature of the releases than the fact that only one of the Appellants—Mr. Redwood—actually granted a release of his claims against the Sacklers, meaning that he is the only appellant with standing to challenge the releases, which he does not do. He just seeks to be paid first.

Second, the Plan complies with all applicable provisions of the Code. As the Bankruptcy Court correctly found after a multi-day confirmation hearing with live testimony from 19 witnesses (all supporting confirmation) and thousands of pages of supporting evidence, Appellants' arguments to the contrary are unfounded. Appellants' claims were properly classified with other holders of personal injury claims, and received fair treatment relative to other classes of claimants. The Bankruptcy Court correctly held that the settlements under the Plan, which result in billions in creditor recoveries, are manifestly reasonable and satisfy Federal Rule of Bankruptcy Procedure 9019. Extensive and uncontroverted evidence demonstrated

that all creditors with allowed claims will receive recoveries that are not less than that they would receive in a liquidation; the Plan thus satisfies the "best interests of creditors" test. Further, nothing in the Plan violates the Seventh Amendment, due process, or any other constitutional right. And Appellants' remaining arguments should be rejected because they are meritless, seek relief that is beyond the Court's power, or are waived because they are improperly raised for the first time on appeal.

Moreover, the Plan was substantially consummated on May 1, 2026. It is delivering billions of dollars in to creditor trusts, and will deliver billions more over time. Purdue has been criminally sentenced, and the Debtors' operating businesses were transferred on May 1, 2026 to Knoa Pharma ("**Knoa**"), a newly created public benefit company owned by a 501(c)(4) foundation. At this juncture, with billions of dollars distributed and all of Purdue's assets transferred, it is impossible to restore the status quo ante. Reversal of the Confirmation Order is unwarranted and would catastrophically frustrate the ongoing distribution of urgently needed funds to creditors, including personal injury victims.

## STATEMENT OF THE CASE

### I. The Debtors-Appellees Filed Chapter 11 Cases To Preserve Value and Equitably Resolve their Opioid Liabilities

Prior to emerging from bankruptcy, the Debtors-Appellees operated pharmaceutical companies that manufactured, among other things, FDA-approved, abuse-deterrent opioid medications, including OxyContin® Tablets ("**OxyContin**").

*In re Purdue Pharma L.P.*, 675 B.R. 632, 647 (Bankr. S.D.N.Y. 2025) ("**MBR**"); (A.009553 (Plan Declaration of Jesse DelConte ("**DelConte Plan Decl.**")).) Purdue Pharma L.P. ("**PPLP**") was a limited partnership managed and operated by its general partner, Purdue Pharma Inc. ("**PPI**"), and governed by PPI's Board of Directors. PPLP and its 22 wholly-owned operating subsidiaries were owned by various trusts for the benefit of members of the Sackler families (the "**Sacklers**").[2]

Almost seven years ago, in September 2019, the Debtors-Appellees filed for bankruptcy under Chapter 11 of the Code. MBR at 647. At the time, the Debtors-Appellees were named defendants in approximately 2,600 lawsuits alleging liability in excess of $8 trillion in connection with the Debtors-Appellees' marketing, manufacturing, and sale of opioid medications. (*See* A.009555 (DelConte Plan Decl.); MBR at 647.) The plaintiffs in these suits included individuals, corporations, states, territories, Native American tribes, and municipalities. MBR at 647. In addition to this litigation, the Debtors-Appellees were subject to investigation by multiple arms of the United States Department of Justice ("**DOJ**"). (*See* A.002239

[2] The Sacklers' equity interests in the Debtors-Appellees were extinguished when the Plan went effective. All of the Debtors-Appellees' operating assets were transferred to Knoa Pharma, a public benefit company created pursuant to the Plan, and all of the Debtors-Appellees' cash was transferred to trusts for the benefit of creditors and Knoa. The Debtors-Appellees are currently in the process of dissolving and otherwise winding down their affairs as contemplated by the Plan.

(Mot. Authorizing and Approving Settlements Between the Debtors and the United States)); MBR at 648.

## II. After Years of Effort, Purdue and Its Creditors Secure Approval for a Landmark Plan Resolving Purdue's Liability and Dedicating Billions to Abatement and Compensation

### A. Purdue and Its Creditors Investigate Claims Against the Sacklers and Mediate Disputes Among Creditors, the Debtors, and the Sacklers

Upon filing for bankruptcy, and over the course of nearly two years, the Debtors-Appellees and their core creditor constituencies engaged in extensive investigation and discovery concerning potential claims against the Sacklers. The Special Committee of the Debtors-Appellees' board conducted a 22-month investigation that included document review, interviews, legal analysis, forensic review of transfers, solvency analysis, and coordination with the UCC. (*See* A.009638–52 (Declaration of John S. Dubel (the "**Dubel Decl.**"))); MBR at 649. The Special Committee's investigation was independent and not influenced in any way by the Sacklers, as the DOJ-selected and Bankruptcy Court-appointed examiner concluded after his own independent investigation. (*See* A.009245–46 (Examiner's Report)); MBR at 649. The Debtors-Appellees also produced more than 100 million pages of material to estate stakeholders.

The UCC conducted its own exhaustive investigation of estate claims, during which it took third-party discovery and depositions of certain Sacklers and other

witnesses. (*See* A.009552–53 (DelConte Plan Decl.); A.003690–91 (UCC Amended Standing Motion)); MBR at 650. The Bankruptcy Court deemed the process "the most extensive discovery process that … any court in bankruptcy has ever seen." *In re Purdue Pharma*, 633 B.R. 53, 85-86 (Bankr. S.D.N.Y. 2021) ("**2021 MBR**"). Those efforts informed the negotiations that followed.

The Debtors-Appellees and various core creditor constituencies participated in four phases of mediation to resolve various intercreditor disputes and certain potential causes of action against the Sacklers. (*See* A.009653 (Dubel Decl.); A.009083 (Phase One Mediators' Report); A.009092 (Phase Two Mediators' Report); A.009101 (Phase Three Mediators' Report).) The first two rounds of mediation resulted in a near-global settlement, that would have been funded in large part by the Sacklers' aggregate settlement contribution of to $4.275 billion payable over nine years. (*See* A.009100 (Phase Two Mediators' Report)); MBR at 651. A third round of mediation led to fifteen additional states signing on to an enhanced shareholder settlement agreement. (*See* A.009660–61 (Dubel Decl.).)

Concurrently, the Debtors-Appellees sought to resolve potential liability to the United States Government. On November 18, 2020, the Bankruptcy Court approved PPLP's entry into (i) a plea agreement with the United States and (ii) a civil settlement agreement with the United States (together, the "**DOJ Resolution**") to resolve federal criminal and civil investigations into the Debtors-Appellees'

prepetition conduct. (*See* A.002586 (Order Approving DOJ Resolution).) On November 24, 2020, pursuant to that resolution, PPLP pled guilty in the United States District Court for the District of New Jersey to three felony offenses: one count charging a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, and two counts charging conspiracy to violate the Federal Anti-Kickback Statute. (*See* A.002423 (Plea Agreement); A.002520 (Civil Settlement).)

As part of the DOJ Resolution, the Debtors and the United States agreed to a $2 billion criminal forfeiture judgment (the "**Forfeiture Judgment**"), which would be entered after confirmation of a qualifying plan and accepted as an allowed superpriority administrative expense claim against PPLP. MBR at 648. Importantly, the United States agreed to provide a credit against that judgment of up to $1.775 billion for value conferred on account of claims asserted by state, tribal, or local governmental entities, provided that the plan satisfied specified conditions, including the establishment of a public benefit company or similar entity. (*See id.*; A.009662, A.009666 (Dubel Decl.).) That credit was a critical component of a confirmable and value-maximizing restructuring.

### B. The Bankruptcy Court Confirms the 2021 Plan; Certain Creditors Challenge the Nonconsensual Third Party Releases on Appeal

In August 2021, the Bankruptcy Court—then under the stewardship of the Honorable Robert D. Drain—presided over a confirmation hearing for the Twelfth Amended Plan. That hearing was an extraordinarily robust exercise that proceeded over six full days of trial, during which the Court received testimony from 41 fact and expert witnesses and accepted over 2,800 exhibits into evidence. Thereafter, Judge Drain issued a comprehensive, 150-page bench ruling confirming the 2021 Plan. He found, among other things, that the then-existing settlement among the Debtors-Appellees, the Sacklers, and other creditor constituencies was fair, reasonable, and in the best interests of the Estates. *See generally* 2021 MBR.

Appeals then ensued for approximately three years. The appeals largely centered around the Twelfth Amended Plan's *nonconsensual* third-party releases of claims against the Sacklers and certain other non-debtors. (*See* A.009658–62 (Dubel Decl.).) In December 2021, the United States District Court for the Southern District of New York vacated the then-operative confirmation order, holding that the Code did not authorize the nonconsensual third-party releases in the Twelfth Amended Plan. *See In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021); (A.009659 (Dubel Decl.).) The Debtors, the UCC and numerous case parties appealed the District Court's decision to the Second Circuit. At the same time, the parties

embarked on a fourth phase of mediation, which ultimately resulted in a settlement with the nine states appealing the Plan, resolving the issues of all Appellants other than the United States Trustee, a group of Canadian creditors (all of whose claims have since been withdrawn), and a handful of *pro se* creditors. (*See* A.009660–61 (Dubel Decl.).) In May 2023, the Second Circuit reversed the decision regarding the nonconsensual releases, while upholding the Bankruptcy Court and District Court's rejection of challenges to jurisdiction and the classification and treatment of certain unsecured creditors. *In re Purdue Pharma L.P.*, 69 F.4th 45, 71–72, 84 (2d Cir. 2023). In June 2024, the Supreme Court issued a 5-4 decision reversing the Second Circuit's decision, holding that the Code does not authorize the nonconsensual release of claims of a nondebtor against another nondebtor in a plan of reorganization. *Harrington*, 603 U.S. at 227. The case was remanded for further proceedings consistent with that opinion.[3]

## III. The Parties Reengage in Mediation After *Harrington*

Shortly after the Supreme Court's decision, the Debtors and key stakeholders began work to preserve the inter- and intra-creditor settlements in the Twelfth

[3] *Harrington* neither addressed nor adjudicated any other bases upon which the Second Circuit affirmed then-operative confirmation order. And regarding the achievement of such "rare" levels of consensus, Supreme Court Justice Brett Kavanaugh (joined in dissent by Chief Justice Roberts, Justice Kagan, and Justice Sotomayor) described Purdue's Twelfth Amended Plan as "a shining example of the bankruptcy system at work." *Harrington*, 603 U.S. at 228 (Kavanaugh, J., dissenting).

Amended Plan, to conform the plan to the Supreme Court's directive. (A.009662 (Dubel Decl.).) To oversee these negotiations, on July 10, 2024, the Bankruptcy Court appointed the Honorable Shelley C. Chapman (Ret.) and Professor. Eric D. Green as co-mediators to facilitate renewed mediation among the Debtors-Appellees and their major creditor constituencies (the "**2024-25 Mediation**"). (*See* A.004112 (Order Appointing Co-Mediators).)

In the absence of a negotiated resolution, the Estates' claims against the Sacklers would have been vigorously prosecuted. In July 2024, the UCC—with the consent of the Debtors-Appellees and the AHC—moved for authority to commence and prosecute Estate causes of action against the Sacklers and related entities. (*See* A.003678 (UCC Standing Motion); *see also* A.009662 (Dubel Decl.).) Appended to its motion was a 193-page, 21-count complaint (the "**UCC Complaint**") against 41 named defendants, including certain of the Debtors-Appellees' former directors and officers including the Sacklers, over 200 Sackler trusts, individual beneficiaries of those trusts, and other Sackler-related entities. (A.003912 (UCC Complaint).)[4] On December 2, 2024, the Bankruptcy Court granted the UCC sole standing to commence and prosecute estate causes of action. (A.004124 (Order Granting UCC Sole Standing).)

[4] On September 6, 2024, the UCC filed an Amended Standing Motion which included 203 pages and 22 counts. (A.003912 (UCC Complaint).)

After months of effort, however, the parties to the 2024-25 Mediation[5] reached a historic revised settlement. The new settlement built upon the Twelfth Amended Plan and provided "for more than $7 billion to creditors through a series of interconnected, interdependent settlements that avoid litigation between the States and creditor groups that would drain estate assets." MBR at 652.

## IV. The Parties Reach a Renewed Set of Settlements and Plan of Reorganization

### A. The Parties Reach New Shareholder Settlements Providing for Voluntary Settlements of Third Party Claims

The new settlement structure—which includes a number of separate yet interrelated settlements (collectively, the "**Shareholder Settlements**")—implements a comprehensive resolution of (i) the Debtors-Appellees' claims against the Sacklers (the "**Estate Claims Settlement**"); and (ii) the voluntary settlement of direct claims held by creditors against the Sacklers (the "**Direct Claims Settlements**"), "who will provide cash distributions to public and private claimants that elect to participate in the Direct Claims Settlements and grant the Third-Party Releases of their direct claims." MBR at 653 (emphasis added); (*see also*

[5] The Debtors-Appellees, UCC, AHC, MSGE, "Covered Parties" (consisting of the Initial Covered Sackler Persons and the Additional Covered Sackler Persons), Ad Hoc Group of Hospitals, NAS Committee, Ad Hoc PI Group, Third-Party Payor Group, Public School District Claimants, Ratepayer Mediation Participants, and one or more negotiating committee(s) of State Attorneys General were all active participants in the 2024-25 Mediation.

A.009666–67 (Dubel Decl.).) As the Bankruptcy Court found, "[a] claimant's vote on the Plan is independent of whether they elect to grant the Third-Party Releases in exchange for an increased recovery." MBR at 653.

Under the Shareholder Settlements, the Sacklers agreed to contribute up to $7 billion. (*See* A.009663, A.009666 (Dubel Decl.).) The $7 billion will be (and has already begun to be) allocated between the Estate Claims Settlement (receiving one-third, or approximately $2.17 billion) and the Direct Claims Settlements (receiving two-thirds, or approximately $4.33 billion). Settling creditors will receive separate distributions on account of both the Estate Claims Settlement and the Direct Claims Settlement.[6] (*See generally* A.009547–52 (DelConte Plan Decl.).) The Plan has the cumulative effect of providing up to approximately $7.9 billion in cash to creditors over time (plus any recoveries from insurance and other litigation claims transferred to the master disbursement trust (the "**MDT**")).

This settlement framework not only provides enormous distributable value, but also provides a number of critical ancillary benefits: (i) it avoided immensely destructive inter-creditor litigation concerning relative entitlement and allocation; (ii) it avoided the potential unwinding of the DOJ Resolution and the destruction of

[6] Non-Settling Creditors will be eligible to receive a distribution from the Estate Claim Settlement if and when their claim is allowed, but will not receive a payment flowing from the Direct Claims Settlement (as they will have chosen to retain their direct claims against the Shareholder Released Parties in lieu of settling).

value to creditor recoveries that would result from the Debtors-Appellees' inability to satisfy the terms of the $1.775 billion forfeiture judgment credit, potentially leading the United States to consume the entire value of the Debtors-Appellees through its $2 billion superpriority claim; and (iii) it largely avoided costly, protracted, and uncertain litigation against the Sacklers by the Debtors-Appellees and their creditors. (*See* A.009666–67 (Dubel Decl.).)

### B. The Renewed Plan of Reorganization Builds on the Successes of the 2021 Plan

The Plan effects a comprehensive resolution of all claims against the Debtors-Appellees. Billions of dollars already have and will continue to flow into trusts established for the benefit of the Debtors-Appellees' creditors, the majority of which will go towards compensating victims and remediating the opioid crisis. There are four core components of the Plan.

First, the overwhelming majority of Purdue's cash and the billions of dollars in proceeds secured by the Estates through settlement of the estate causes of action under the Master Shareholder Settlement Agreement, was or will be transferred to nine trusts for the benefit of the Debtors-Appellees' public and private creditors—including the MDT, two public creditor trusts, a public school trust, four private creditor trusts, and a plan administration trust (the "**PAT**"). (A.009541–43 (DelConte Plan Decl.).) The allocation among the various trusts was heavily negotiated by the parties leading up to both the 2021 and 2025 confirmation hearings.

(A.9501.019 (Declaration of John M. Guard in Support of AHC's Reply to Plan Objections ("**Guard Decl.**")) ("In many ways the private-public negotiations were more difficult than the previous governmental negotiations. These negotiations required considerable effort and compromise given the disparate views on the value of different constituencies' claims.")); (A.009083 (Phase One Mediators' Report) (concluding "that every participant in the Mediation . . . engaged with both the Mediators and one another in good faith for the purpose of negotiating an allocation of the Debtors' estate as among the Private Claimants and Non-Federal Public Claimants.")); (A.009097 (Phase Two Mediators' Report) ("The primary purpose of the mediation – reaching a consensual agreement as to the allocation percentages between and among the public and private creditor groups engaged in the mediation – was successfully achieved.")); 2021 MBR at 76 ("The people representing the personal injury claimants in the mediation were some of the most effective personal injury lawyers in the world, which means that they are aggressive, creative, knowledgeable and responsible in the pursuit of their clients' claims.")); (A.009154–57 (Co-Mediators' Fourth Interim Status Report) ("[N]egotiations between public and private side claimants regarding plan distributions for private-side claimants, including some 140,000 personal injury claims, have also been ongoing.")); MBR at 672–73 ("the different classifications here reflect meaningful distinctions between the personal injury victims and the

governmental entities."). In order to facilitate the resolution of claims contemplated under the Plan, the Plan provides for an injunction that will channel claims against the Debtors-Appellees to the creditor trusts as provided for under the Plan and applicable trust distribution procedures ("**TDPs**"). (A.008258–59 (Plan § 10.8); A.006232 (Second Plan Supplement, Ex. A); A.008051 (Fourth Plan Supplement, Ex. R, Non-NAS Trust Distribution Procedures); A.008064 (Fourth Plan Supplement, Ex. Q, NAS Trust Distribution Procedures).)

The private creditor trusts and public-school trust are projected to receive in excess of $1.5 billion in value under the Plan, approximately $865.8 million of which will be used to compensate PI Claimants. (*See* A.009549–51 (DelConte Plan Decl.).) The trust distribution procedures governing this allocation were designed by representatives of the Ad Hoc PI Group and "employ procedures and terms that are consistent with best practices and follow the general types of distribution procedures approved and implemented successfully in multiple settlements and bankruptcy trusts involving large numbers of claims." (*See* A.009753.011 (Amended Expert Report of Deborah E. Greenspan ("**Am. Greenspan Report**")); A.008116 (Plan § 1.1) (defining "NAS PI TDP" as "trust distribution procedures to be implemented by the PI Trust with respect to NAS PI Channeled Claims, the terms of which shall be . . . reasonably acceptable to the Ad Hoc Group of Individual Victims"); A.008118 (providing same definition in connection with the "Non-NAS

PI TDP").) The amount allocated to PI claimants under the Plan is greater than the allocation in the 2021 Twelfth Amended Plan. *Compare* (A.009551 (DelConte Plan Decl.)) ("The [2025] Plan contemplates that the PI Trust will receive a total of approximately $865.8 million") *with In re Purdue Pharma*, 633 B.R. 53, 64 (Bankr. S.D.N.Y. 2021) (recognizing that the 2021 Plan contemplated "payments between 700 and $750 million through personal injury trusts".)

Second, "[t]he Plan also provides for the voluntary settlement of direct claims held by creditors [ ] against the Sackler[s]." MBR at 653. Each class of creditors was provided one of several Shareholder Release Consent Mechanisms (*see* A.008136 (Plan § 1.1)) through which they could consensually release any direct claims, which included, for PI Claimants, utilizing opt-in check boxes on the applicable form of ballot or other forms of affirmative consent, triggering releases governed by Sections 10.6(b) and 10.7(b) of the Plan (*See* A.008131; A.008243–45; A.008249–53 (Plan §§ 1.1, 10.6(b), 10.7(b))).

Third, the Plan delivered on a commitment made at the very outset of the Debtors-Appellees' chapter 11 cases: the creation of a public document repository containing over 100 million of pages of material. (*See* A.008203–14 (Plan § 5.13); A.09552–53 (DelConte Plan Decl.).) The Plan ensures that scholars and the public will have access to these materials.

Fourth, on the Effective Date, which occurred on May 1, 2026 (Dkt. No. 9133), all of the Debtors-Appellees' business operating assets were transferred to Knoa. (*See* A.008177–79 (Plan § 5.4(a)); A.009541–42, A.009544 (DelConte Plan Decl.).) Knoa is a private company owned by a 501(c)(4) foundation that is uniquely governed by a charter requiring that it deploy its assets to address the opioid crisis. (*See* A.009544 (DelConte Plan Decl.); A.009734–35 (Knoa Operating Agreement).) No federal, state, or local governmental entity owns the equity of Knoa. Knoa is required to operate in a responsible and sustainable manner, and is subject to the same laws and regulations as any other pharmaceutical company. (*See id.*) Moreover, Knoa is subject to an operating injunction binding it and its successors to certain restrictions on the marketing of opioid products. (*See* A.009544–45 (DelConte Plan Decl.); A.008178 (Plan § 5.4(g)); A.009732, A.009751 (Knoa Operating Agreement).)[7]

## V. The Bankruptcy Court Confirms the Renewed Plan of Reorganization, Which Becomes Effective on May 1, 2026

### A. Solicitation of the Revised Plan and Voting

On March 19, 2025, the Debtors-Appellees filed the Thirteenth Amended Plan of Reorganization and corresponding Disclosure Statement, which, among other

[7] Under the terms of the Master Shareholder Settlement Agreement, the Sacklers will be subject to restrictions on participation in the opioid business. (A.004643 (First Plan Supplement, Ex. A § 8.8).)

things, incorporated the terms of the Shareholder Settlements. (A.004136 (Thirteenth Amended Plan); A.004311 (Amended Disclosure Statement).) Following hearings held on June 18, 2025, and June 20, 2025, the Bankruptcy Court entered the Order approving the Disclosure Statement. (*See* A.004839 (Order Approving Disclosure Statement) ("**Disclosure Statement Order**").)[8] Pursuant to the Solicitation/Voting Procedures approved by the Court (A.004855 (Disclosure Statement Order, Ex. 1)), the Debtors-Appellees' Solicitation Agent, Kroll Restructuring Administration LLC ("**Kroll**"), mailed a solicitation package to each holder of Claims in the Voting Classes by July 11, 2025. (*See generally* A.007760 (Affidavit of Service of Solicitation Materials); A.010037 (Supplemental Declaration of Craig E. Johnson ("**Johnson Decl.**")).) The solicitation packages

[8] On July 1, 2025, the Debtors-Appellees filed amended versions of the Plan and Disclosure Statement. On June 17, 2025, the Debtors-Appellees also filed a series of Plan Supplements that contained drafts of certain documents relevant to the Plan's implementation, such as the Master Shareholder Settlement Agreement, the various trust agreements and trust distribution procedures. (*See* A.004643; A.006232 (Second Plan Supplement, Ex. A).) On June 17, 2025 and September 19, 2025, the Debtors-Appellees also filed (for informational purposes and not as part of the Plan Supplement) drafts of the various Direct Shareholder Settlement Agreements. (A.004757 (Governmental Entity Direct Shareholder Settlement Agreement); A.007242 (Certain Direct Claims Shareholder Settlement Agreements).) On September 26, 2025, the Debtors-Appellees filed the Fourteenth Amended Joint Chapter 11 Plan of Reorganization (A.007532), which incorporated additional detail regarding the Shareholder Settlements among certain organized creditor groups, and a final version of the Plan was filed on November 14, 2025 (A.008081 (Eighteenth Amended Joint Chapter 11 Plan of Reorganization).)

included (i) a notice of the Confirmation Hearing; (ii) the applicable Ballot; (iii) a cover letter from the Debtors-Appellees urging creditors to accept the Plan and a cover letter from the UCC recommending acceptance of the Plan; (iv) the Solicitation/Voting Procedures; and (v) a flash drive containing the Disclosure Statement Order, the Disclosure Statement, and the Plan. (*See* A.004857 (Disclosure Statement Order, Ex. 1).)

After the distribution of the solicitation packages, voting commenced. When the applicable voting deadlines had passed, Kroll tabulated the valid ballots in accordance with the Solicitation/Voting Procedures. (*See* A.010036, A.010038–39 (Johnson Decl.).) The voting results confirmed historic consensus in support of the Plan. Across all classes of voting creditors, more than 99% of the ballots cast and more than 99% of the amount of total voting dollars voted to accept the Plan. (*See* A.009670 (Johnson Decl., Ex. A).) Each class of creditors that voted overwhelmingly voted to accept the Plan. (*Id.*)

### B. The Bankruptcy Court Holds the Confirmation Hearing and Confirms the Plan

A three-day trial was held before the Bankruptcy Court on the Debtors-Appellees' Plan from November 12 through November 14, 2025 (the "**Confirmation Hearing**"). The Debtors-Appellees and other Plan supporters—including the remaining Appellees—put forth 19 witnesses and thousands of pages of evidence in support of confirmation of the Plan. MBR at 656-59. Not a single

party objected to the introduction of the testimony of any of the Debtors-Appellees' witnesses, or to the exhibits introduced through their testimony. *Id.* at 657. Ultimately, all of the testimony and exhibits offered by the Plan proponents were admitted. *Id*. at 659. No objecting party introduced any evidence.

By the end of the Confirmation Hearing, no represented party objected to confirmation of the Plan. *Id.* However, 19 *pro se* litigants, including eight of the Appellants in these Appeals, filed papers that could reasonably be construed as objections to the Plan. (A.007897–98 (Debtors' Memorandum of Law in Support of Confirmation).) These objectors were given an opportunity to present argument and be heard by the Bankruptcy Court on November 13 2025. Appellants Bass, Ecke, Jannotta, Morales, Pitts-Tillman, and Walker spoke on the record.

On November 18, 2025, the Bankruptcy Court confirmed the Plan and overruled all objections in a multi-hour bench ruling. MBR at 670-76. That same day, the Bankruptcy Court entered the Confirmation Order. (A.008314 (Confirmation Order).) This ruling was later memorialized in a 64-page modified bench ruling issued on November 20, 2025. *See generally* MBR. The MBR reflects the Bankruptcy Court's conclusion that the Plan and its components, including the fully consensual third-party releases, satisfy all applicable requirements of the Code, pursuant to 11 U.S.C. § 1129. MBR at 646-47. The Bankruptcy Court held that the

Plan's classification scheme is fair and equitable, and the various Plan mechanics are consistent with the Code and governing law, including *Harrington*. *Id.*

### C. Purdue Pharma is Sentenced Pursuant to the Court-approved Resolution with the Department of Justice

On April 28, 2026, the United States District Court for the District of New Jersey sentenced PPLP in connection with its November 2020 guilty plea underlying the DOJ Resolution. PPLP's sentencing included a criminal fine of $3.544 billion, which is being treated as part of the Federal Government's unsecured claim, and a $2 billion criminal forfeiture, of which $1.775 billion represents the Forfeiture Judgment Credit. As a consequence of the criminal sentencing, PPLP was excluded from participating in federally funded healthcare programs by the U.S. Department of Health and Human Services.[9] Consequently, PPLP is no longer eligible to engage in the sale, marketing, and distribution of opioid products.

### D. The Plan Becomes Effective and is Consummated on May 1, 2026, Ending Purdue's Operations and Commencing Knoa Pharma's Public Health Efforts

Following PPLP's sentencing, the Debtors-Appellees emerged from chapter 11 on May 1, 2026 (the "**Effective Date**") (Dkt. No. 9133).

---

[9] Press Release, U.S. Dep't of Justice, Opioid Manufacturer Purdue Pharma Sentenced for Fraud and Kickback Conspiracies (Apr. 28, 2026), https://www.justice.gov/usao-nj/pr/opioid-manufacturer-purdue-pharma-sentenced-fraud-and-kickback-conspiracies (noting a condition of the Forfeiture Credit Judgment is that "Purdue ceases to operate in its current form").

Prior to emergence, the Debtors-Appellees had both non-cash and cash assets. As of the Effective Date, and as contemplated by the Plan, all operational non-cash assets of the Debtors-Appellees were transferred to Knoa. (A.008177 (Plan § 5.4(c)).) The Debtors-Appellees' remaining roughly $1.5 billion in unrestricted cash was disbursed to various sources at or around the time of emergence. Roughly $135 million was transferred to Knoa for operating expenses and related costs, approximately $140 million was transferred to the PAT to fund certain distributions to creditors and the wind down of the Debtors' estates. (A.008177, A.008174 (Plan §§ 5.4(c) 5.3(d)).) Roughly $910 million was also transferred to the MDT, (A.008180–81 (Plan § 5.6(b)–(c)), of which roughly $880 million was disbursed to the various creditor trusts for satisfaction of claims against the Estates, with the remaining cash funding operation of the MDT.[10] The roughly $880 million provided by the Debtors-Appellees was disbursed to the various creditor trusts together with approximately $1.1 billion in Sackler payments, and there is no practical way to trace current location of all dollars contributed by the Debtors-Appellees.

Ultimately, following the aforementioned transactions and PPLP's criminal sentencing, the Debtors-Appellees have no cash or other assets and no longer retain

[10] Further, an additional roughly $285 million has been distributed to finance a number of the Debtors-Appellees' financial obligations, including satisfaction of the DOJ forfeiture judgment, employment retention plan payments, and insurance obligations.

an interest in potential causes of action (which are now vested in others, like the MDT and Knoa).

## VI. Nine Individuals Proceeding *Pro Se* Appeal the Confirmation Order

Nine individual appeals from the Confirmation Order were filed by Ronald Bass, Maria Ecke,[11] Ellen Isaacs, Mary Jannotta, Amanda Morales, Laurie Danielle Pitts-Tillman, Keith Redwood, Rosemary Walker, and Joshua Williams (the "**Appellants**").[12] Only six of the Appeals were filed before the December 2, 2025 deadline to file a notice of appeal. Ms. Jannotta's appeal was filed on December 9, 2025—a full week after the deadline elapsed. (*See* A.008641 (Jannotta Notice of Appeal).) Ms. Isaacs contends that she timely filed her appeal, (Isaacs Appeal, [Dkt. No. 7] at 2), but her notice of appeal was filed and entered on December 4, 2025—two days after the applicable deadline, (A.008639 (Isaacs Notice of Appeal)). Mr. Williams, who did not object to confirmation of the Plan, filed his notice of appeal

[11] Ms. Ecke's Statement of Issues and Designation of Contents was untimely filed in the Bankruptcy Court on January 12 and 15, 2026. (*See* A.008653; A.008663.)

[12] *See Bass v. Purdue Pharma*, No. 7:25-cv-10282 (S.D.N.Y 2025) ("**Bass Appeal**"); *Isaacs v. Purdue Pharma*, No. 7:25-cv-10427 (S.D.N.Y 2025) ("**Isaacs Appeal**"); *Morales v. Purdue Pharma*, No. 7:25-cv-10158 (S.D.N.Y 2025) ("**Morales Appeal**"); *Pitts-Tillman v. Purdue Pharma*, No. 7:25-cv-10433 (S.D.N.Y 2025) ("**Pitts-Tillman Appeal**"); *Walker v. Purdue Pharma*, No. 7:25-cv-09681 (S.D.N.Y 2025) ("**Walker Appeal**"); *Redwood v. Purdue Pharma*, No. 7:25-cv-10327 (S.D.N.Y 2025) ("**Redwood Appeal**"); *Ecke v. Purdue Pharma*, No. 25-cv-10420 (S.D.N.Y. 2025) ("**Ecke Appeal**"); *Jannotta v. Purdue Pharma*, No. 25-cv-10646 (S.D.N.Y. 2025) ("**Jannotta Appeal**"); *Williams v. Purdue Pharma*, No. 26-cv-00045 (S.D.N.Y. 2026) ("**Williams Appeal**").

24 days after the applicable deadline and has not filed any brief in support of his appeal. (A.008651 (Williams Notice of Appeal).) Of the nine appellants, only four filed submissions that have been construed as opening briefs and shared with the Court pursuant to the Court's order dated April 22, 2026.[13] (*See* Walker Appeal [Dkt. Nos. 9, 39]; Redwood Appeal, [Dkt. No. 53] (the "**Redwood Br.**"); Isaacs Appeal [Dkt. No. 44] (the "**Isaacs Br.**").) The Debtors-Appellees have not received or identified on the dockets of these consolidated appeals any documents that they believe can be reasonably construed as an opening appeal brief of Appellants Morales, Bass, Ecke, Jannotta, or Williams.

Although the Appellants raise a number of issues, each Appellant seeks vacatur of the Plan on two overarching (and meritless) bases: (1) the Plan contains nonconsensual third-party releases in violation of *Harrington*; and (2) the Plan was not properly confirmed by the Bankruptcy Court.[14] The Appellees sought

[13] Ms. Pitts-Tillman submitted her opening brief to Debtors-Appellees via e-mail (the "**Pitts-Tillman Br.**"). A courtesy copy was shared with the Court.

[14] *See, e.g.*, Bass Appeal (Dkt. No. 15 at 5) (releases are invalid because the Sacklers "haven't petition personally to the bankruptcy court for the protection and release they're seeking"); Isaacs Appeal (Dkt. No. 9-1 at 4) ("The plan's opt-in mechanism is a transparent attempt to circumvent *Harrington*"); Morales Appeal (Dkt. No. 4-1 at 3) (Plan was required to treat her claim differently from other personal injury claims and improperly "include[s] broad releases shielding the Sackler family"); Pitts-Tillman Appeal (Dkt. No. 15 at 1) (releases are "imposed without proper consent"); *id*. (issues include "[w]hether confirmation of the plan denied the appellant equal protection and fair treatment compared to other similarly situated claimants."); Walker Appeal (Dkt. No. 11 at 4) (describing third-party releases as

consolidation of these Appeals to streamline their resolution, and on April 16, 2026, this Court granted Appellees' motion for consolidation, holding that the Appeals "arise from the same Confirmation Order, are based on a single factual record, and present overlapping questions of law and fact." (Walker Appeal, Dkt. No. 93 at 5; *id.* at 4 (agreeing that "each Appellant ultimately seeks vacatur of the Plan on two overarching grounds").)[15]

While the Appeals were pending, this Court considered and denied two motions to stay the Confirmation Order from Ms. Morales (Morales Appeal, Dkt. No. 45) and Ms. Pitts-Tillman (Pitts-Tillman Appeal, Dkt. No. 44). In denying such relief, this Court found that Appellants likely lacked standing to challenge the Plan's nondebtor releases because neither Appellant had consented to release their own claims against the Sacklers. (Pitts-Tillman Appeal, Dkt. No. 44 at 2.) The Court also found that delaying emergence would "halt the recovery of billions of dollars in creditor recoveries, opioid abatement programs, and the creation of a public

---

"blackmail, quid pro quo for [nothing] . . . fraud [and] bribe[ry]"); A.008646 (*Designation of Contents and Statement of Issues filed by Mary S. Jannotta*) (arguing that "the Plan violates *Harrington*"); A.008648 (issues include "[w]hether the Plan violates §1123(a)(4) by treating similarly situated PI claimants differently"); Redwood Appeal (Dkt. No. 18 at 2) (alleging that the Plan was improperly confirmed because it misclassifies his economic damages claims).

[15] This Court *sua sponte* consolidated Mr. Williams's appeal with the remaining Appeals. (Dkt. No. 93 at 1 n.1.)

benefit company dedicated to combatting the effects of the opioid crisis." (Pitts-Tillman Appeal Dkt. No. 44 at 2; Morales Appeal Dkt. No. 45 at 2-3.)

## ARGUMENT

The Confirmation Order should be affirmed. The Bankruptcy Court correctly determined that, as a factual matter, releases of third-parties under the Plan were granted only by creditors who affirmatively consented to settle such claims. MBR at 646. That mechanism is consistent with *Harrington*, the United States Constitution, and governing law, including section 1129 of the Code. Appellants' remaining arguments are irrelevant to the standards governing confirmation and do not bear on this appeal.

The appeals by Ms. Morales, Mr. Bass, Ms. Ecke, Mr. Williams and Ms. Janotta should additionally be rejected because these five Appellants did not file merits briefs. Accordingly, the Court "may—on its own after notice or on the appellee's motion—dismiss the appeal." Fed. R. Bankr. P. 8018(a)(4). *See also* Fed. R. Bankr. P. 8003(a)(2) ("An appellant's failure to take any step other than timely filing a notice of appeal . . . is ground only for the district court . . . to act as it considers appropriate, including dismissing the appeal."). Courts in this district accordingly routinely dismiss bankruptcy appeals *sua sponte* for failure to file a brief. *See In re Archibald*, 2024 WL 2093644, at *1 (S.D.N.Y. May 9, 2024) (*sua sponte* dismissing bankruptcy appeal for failure to submit appellate brief and

collecting authority of the court's inherent power to do so); *In re Residential Cap., LLC*, 2016 WL 7477558, at *1 (S.D.N.Y. Dec. 28, 2016) (same); *In re Regan*, 2024 WL 2132569, at *2 (N.D.N.Y. May 13, 2024) (same).

## I. The Bankruptcy Court Correctly Determined that the Releases Under the Plan are Fully Consensual

Appellants' principal attack on the Plan is that the third-party releases are an unlawful end-run around *Harrington*—or, in some formulations, a bribe, blackmail, or extortion.[16] This is entirely wrong, as most vividly illustrated by the simple and ironic fact that every Appellant who argues the releases are nonconsensual chose not to grant and is thus not bound by the third-party releases at all, was not "forced" to release anyone, and lacks standing to challenge other parties' right to grant those releases voluntarily. This alone largely disposes of these appeals.

### A. *The Plan's Third-Party Releases Are Fully Consensual*

As the Supreme Court recognized, the Bankruptcy Court's authority to confirm a plan of reorganization containing consensual third-party releases is well settled. *Harrington,* 603 U.S. at 226 ("Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan."); *see also In re Chassix Holdings, Inc.*, 533

[16] (*See* Isaacs Br. at 11–12, 25; Pitts-Tillman Br. at 5–6, 10–13, 16; Walker Br. (Dkt. No. 9) at 2, 5–6, 9–10; Walker Br. (Dkt. No. 39) at 3–6, 9–10, 13–17, 20–25, 27–37.)

B.R. 64, 80 (Bankr. S.D.N.Y. 2015); *In re Voyager Digit. Holdings, Inc.*, 649 B.R. 111, 130 (Bankr. S.D.N.Y. 2023); *In re 2U, Inc., et al.*, No. 24-11279, Hr'g Tr. 35:15-16; 28:2-14; 32:12-20; 38:2-8 (Bankr. S.D.N.Y. Sept. 6, 2024) (Dkt. No. 175); *In re Acorda Therapeutics, Inc., et al.*, No. 24-22284, Hr'g Tr. 101:5-103:4 (Bankr. S.D.N.Y. Aug. 7, 2024) (Dkt. No. 449). Each appellant was given the opportunity to elect to participate, or not participate, in third-party settlements under the Plan. Only one Appellant, Keith Redwood, elected to participate; he does not challenge the third-party releases. Because the third-party releases were granted knowingly and voluntarily, the Bankruptcy Court correctly determined that "the releases here are consensual." MBR at 663.

Perhaps confused by the plan confirmed in 2021, certain Appellants erroneously contend that the Plan's third-party releases are nonconsensual. But none really contend that the Plan imposed releases on anyone that did not affirmatively consent. Nor could they. The Plan provides that creditors belonging to classes 10(a) and 10(b) (PI Claimants) may elect to release any direct claims they hold against the Sacklers by affirmatively 'opting in' to the release on their ballot. *See* MBR at 646 ("Parties are free to preserve their right to sue the Sackler[s] [], with such a right preserved unless the party takes the affirmative step of opting into the release.") Section 10.7(b) of the Plan, which governs the releases of creditors' direct claims against the Sacklers, is absolutely clear that releases are only granted under the Plan

by "the Releasing Parties"—which the Plan defines as creditors who consent to the releases, including, in the case of PI Claimants, by "electing to opt-in to the Third-Party Releases on [their] applicable ballot." (A.008249–53; A.008131 (Plan §§ 10.7(b); 1.1) (defining "Releasing Parties" and "Opt-In Settling Creditor").) And the Plan explicitly provides that the releases "shall not apply to [] Holders of Claims who do not opt-in to the releases through their applicable ballots." (*See* (A.008243–45; A.008249–53 (Plan §§ 10.6(b), 10.7(b)).)

Indeed, each Appellant voted on the Plan and separately chose whether to opt in to settle any direct claims they may have against the Sacklers:

| Appellant | Vote on Plan | Granted Third-Party Releases? |
|---|---|---|
| Ronald Bass | Reject | No (Blank) |
| Maria Ecke | Reject | No |
| Ellen Isaacs | Reject | No |
| Mary Janotta | No Ballot Returned | No (No Ballot Returned) |
| Amanda Morales | Reject | No |
| Laurie Danielle Pitts-Tillman | Accept | No |
| Keith Redwood | Accept | Yes (Opt-In to Releases) |
| Rosemary Walker | Claim disallowed | No (claim disallowed)[17] |

As the Bankruptcy Court put it, "[a] clearer form of 'consent' can hardly be imagined." (MBR at 666 (quoting *In re Chassix Holdings, Inc.*, 533 B.R. at 80

[17] Only a "person aggrieved" has standing to appeal an order from the bankruptcy court. *Gordon v. Gazes* (*In re 22 Fiske Place, LLC*), 2022 WL 2819093, at *7 (S.D.N.Y. July 18, 2022). This test is more demanding than standing under Article III; the injury must be direct and financial. *Id.* Ms. Walker does not meet these stringent standards because her claim has been disallowed by the Bankruptcy Court,

(confirming plan with opt-in settlement structure).) And courts routinely confirm plans of reorganization with similar "opt in" structures for consensual settlement of claims. *In re Voyager Digit. Holdings*, *Inc.*, 649 B.R. at 130 (rejecting objections to third-party releases where "the plan here provides that no creditor or shareholder has released any claims belonging to that person or entity unless that person has affirmatively done so by executing the 'opt-in' release form"); *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (confirming plan of reorganization where "any third party release is effective only with respect to those who affirmatively consent to it . . ."); *In re Wyly*, 2019 WL 2590035, at *6 (Bankr. N.D. Tex. June 22, 2019) (same); *In re PG&E Corp.*, 617 B.R. 671, 683 (Bankr. N.D. Cal. 2020) (same).

### B. *The Plan Did Not "Coerce" Creditors to Opt-In by Providing Third-Party Settlement Consideration Only to Those Creditors That Elected to Participate in the Third-Party Settlements*

The Bankruptcy Court also correctly determined that creditors were not "coerced" or "bribed" into granting releases under the Plan. (MBR at 671–72.)

---

leaving her with no interest in the estate. (*See* A.008849 (Order Denying Submissions by Rosemary Walker); *In re E. C. Ernst, Inc.*, 2 B.R. 757, 760 (S.D.N.Y. 1980) (a person is "aggrieved" where their "property may be diminished, his burdens increased or his rights detrimentally affected by the order sought to be reviewed."); *In re Quigley Co.,* 391 B.R. 695, 705 (Bankr. S.D.N.Y. 2008) ("[T]he objecting party can only challenge the parts of the plan that directly implicate its own rights and interests.").) She therefore has no direct, pecuniary interest in the outcome of the appeal, and is not an aggrieved person.

Being given the choice to participate in a settlement, and receive the consideration, or to reject the settlement and not get the settlement consideration is the essence of free choice—not coercion.

As an initial matter, it appears some Appellants remain confused about the Plan, and argue—incorrectly—that creditors must opt in to the third-party releases to receive distributions on account of their claims against the Debtors. This is simply wrong (*see* A.008131; A.008243–45; A.008249–53 (Plan §§ 1.1, 10.6(b), 10.7(b)), and the Bankruptcy Court correctly explained as much: creditors who did not release their direct claims against the Sacklers are still entitled to "receive pro-rata distributions from the Estate Claims Settlement and other estate value (if they meet the applicable trust distribution procedures)" on any allowed claims. (MBR at 54.) No creditors' eligibility to receive distributions on account of claims against the Debtors was conditioned on their decision to grant or withhold the third-party releases.

On the other hand, because non-settling creditors did not release their direct claims against the Sacklers, they, of course, do not receive additional distributions and rights[18] in consideration for a settlement they decided not to become party to—

[18] As the UCC explains in paragraph 14 of its brief, claimants who elected to give a release also had their claims immediately deemed "allowed," (*see also supra* note 6) and the Debtors, Sacklers, and other Plan proponents agreed to waive any legal objections to their claims.

i.e. they do not receive consideration on account of a contract they declined to enter into. (*See id.*) Instead, such creditors "will be able to pursue litigation of their direct claims against the Shareholder Released Parties" irrespective of whether their claims are allowed in the bankruptcy. (*Id.*) That does not amount to coercion or a "bribe"—it is simply consideration in exchange for value, which is precisely what a settlement is. *See* MBR at 671-72 ("[T]his Plan does not compel victims to forfeit their rights to pursue the Sacklers. Only claimants that affirmatively opt into the releases provided to the Sacklers waive their rights to pursue such claims."); *Cf.* 8 Collier on Bankruptcy ¶ 1141.02 (Richard Levin & Henry J. Sommer eds., 16th ed. 2025) (because a court's approval is based on contract principles, "a consensual third-party release is no different from any other contract or settlement").

### C. *Appellants that Did Not Grant the Third Party Releases Lack Standing To Challenge Releases That They Did Not Give and That Do Not Bind Them*

The Appellants who did not grant the third-party releases—*i.e.*, every Appellant other than Mr. Redwood—are not party to the settlement, and thus lack standing to challenge the third-party releases.[19] To satisfy the "injury in fact"

[19] As explained *supra*, n.17, Ms. Walker's claim was disallowed. Only claimants are offered the opportunity to release claims they hold against non-debtor third parties. Because Ms. Walker is not a claimant in the bankruptcy, she has not granted any third-party release and is free to pursue any claims she has against non-debtor third parties.

requirement of Article III standing, a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This settled rule applies equally in bankruptcy: a creditor "cannot challenge portions of the plan that do not affect its direct interests." *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 497 (Bankr. S.D.N.Y. 2024). The Appellants who did not opt in do not have any interest in the provisions of the Plan permitting other creditors to settle their claims—and they thus lack standing to challenge the Plan on this basis.

Similarly, arguments concerning "coercion" or "bribery" by Appellants that did not grant the releases are both baseless and irrelevant in this context. Coercion and bribery are defenses to enforcement of a contract. *See, e.g.*, Restatement (Second) of Contracts §§ 78 (providing that the remedy for an unenforceable contract is voiding the contract); 175 (Comment)(d) (A.L.I. 1981) (observing that the remedy for duress is voiding the existing agreement); *cf. New York Life Ins. Co. v. Singh*, 2016 WL 11395019, at *3 (E.D.N.Y. Jan. 12, 2016), *report and recommendation adopted,* 2016 WL 1451534 (E.D.N.Y. Apr. 12, 2016) (collecting cases holding that duress and mistake are defenses, not affirmative claims). Appellants (other than Mr. Redwood) did not contract to release their direct claims, which they retain and may pursue as they see fit. They are not a party to any release

contract that is being enforced against them, making the contractual defenses of coercion and duress entirely inapplicable.

## II. The Plan Was Properly Confirmed Pursuant to Section 1129 of the Code

Section 1129 of the Code provides that a plan can be confirmed only if sixteen requirements are met. *See* 11 U.S.C. § 1129. Appellants challenge only two: whether the Plan "complies with the applicable provisions of this title" and whether the Plan is in the best interests of the creditors. 11 U.S.C. § 1129(a)(1), (a)(7). Both requirements are met. As explained below, Appellants' objections fail because their claims were properly classified and all evidence presented at trial showed that the Plan comfortably satisfies the "best interests of creditors" test.

### A. *Appellants' Personal Injury Claims are Properly Classified with Other Personal Injury Claims*

Ms. Morales and Mr. Redwood argue that the Plan improperly classified their claims with the claims of other adult PI Claimants. That is, they assert that the nature or mechanism of injury that caused their claims (a drug interaction in Ms. Morales's case, and economic damages in Mr. Redwood's) is different from those of other PI Claimants such that they must be in their own class. (Morales Appeal, Dkt. No. 4-1 at 2-3); Redwood Appeal, Dkt. No. 18 at 1-3.) The Bankruptcy Court correctly rejected this argument, and held that the tens of thousands of unsecured personal injury claims are properly classified together.

The Code requires that a plan organize claimants into "classes" and authorizes classification of "a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122. Thus, classification is governed by "two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason." *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996). Within the confines of these rules, bankruptcy courts exercise "broad discretion" to classify similar claims together—and they routinely exercise this discretion to classify personal injury claims together. *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 110 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) (holding claims arising out of exposure to asbestos were properly classified together because "[i]t makes no difference . . . what the applicable legal theory is that underlies the claim, because, after all is said and done, all these claims relate to the assets of the debtor in substantially the same way" (internal quotation marks omitted)); *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (personal injury claims were properly classified together because all "have the same legal rights against Quigley's estate; they are unsecured creditors."). Indeed, it is hornbook law that courts "look[] at the nature of the claim . . . and the relationship of the claim to property of the debtor" to determine whether classification was proper—not, as Appellants contend, at the nature of the

underlying allegations of a claim. 7 Collier on Bankruptcy ¶ 1122.03[3] (16th ed. 2021).

Under the Plan, claims are classified based on, among other things, legal rights to the Debtors' property and their priority. (*See* Plan § 3.2.) Different classes of opioid claimants have different rights and causes of action against the Debtors: for example, some governmental entities have sovereign powers that individuals do not possess, while individuals may assert claims for bodily injury that governments cannot bring. But not all differences in a claim bear on classification. As Judge Lane explained, the nature of the injury Appellants suffered does "not meaningfully alter the priority or legal basis" for the claim in the bankruptcy proceedings. (MBR at 672). "Claims of adults . . . [for] 'alleged opioid-related personal injury' are classified together, regardless of the alleged mechanism of injury or nature of damages, because such claims have the same legal nature and relationship to the property of the estates." (MBR at 672) (citing Plan Art. IV (explaining treatment of claims and interests).) Appellants do not contend that any of their claims relate to the Debtors' assets differently from other personal injury claims. Moreover, as Judge Lane also determined, there is far more than a "legitimate reason" to classify personal injury claims together: with tens of thousands of PI Claimants, any attempt to mince these claims into myriad differing classes based on the specifics of their asserted injuries and causes of action would "result in an unworkably complex

classification scheme" with many thousands of classes. (MBR at 672); *see also In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310-11 (Bankr. S.D.N.Y. 2016) (plan proponents must only show a rational or reasonable business, factual, and/or legal basis to justify separate classification of similar claims).

### B. *The Bankruptcy Court Correctly Determined that Creditors Receive Far More than They Stand to Receive in a Liquidation, Satisfying the "Best Interests" Test of 11 U.S.C. § 1129(a)(7)*

The Bankruptcy Court correctly held that the Plan satisfies section 1129(a)(7) of the Code. This provision requires that each individual creditor has either accepted the plan or "will receive or retain" property having a present value of "not less than the value such holder would receive . . . if the debtor were liquidated under chapter 7" of the Code. 11 U.S.C. § 1129(a)(7)(A)(ii). Commonly referred to as the "best interests of creditors" test, this standard is satisfied so long as the estimated recoveries for a debtors' creditors in a hypothetical chapter 7 liquidation would be less than or equal to the estimated recoveries under the debtors' plan of reorganization for a holder of an impaired claim that votes to reject the plan. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) ("[T]he court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7," factoring in, among other things, "the probable costs incident to

such liquidation."); *In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997) (same).

Ms. Pitts-Tillman's contention that the Debtors "failed to provide adequate Chapter 7 liquidation comparisons" is flatly contradicted by the uncontested record. (Pitts-Tillman Br. at 6.) The Bankruptcy Court held that the Plan provides far greater recoveries for the Debtors' creditors than would be received under a hypothetical liquidation based on "[a] detailed and unchallenged liquidation analysis set[ting] forth the estimated recoveries for each class of impaired creditors in a hypothetical Chapter 7 liquidation scenario." (MBR at 668.) That analysis was prepared by Jesse DelConte, a Managing Director of AlixPartners and financial advisor to the Debtors. (*Id.*) Mr. DelConte has advised companies for over 20 years across various industries in restructuring, including with respect to liquidation analyses. (A.009566–67 (DelConte Report).)

Mr. Delconte's uncontradicted sworn testimony showed that "estimated recoveries for all creditor groups under the Plan are no less than, and in many cases significantly greater than, the estimated recoveries for creditor groups in a hypothetical chapter 7 liquidation." (*See* A.009568–69 (DelConte Report); A.010173–74 (Nov. 12 H'rg Tr.).) Liquidation of the Debtors' assets would, he found, result in proceeds available for distribution to creditors ranging from $623.1 million to roughly $3.4 billion (in an unlikely high-case scenario)—compared with

over $7 billion under the Plan. (A.009568–69 (DelConte Report).) As the Bankruptcy Court put it, "[t]he contrast between a hypothetical Chapter 7 liquidation and the Plan is stark: at least an estimated $7.4 billion dollars of cash in creditor recoveries plus significant additional non-monetary benefits under the Plan, as compared with, at most, roughly $3.4 billion, $2 billion of which would satisfy the claim resulting from the DOJ Forfeiture Judgment." MBR at 668. No party proffered any competing expert contesting the results of Mr. DelConte's analysis. And Ms. Pitts-Tillman does not identify any clear error in the Bankruptcy Court's reliance on the extensive and unchallenged evidence before it.

## III. The Plan is Constitutional

The Plan does not, as Appellants contend, vitiate any jury trial rights protected by the Seventh Amendment. Nor was the process for confirmation of the Plan inconsistent with the Due Process Clause.

### A. *The Plan's Claims Allowance Procedures Do Not Violate the Seventh Amendment*

Ms. Isaacs and Ms. Pitts-Tillman improperly argue for the first time on appeal that the Plan disposes of non-core claims carrying jury trial rights. (Isaacs Br. at 29–30; Pitts-Tillman Br. at 4-6, 12-13, 15-16.) The Court need not consider these arguments, which have been waived because they were not raised before the Bankruptcy Court. "It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal[,]" and this rule applies

equally in the context of appeals from bankruptcy courts. *In re Latam Airlines Grp., S.A.*, 643 B.R. 741, 752 (S.D.N.Y. 2022) (quoting *In re Nortel Networks Corp. Secs. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) and declining to consider creditor's argument raised for the first time on appeal from bankruptcy court order), *aff'd sub nom. In re Latam Airlines Grp. S.A.*, 55 F.4th 377 (2d Cir. 2022); *see also Flynn v. James*, 513 F. App'x 37, 40 (2d Cir. 2013) ("Arguments raised for the first time on appeal are deemed waived.").

In any event, the arguments are meritless because the Plan does not dispose of non-core claims or otherwise vitiate any creditor's right to a jury trial under the Seventh Amendment. The Plan does not dictate how an allowed claim carrying a jury trial right must be treated at all—and its silence cannot be read to impair Appellants' constitutional rights. The only processes the Plan does address—claims allowance and disallowance, and channeling of claims to trusts—are procedures that are properly implemented under the Code.

Under the Plan, channeled claims for alleged opioid-related personal injury to a neonatal abstinence syndrome child ("**NAS PI Claims**") or to persons who do not hold a NAS PI Claim ("**Non-NAS PI Claims**") are channeled to the Personal Injury Trust, which has its own procedures for adjudicating allowed claims. (*See* Plan §§ 1.1, 5.8.) The claims allowance process is explicitly enumerated as a "core"

proceeding that may proceed in bankruptcy court under 28 U.S.C § 157.[20] Courts in this district accordingly regularly hold that claims allowance—including personal injury claims allowance—belongs in bankruptcy court, and that bankruptcy courts have constitutional and statutory power to administer the process. *See, e.g.*, *In re Roman Cath. Diocese of Rockville Ctr.*, 650 B.R. 765, 776 (Bankr. S.D.N.Y. 2023), *appeal denied, judgment aff'd sub nom. In re Roman Cath. Diocese of Rockville Ctr., New York*, 2024 WL 2262708 (S.D.N.Y. May 17, 2024) (bankruptcy court had authority to disallow personal injury claim); *In re Chateaugay Corp.,* 111 B.R. 67, 76 (Bankr. S.D.N.Y. 1990) (personal injury proof of claim was properly subjected to the claims allowance and disallowance process); *cf. In re Kirwan Offs. S.à.R.L.*,

[20] Allowance of a claim is distinct from liquidation of a claim. The exception to bankruptcy courts' jurisdiction under § 157(b)(2)(B) for "the liquidation or estimation of . . . personal injury tort or wrongful death claims . . . for purposes of distribution" is not implicated by the claims allowance or disallowance process. *See In re Chateaugay Corp.*, 111 B.R. 67, 73–74 (Bankr. S.D.N.Y. 1990) ("Although § 157(b)(2)(B) restricts a bankruptcy court's power to liquidate or estimate personal injury tort or wrongful death claims for purposes of distribution, it imposes no corollary restriction upon a bankruptcy court's ability to *disallow* such claims in the first instance if they are not sustainable at law. Allowing or disallowing claims is clearly a separate and distinct function from liquidating or estimating that claim."); *In re Residential Cap., LLC*, 519 B.R. 890, 905 (Bankr. S.D.N.Y. 2014) ("[T]his Court has jurisdiction over the allowance or disallowance of personal injury tort claims; the only limitation being that the Court lacks authority to estimate or liquidate such claims, which is unnecessary here."). The TDPs' provision for *liquidation* of a claim explicitly "do[] not impair" applicable rights under 28 U.S.C. § 157. (A.008055 (Fourth Plan Supplement, Ex. R, Non-NAS Trust Distribution Procedures); A.008068 (Fourth Plan Supplement, Ex. Q, NAS Trust Distribution Procedures)).

792 F. App'x 99, 103–04 (2d Cir. 2019) ("Because [the creditor] voluntarily presented these claims to the bankruptcy court . . . we conclude that his conduct establishes implicit consent.").

Appellants' invocation of the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011) is misplaced. Submission of a proof of claim is the quintessential form of consent to a bankruptcy court's jurisdiction. *See Langenkamp v. Culp*, 498 U.S. 42, 44 (1990) ("[B]y filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power."). Consequently, in *Stern*, the Supreme Court explained that a bankruptcy court may issue a final order in the claims allowance process. *Stern*, 564 U.S. at 498 ("[H]e who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure." (citing *Katchen v. Landy,* 382 U.S. 323, 333 n. 9 (1966)).

### B. *Appellants Were Provided Process Far Exceeding the Constitutional Minimum*

The confirmation proceedings provided Appellants with far more than the constitutional minimum process due. The bedrock of due process is notice and the opportunity to be heard. *See, e.g.*, *In re Medaglia*, 52 F.3d 451, 455 (2d Cir. 1995) ("The means to that end is 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action.'") (quoting *Mullane v.*

*Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950))); *In re Haemmerle*, 529 B.R. 17, 23 (Bankr. E.D.N.Y. 2015). Appellants received ample notice far exceeding the minimum constitutional standards. *See* 2021 MBR at 59 (notice program was "unprecedently broad.") They do not seriously contend that the noticing program for the Plan was inadequate—nor could they, given that they all received notice of and most participated in the Confirmation Hearing.

Appellants also had ample opportunity to be heard. The Bankruptcy Court extended a number of special accommodations to *pro se* creditors. It specifically directed that plain language notices be filed on the docket indicating that *pro se* parties would have a dedicated block of time to present argument. (*See* A.008078 (Notice of Hearing to Objecting *Pro Se* Claimants Regarding The Confirmation Hearing ); MBR at 656 (observing that 13 *pro se* parties were heard), 61 ("The Court permitted any party to object to witness testimony and cross-examine witnesses in person").) Many of the Appellants took this opportunity, and in fact, during the Confirmation Hearing, the only person to cross-examine any witness was a *pro se* claimant. (A. 10676 (Nov. 14, 2025 Hr'g Tr.) (noting that "[e]very single witness was made available for live cross-examination" but only a single *pro se* claimant cross-examined any witness).)

## IV. Appellants' Remaining Arguments Do Not Provide a Basis to Disturb the Confirmation Order

Appellants' remaining arguments do not bear on the legal standards governing confirmation of a chapter 11 plan, and in any event were not raised below and are thus waived. *See supra* Section III(A).

***Mr. Redwood's*** self-styled "memorandum of understanding" appears to ask this Court to adjudicate his individual claim under Section 502 of the Code. The submission contains AI-generated output that appears to raise concerns about the claims allowance process. Mr. Redwood's request appears to seek to be paid first and in full. He does not identify any cognizable defect in the Bankruptcy Court's confirmation analysis or the classification scheme. *See* Redwood Br. at 1–3, 8–10.

***Ms. Walker:*** The Court need not consider Ms. Walker's various assertions regarding privacy, defamation, the ADA, or the Plan's use of the term "cramdown." Ms. Walker lacks standing to appeal because her claim has been disallowed[21] (it was filed over five years after the bar date) and she therefore is not a "person aggrieved" by the Confirmation Order nor a party in interest. *In re 22 Fiske Place, LLC*, 2022 WL 2819093, at *7. Ms. Walker's many repetitive filings concerning perceived

[21] Mem. Decision and Order On Late Claim Mot., *In re Purdue Pharma L.P.*, 2026 WL 1905691, at *9 (Bankr. S.D.N.Y. July 1, 2026) (denying Ms. Walker's late claim motion on the basis that she failed to demonstrate excusable neglect for filing years after the bar date because, among other reasons "Ms. Walker did not seek to file a claim . . . for some two years after she learned of these bankruptcy cases in 2023").

personal grievances and terminology have resulted in both this Court and the Bankruptcy Court barring Ms. Walker from filing submissions without leave. (*See* Dkt. No. 104; A.008854–55 (Order Denying Submissions by Rosemary Walker) (barring Ms. Walker from additional filings other than notices of appeal in light of her "increasingly abusive" interactions with the Court, including because "her pleadings also often contain wildly inappropriate material").)

***Ms. Pitts-Tillman***, for her part, argues that the Plan permits duplicative recoveries by governmental and institutional entities and therefore produces unjust enrichment and unfair dilution of individual personal-injury recoveries. *See* Pitts-Tillman Br. at 17–19. But this contention is entirely unsupported by the record below (and was not raised before the Bankruptcy Court, and is thus waived). To the extent her argument amounts to an objection to the Plan's comparative treatment of governmental and PI Claimants, that objection is meritless because both classes voted in favor of the plan by a more than 99% margin, and because personal injury claims meaningfully differ from governmental and other institutional creditors and are properly classified separately.

## V. The Appeals of Ms. Jannotta, and Ms. Isaacs Should be Dismissed as Untimely

For the reasons described above, Appellants' arguments fail on the merits. Ms. Jannotta and Ms. Isaacs' appeals are subject to dismissal because they did not timely file their appeals, depriving this Court of jurisdiction. *Siemon v. Emigrant*

*Savs. Bank* (*In re Siemon*), 421 F.3d 167, 169 (2d Cir. 2005) ("[I]n the absence of a timely notice of appeal . . . the district court is without jurisdiction to consider the appeal.").

As explained above, Bankruptcy Rule 8002(a)(1) required any notice of appeal to be filed "within 14 days after entry of" the Confirmation Order, Bankruptcy Rule 8002(a)(1), which was entered on November 18, 2025. (A.008314 (Confirmation Order).) Consequently, the deadline for appeals from the Confirmation Order lapsed on December 2, 2025.

Ms. Jannotta filed her notice of appeal on December 9, 2025 (A.008641 (Jannotta Notice of Appeal))—a full week after the deadline. Ms. Isaacs filed her notice of appeal on December 4, 2025 (A.008639 (Isaacs Notice of Appeal))—two days after the deadline. Their appeals are accordingly untimely, and this Court is, respectfully, without jurisdiction to hear the appeals. *See Sterling v. Carlebach* (*In re Sterling*), 690 F. App'x. 747, 748 n.1 (2d Cir. 2017) (affirming dismissal of pro se appeal filed "16 days after the entry of the bankruptcy court's order.").

## VI. The Appeals Are Equitably Moot

The Appeals should be denied on the merits and the Confirmation Order affirmed because the Plan unquestionably complies with *Harrington* and the Code. Nevertheless, in the alternative, the Appeals can be dismissed because they are equitably moot. Under the prudential doctrine of equitable mootness, "a court [may]

dismiss a bankruptcy appeal 'when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'" *In re Windstream Holdings, Inc.*, 2022 WL 14199458, at *1 (2d Cir. Oct. 25, 2022) (quoting *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005)). Because finality in bankruptcy "is essential to the fashioning of effective remedies," *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir. 1993), the doctrine of equitable mootness should be applied where, as here, an appellant's requested relief would unfairly disrupt a plan of reorganization.

In the Second Circuit, "a bankruptcy appeal is presumed equitably moot when the debtor's reorganization plan has been substantially consummated." *In re BGI, Inc.*, 772 F.3d 102, 108 (2d Cir. 2014). Substantial consummation has occurred where there has been (1) "transfer of all or substantially all of the property proposed by the plan to be transferred;" (2) "assumption . . . by the successor to the debtor . . . of the business or of the management of all or substantially all of the property dealt with by the plan;" and (3) "commencement of distribution under the plan." 11 U.S.C. § 1101(2).

Here, the Plan has been substantially consummated. As of May 1, 2026, all operating non-cash assets (and $135 million) of the Debtors-Appellees had been transferred to Knoa, which has now been in operation for several months. *See supra* Section V(D). The Debtors-Appellees no longer possess the operating assets to

conduct opioid businesses, *see* Plan § 5.1, and cannot engage in those businesses as a consequence of PPLP's criminal sentencing. In addition, the Debtors-Appellees' remaining approximately $1.5 billion in unrestricted cash and from many different Sackler entities and trusts, was disbursed to multiple trusts and other recipients upon or soon after emergence. Put simply, all or substantially all of property to be transferred under the Plan has been transferred; the Debtors-Appellees' operating businesses have been transferred to NewCo; and distributions under the Plan have commenced.

To overcome the presumption of equitable mootness, an appellant must: (1) show the Court can still order effective relief; (2) such relief will not affect the debtor's emergence as a new corporate entity; (3) such relief will not unravel intricate transactions; (4) the parties who would be adversely affected by modification of the plan have notice of the appeal and an opportunity to participate; and (5) the appellant diligently pursued all available remedies to obtain a stay. *In re Chateaugay Corp.*, 10 F.3d 944, 952–53 (2d Cir. 1993); *In re 307 Assets LLC*, 665 B.R. 214, 220 (S.D.N.Y. 2024). The burden rests on appellants to demonstrate that the appeal is not equitably moot. *2 River Terrace Apartment 12J, LLC v. Ehrenberg*, 2022 WL 992715, at *2 (E.D.N.Y. Mar. 31, 2022); *In re Centric Brands Inc.*, 2023 WL 2139556, at *5 (S.D.N.Y. Feb. 21, 2023).

Appellants cannot carry that burden. With respect to the first four factors, the Bankruptcy Court has found that "the Plan has gone effective." (A.008853 (Order Denying Submissions by Rosemary Walker).) Now that the Plan is effective and has been substantially consummated, the relief Appellants seek cannot be granted without seriously disrupting transactions already implemented under the Plan and prejudicing the tens of thousands of creditor parties not before the Court. On April 28, 2026, PPLP was criminally sentenced in connection with its November 2020 guilty plea underlying the DOJ Resolution. *See supra* Section V(C). PPLP is now a convicted felon burdened with a $2 billion superpriority forfeiture judgment. This alone makes a return to the status quo ante impossible. The Debtors-Appellees' operating assets have been transferred to Knoa. *See* Plan § 5.1. Reversing the billions of dollars of distributions that have already occurred or attempting to reconstruct the pre-confirmation status quo would be impracticable and inequitable. Courts regularly invoke the doctrine of equitable mootness under such circumstances. *In re Celsius Network LLC*, 2025 WL 3527112, at *3 (S.D.N.Y. Dec. 9, 2025) (appeal was equitably moot where requested relief would require the bankruptcy court "to not only restart an already complicated bankruptcy process, but also somehow craft a system for Debtors to claw back *billions* in assets from *thousands* of creditors"); *In re Centric Brands Inc.*, 2023 WL 2139556, at *5

(S.D.N.Y. Jan. 17, 2023) (appeal was equitably moot where plan had gone effective, distributions were made, and unwinding plan would be inequitable).

With respect to the fifth factor—whether appellants diligently sought a stay—Mr. Bass, and Mr. Williams did not seek a stay *at all*, while Ms. Ecke, Ms. Isaacs, and Ms. Jannotta did not seek a stay before this Court. That failure weighs heavily in favor of dismissal. *See In re 307 Assets LLC*, 665 B.R. at 222 (explaining that courts place "significant reliance" on whether a stay was diligently pursued). As for those Appellants who did seek a stay in the Bankruptcy Court and before this Court—only Ms. Walker, Ms. Pitts-Tillman, and Ms. Morales—this factor is insufficient to preserve these appeals where the remaining factors strongly favor mootness. *See In re Charter Communications, Inc.*, 691 F.3d 476, 482–85 (2d Cir. 2012) (holding appeal equitably moot where appellant sought a stay but relief would unravel complex transactions, undermine plan implementation, and prejudice third-party reliance interests).

Equitable mootness thus provides an independent basis for dismissing these appeals.

## CONCLUSION

For the foregoing reasons, the Appellees respectfully request that the Court affirm the Confirmation Order.

Dated: July 23, 2026
New York, New York

Respectfully Submitted,

*/s/ Marshall S. Huebner*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Ben Kaminetzky
Eli J. Vonnegut
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors-Appellees*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), the undersigned certifies that the above principal brief contains 12,895 words. The above principal brief also complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Dated: July 23, 2026
New York, New York

DAVIS POLK & WARDWELL LLP

By: */s/ Marshall S. Huebner*

Marshall S. Huebner
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Counsel to the Debtors-Appellees*

**CERTIFICATE OF SERVICE**

I, Marshall S. Huebner, hereby certify that I am a partner at the law firm Davis Polk & Wardwell LLP, counsel to the Appellees in the above-captioned proceeding. On July 23, 2026, Davis Polk caused this principal brief to be served via overnight mail and email on the following:

Rosemary Walker
111 Waller Street SE
Salem, OR 97302
bigrosemary@gmail.com

Amanda Morales
205 Calle Del Banco
Bernalillo, NM 87004
ajlare356@gmail.com

Ronald Bass
450 Little Place Apt. 53
N. Plainfield, NJ 07060
Ronaldbass12345@gmail.com

Maria Ecke
8 Glenbrook Dr
West Simsbury, CT 06092
sagitarianm2004@yahoo.com

Keith Redwood
51a Pratt St.
Rocky Hill, CT 06067
kthredwood@gmail.com

Laurie Danielle Pitts-Tillman
5116 Georgia Highway 99
Brunswick, GA 31525
Greatmommy2002@gmail.com

Ellen Isaacs
1029 Queensway Dr.
Weidman, MI 48893
ryansopc@gmail.com

Mary Janotta
427-A Sycamore
Croydon, PA 19021
Tycord528@gmail.com

Joshua Williams
628 Morton St.
Stoughton, MA 02072
Joshuawilliams133@aol.com

Dated: July 23, 2026
New York, New York

DAVIS POLK & WARDWELL LLP

By: */s/ Marshall S. Huebner*

Marshall S. Huebner
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Counsel to the Debtors-Appellees*