# <u>Exhibit B</u>

**Appellee Purdue Master Disbursement Trust's Memorandum of Law in Opposition to Appellants' Opening Briefs**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:**<br><br>**PURDUE PHARMA L.P., *et al.*,**<br><br>**Debtors.**[1] | **Case No. 25-cv-09681 (NSR)**<br>**Case No. 25-cv-10158 (NSR)**<br>**Case No. 25-cv-10282 (NSR)**<br>**Case No. 25-cv-10327 (NSR)**<br>**Case No. 25-cv-10420 (NSR)**<br>**Case No. 25-cv-10427 (NSR)**<br>**Case No. 25-cv-10433 (NSR)**<br>**Case No. 25-cv-10646 (NSR)**<br>**Case No. 26-cv-00045 (NSR)** |

# APPELLEE PURDUE MASTER DISBURSEMENT TRUST'S MEMORANDUM OF LAW IN OPPOSITION TO APPELLANTS' OPENING BRIEFS

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Bankr. P. 8012(b)(1), Appellee the Purdue Master Disbursement Trust states that it does not have any parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

A. Leadup to Bankruptcy ..... 3

B. The Organization of the Creditor Groups ..... 4

C. Establishment and Invalidation of the First Plan ..... 6

D. Renegotiation of Amended Plan ..... 7

E. The Mechanics of the Confirmed Plan ..... 10

F. The Appeals ..... 12

ARGUMENT ..... 13

I. THE PLAN WAS PROPERLY CONFIRMED BY THE BANKRUPTCY COURT ..... 13

A. THE INTERCREDITOR ALLOCATION IS FAIR ..... 15

i. The Plan's Distributions Result from Unprecedented Negotiations ..... 16

ii. The Release of Claims Against the Sacklers Provides Unprecedented Value to Creditors and is Vastly Superior to Litigation ..... 17

B. THE TRUST DISTRIBUTION PROCEDURES ARE EFFICIENT, TRANSPARENT, AND FAIR ..... 19

II. THE APPEALS SHOULD BE DISMISSED AS EQUITABLY MOOT ..... 23

CONCLUSION ..... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beeman v. BGI Creditors' Liquidation Trust (In re BGI, Inc.)*,
772 F.3d 102 (2d Cir. 2014) ....................23

*In re Chemtura Corp*.,
439 B.R. 561 (Bankr. S.D.N.Y. 2010)....................15

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024 ....................7, 9, 10

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ....................*passim*

*In re Purdue Pharma L.P.*,
633 B.R. 53 (Bankr. S.D.N.Y. 2021)....................*passim*

*In re Purdue Pharma, L.P.*,
635 B.R. 26 (S.D.N.Y. 2021) ....................7

*In re Purdue Pharma L.P.*,
69 F.4th 45 (2d Cir. 2023) ....................7

*In re Purdue Pharma*,
No. 19-23649 (SHL), (Bankr. S.D.N.Y. Nov. 20, 2025) ....................*passim*

*Sei Insieme LLC v. 307 Assets LLC (In re 307 Assets LLC)*,
2025 WL 2751373 (2d Cir. Sept. 29, 2025) ....................23

**Statutes**

11 U.S.C. § 1123(a)(4)....................19

11 U.S.C. § 1123(a)(5)....................19

11 U.S.C. § 1123(b)(3)(A)....................17

11 U.S.C. § 1129....................9, 13, 15

11 U.S.C. § 1129(a) ....................................................................................................14

**Rules**

Fed. R. Bank. P. 9019 ..................................................................................................15

The Purdue Master Disbursement Trust (the "**MDT**"), which was established pursuant to the confirmed chapter 11 plan (A.008081) (the "**Plan**")[2] in the bankruptcy cases of Purdue Pharma L.P. and its debtor affiliates (the "**Debtors**"), by and through its trustees, hereby files this memorandum of law in opposition to the nine appeals consolidated by this Court in its Order of April 16, 2026 (ECF No. 52) (A.008983) (the "**Consolidation Order**").

## PRELIMINARY STATEMENT

On November 18, 2025, the Bankruptcy Court confirmed the chapter 11 Plan for the Debtors, and on May 1, 2026 (the "**Effective Date**"), that Plan went effective. Among many other things, the Plan created the MDT, a Delaware statutory trust that was established, *inter alia*, to receive, hold, administer, and distribute substantial assets for the benefit of the Debtors' opioid creditors. In addition to serving as a successor to certain of the Debtors' rights and interests under the Plan, the MDT also represents the interests of its primary beneficiaries, which include governmental entities such as States, local governments, and Tribes formerly represented by the AHC (as defined below), as well as private creditors, such as the individual victims harmed by Purdue's misconduct.

---

[2] Capitalized terms used but not otherwise described herein shall have the meanings set forth in the Plan. Unless otherwise indicated, citations to "ECF. No. __" refer to this case's docket; "Bankr. Dkt. No. __" to the underlying bankruptcy case, No. 19-2364 (Bankr. S.D.N.Y.); and "A__" to Appellee's Appendix in this case.

The Plan, which garnered near universal support from Purdue's stakeholders, delivers tremendous value to Purdue's creditors and should be affirmed. While the legal merits of the Plan will be largely addressed by the Debtors in their separate brief, several of its features deserve emphasis. *First*, the Plan has the support of every single one of the organized creditor groups in the case, as well as the Debtors themselves, the Sacklers, all 50 States, and the United States government. *Second*, individual creditors, including States, municipalities, Tribes, and victims, likewise support the Plan, and overwhelmingly so: all but one eligible class of creditors voted to accept by margins exceeding 99% in dollar amount represented. *Third*, and relatedly, the Plan was negotiated and designed in major part *by the creditors* and followed on the heels of perhaps the most extensive investigation ever conducted in bankruptcy as well as a series of negotiations and formal mediations spanning more than five years. *Fourth*, the Plan does not include any non-consensual third-party releases; instead, creditors are given the choice of releasing (or not) their claims against the Sacklers. *Fifth*, the Plan contains many other salutary features (not all of which can be listed here), including its delivery of all of the value of Purdue to the creditors, its contribution to creditors of more than $6.5 billion from the Sacklers, and its creation of a public document repository containing tens of millions of documents detailing Purdue and the Sacklers' malfeasance.

In the face of the overwhelming creditor support for the Plan, as well as its obvious benefits, it is no surprise that not a single represented party has appealed confirmation. Nine *pro se* claimants have appealed, and to be sure, their disappointment in certain Plan features is understandable. No creditor, including the MDT, is here to defend Purdue or the Sacklers for their prior bad acts. But the unfortunate reality is that the assets of Purdue and the Sacklers combined are insufficient by many orders of magnitude to cover the enormous harm they have wrought. The Plan, which was negotiated by representatives of every creditor group, including representatives of individual victims like the Appellants, represents the best, and perhaps only, workable solution. The Appellants articulate no legal nor factual basis for reversal of plan confirmation.

Therefore, for the reasons set forth below and in the briefs of other Appellees, the MDT urges the Court to affirm the Confirmation Order so that much-needed and well-deserved value may continue to flow towards all of Purdue's many stakeholders under the Plan.

## BACKGROUND

### A. Leadup to Bankruptcy

As the Court is well aware, the Debtors, before their bankruptcies, were pharmaceutical companies that manufactured, sold, and distributed opioid medications, most famously including OxyContin. The Debtors were owned and

controlled by the members of the Sackler family (the "**Sacklers**"). *In re Purdue Pharma,* No. 19-23649 (SHL), (Bankr. S.D.N.Y. Nov. 20, 2025), Modified Bench Ruling (A.009019) ("**MBR**") at 10, 13.

In the leadup to their bankruptcies, the Debtors faced more than 2,600 civil actions in dozens of courts and other fora around the country arising out of the marketing and sale of these drugs. *Id.* at 13. The plaintiffs and other affected parties included, among many other parties, each of the fifty States (and several Territories), thousands of cities, counties, municipalities, and Tribes, and individual victims. *Id.*

Ultimately, the Debtors determined that case-by-case adjudication of the claims was untenable, and that bankruptcy was the most sensible route to resolve these claims.

**B. The Organization of the Creditor Groups**

Upon filing of the bankruptcy petition (and in some instances, even before), Purdue's creditors organized into well-represented groups. Over the course of the case, the groups, through investigation, litigation, negotiation, and formal mediation, sought among other things to (i) grow the pool of assets available to creditors, and (ii) divide those assets appropriately among Purdue's disparate creditor constituencies. The main creditor groups included, among others:

> (i) The Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("**AHC**"), comprised of ten States, the court-appointed Plaintiffs' Executive Committee in the multi-district litigation captioned In re National Prescription Opiate Litigation,

> No. 17-md-02804 (N.D. Ohio), six municipalities, and one federally recognized American Indian Tribe (*see, e.g.*, Bankr. Dkt. No. 296);[3]
>
> (ii) The Multi-state Governmental Entities Group (the "**MSGE**"), a collection of settling government creditors (*see, e.g.*, Bankr. Dkt. No. 409);
>
> (iii) Various formal and informal creditor groups representing different categories of private creditors, chiefly the Personal Injury Group ("**PI Group**") (representing personal injury claimants) and the NAS Committee (representing holders of claims of certain children harmed by opioids) (*see, e.g.*, Bankr. Dkt. No. 348);
>
> (iv) The Unsecured Creditors Committee ("**UCC**"), the official creditors' committee appointed by the United States Trustee as the statutory fiduciary for unsecured creditors; (*see, e.g.*, Bankr. Dkt. No. 131).

These creditor groups focused on how to maximize value available for distribution, including by investigating claims against the Sackler family, who had taken $10.4 billion in cash out of the company in the ten years before the bankruptcy. The Debtors' estates possessed valuable claims against the Sacklers, notably including claims for fraudulent transfer. Many creditors also believed that they possessed valuable direct claims against the Sacklers, including personal injury claims, and (in the case of, for instance, the States), claims for public nuisance. However, the defendants maintained that each of these claims faced substantial defenses. *See, e.g.*, *In re Purdue Pharma L.P.,* 633 B.R. 53, 89–95 (Bankr. S.D.N.Y.

[3] The MDT is the successor to the interests of the AHC in relevant respects in that the MDT represents the interests of the AHC's primary members, which include governmental entities such as States, local governments, and Tribes formerly represented by the AHC.

2021) (A.009278) (hereinafter, the "**Original Confirmation Op.**") (discussing certain of these purported defenses).[4]

**C. Establishment and Invalidation of the First Plan**

By the time the Debtors' bankruptcies were commenced on September 15, 2019 (and after extensive and hard-fought prepetition negotiations), the Debtors, the Sacklers, and a critical mass of States and municipalities, had already reached an agreement in principle on a framework for a global resolution of litigation. *See* A.009635 at ¶ 37 ("**Dubel Decl.**"). The resolution centered around the Debtors' agreement to provide the creditors with the entire value of the company and the Sacklers' agreement to provide a multi-billion dollar contribution in exchange for releases of estate and third-party claims against them individually. *Id.*; *see also* A.000001. During the bankruptcy, additional negotiations ensued with the newly-formed UCC and the many other creditor groups. These negotiations spanned nearly two years and proceeded in parallel with extensive investigations by the UCC and other creditors. *See* Dubel Decl. ¶¶ 17-36; Original Confirmation Op. at 85-86 ("[T]he Sackler settlement was clearly and unmistakably the product of arm's-length bargaining . . . it was preceded, moreover, by the most extensive discovery process that not only I have seen . . . but I believe any court in bankruptcy has ever seen.").

[4] Judge Drain's opinion confirming Purdue's original plan, while ultimately overturned on the grounds of its approval of a non-consensual third-party release, provides extensive background on the history of the case.

On August 12, 2021, after a Confirmation hearing on the Twelfth Amended Plan, the Court delivered a comprehensive bench ruling that was later reduced to a written decision. *See generally* Original Confirmation Op. Despite the broad degree of consensus supporting the Twelfth Amended Plan, it was nevertheless appealed primarily on the asserted grounds that the Bankruptcy Code does not authorize non-consensual third-party releases. *See, e.g.*, Dubel Decl. ¶¶ 50-56 (detailing procedural history of Plan). In December 2021, the District Court vacated the Confirmation Order, holding that the Bankruptcy Code does not authorize nonconsensual third-party releases. *See In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021). The Second Circuit reversed the District Court and affirmed the Confirmation Order. *See generally In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023); Dubel Decl. ¶ 54.

The United States Supreme Court ultimately granted certiorari to consider the permissibility of nonconsensual third-party releases. *See* Dubel Decl. ¶ 54. The Supreme Court reversed the decision of the Second Circuit in a 5 to 4 decision in *Harrington v. Purdue Pharma L.P.,* 603 U.S. 204 (2024), and invalidated that element of the plan.

**D. Renegotiation of Amended Plan**

Stakeholders, with guidance from the Supreme Court, thereafter began negotiating a new plan. On July 10, 2024 Shelley C. Chapman (Ret.) and Professor Eric D. Green were appointed as co-mediators to facilitate new negotiations. *See*

Dubel Decl. ¶¶ 51, 57, 60. The Debtors, UCC, AHC, MSGE, the Sacklers, Ad Hoc Group of Hospitals, NAS Committee, Ad Hoc Group of Individual Victims, Third-Party Payor Group, Public School District Claimants, Ratepayer Mediation Participants, and one or more negotiating committee(s) of State Attorneys General were all active participants in the 2024-25 Mediation. As a result of the mediation and follow-up negotiations, a new Plan was negotiated that included only *consensual* releases, and which delivers more than $6.5 billion of distributable cash to stakeholders from the Sacklers over the course of 15 years (up from the $6.0 billion over 10 years that was included in the Plan that was overturned by the Supreme Court). *See generally,* Plan Article VI; MSA Exhibit M. The Plan also included extensively negotiated mechanisms for delivering fully consensual releases to those wishing to participate in the global settlement. *Id*. Articles VII, X.

On March 18, 2025, the Debtors filed the Thirteenth Amended Plan and corresponding Disclosure Statement. A.004136. The voting results confirmed a historic level of consensus among creditors in support of the Plan. Overall, across all classes of voting creditors, more than 99% of the ballots cast and more than 99% of the amount of total voting dollars voted to accept the Plan. MBR at 29. Each eligible State and Territory voted in favor of the Plan and ultimately joined the settlement (meaning that each one of those States and Territories delivered consensual releases to the Sackler parties). Moreover, local governments

overwhelmingly supported the Plan and global settlement: more than 99.6% voted in favor. *Id*. As for the private creditors, 99.8% of NAS PI claimants voted in favor of the plan, as did 99.6% of non-NAS PI claimants. *Id*.

On November 12, 2025, the Bankruptcy Court commenced a multi-day confirmation hearing on the Plan. A.010088. Remarkably few parties opposed confirmation; by the conclusion of the hearing, nineteen *pro se* litigants—including several of the appellants in this case—had submitted papers that could reasonably be construed as objections to the Plan. *See* A.007881 at A.007897 n.2. The Bankruptcy Court afforded those objectors an opportunity to present arguments and be heard on November 13, 2025. A.010338. Shortly after the Confirmation Hearing concluded on November 18, 2025, the Bankruptcy Court entered an order confirming the Plan. A.8314 (the "**Confirmation Order**"). The Bankruptcy Court subsequently issued a 64-page bench ruling setting forth its findings of fact and conclusions of law in support of confirmation on November 20, 2025. *See* MBR. In that ruling, the Bankruptcy Court concluded that the Plan complied with the Supreme Court's decision in *Harrington* and overruled the objections of the *pro se* litigants. *See Id.* at 41–55. In particular, the Bankruptcy Court held that the plan had satisfied the provisions of Section 1129 of the Bankruptcy Code and that the settlements in the Plan were fair and reasonable, upon application of the required analytical factors. In so doing, the Bankruptcy Court also addressed *pro se*

objections that the plan was not in good faith, that the classification scheme was improper, and what the Bankruptcy Court described as "a variety of miscellaneous objections." MBR at 49; *see also Id.* at 57, 61.

**E. The Mechanics of the Confirmed Plan**

At a high level, nearly all of the value delivered under Purdue's Plan flows into trusts for the benefit of creditors, which go to victim compensation and opioid abatement pursuant to various applicable Trust Distribution Procedures ("**TDPs**"). Rather than impose mandatory releases, the new Plan, to comply with *Harrington,* gave creditors the option to choose whether to exchange settlement of their claims against the Sacklers for enhanced recoveries. MBR at 41 ("[T]he releases here are consensual, occurring only where a party chooses to opt into a release in exchange for the value provided by the Sackler Parties.").

As most relevant here, in order to distribute payments, the Plan established nine trusts: the MDT, Governmental Remediation Trust (for the benefit of State and local government creditors), Tribe Trust, Public School Trust, PI Trust, Healthcare Provider Trust, TPP Trust, ERP Trust, and Plan Administrator Trust. Plan Article V. Funds from the Shareholder Settlement Amount were and are being deposited into trusts established for the benefit of States and localities and other non-governmental claimants, including the Tribes and public schools. *See* A.009540 ¶ 18; *see also* Plan Articles 5.2, 5.6, 5.8. Other trusts will make distributions to

qualified personal injury claimants, including children with a history of NAS and their guardians, ensuring that monies also flow directly to those individual victims of the opioid crisis. *See* A.009563 ¶ 18; *see also* Plan Articles 4.10, 5.8(d).

The Plan also provides for a public document repository that will make more than 100 million pages of material available for public review. Plan Article 5.13.

Finally, the Plan provided for the transfer of Purdue's operating assets into Knoa, a new private company uniquely and historically governed by a charter requiring that Knoa deploy its assets to address the opioid crisis.

The MDT is the primary interface between the creditor trusts established to make distributions to various individual classes of creditors under the Plan, on the one hand, and the Sacklers, Knoa, and the MDT Advisory Council (a group of State and subdivisions tasked with oversight of the MDT) ("TAC") on the other. The MDT has a number of key responsibilities including: receipt and distribution of funds and calculation of settlement payments; enforcing covenants and exercising remedies granted to the MDT, as the secured party, with respect to collateral and the Sackler Parties' obligations, including in the event there are breaches of the underlying settlement documents during the 15-year term; interfacing with the Sacklers; enforcing the Plan (including the "Estate Releases") against Non-Participating Channeled Claims, and/or objecting to such claims; and administering the special operating reserve ("SOR"), a dedicated account established from Sackler

estate payments and replenished over time (capped at $800M over the life of the settlement) to fund qualifying Sackler litigation costs (e.g., legal defense, judgments and settlements).

**F. The Appeals**

After the Plan was confirmed, nine *pro se* appellants (the "Appellants") filed notices of appeal, initiating the present appeals.[5] On April 16, 2026, this Court consolidated the appeals. As this Court explained in its decision on the Appellees' motion to consolidate the appeals, each Appellant ultimately seeks vacatur of the Plan on "two overarching grounds: (1) that the Plan was not properly confirmed by the Bankruptcy Court; and (2) that the Plan contains non-consensual third-party releases in violation of the Supreme Court's Decision." *See* Consolidation Order at 4 n.5 (collecting notices of appeal: "*Bass v. Purdue Pharma L.P.,* No. 7:25-cv-10282, ECF No. 15 at 5 (S.D.N.Y. Dec. 23, 2025) (arguing that the Plan's releases are invalid because the Sackler Parties did not seek bankruptcy protection); *Isaacs v. Purdue Pharma L.P.,* No. 7:25-cv-10427, ECF No. 9 at 4 (S.D.N.Y. Dec. 23, 2025) (arguing that the Plan's opt-in mechanism improperly circumvents the Supreme Court's decision in *Harrington); Morales v. Purdue Pharma L.P.,* No. 7:25-cv- 10158, ECF No. 4-1 at 3 (S.D.N.Y. Dec. 11, 2025) (arguing that her claim is distinct and should be treated differently, and that the Plan includes overly broad

[5] The MDT notes that certain Appeals (those of Ms. Ecke, Ms. Jannotta, and Ms. Isaacs) were untimely filed, and joins the Debtors' arguments as to the denial of those Appeals on that basis.

releases); *Pitts-Tillman v. Purdue Pharma L.P.,* No. 7:25-cv-10433, ECF No. 15 at 1 (S.D.N.Y. Dec. 23, 2025) (arguing that the Plan's releases were imposed without proper consent and raise fairness concerns); *Walker v. Purdue Pharma L.P.,* No. 7:25-cv-09681, ECF No. 12 at 4 (S.D.N.Y. Dec. 8, 2025) (characterizing the Plan's third-party releases as coercive and improper); *In re Purdue Pharma L.P.,* No. 19-23649, Designation of Contents and Statement of Issues filed by Mary S. Jannotta, ECF No. 8433 at 4, 6 (Bankr. S.D.N.Y. Dec. 29, 2025) (arguing that the Plan violates the Supreme Court's decision in *Harrington* and improperly treats similarly situated personal injury claimants differently); *Redwood v. Purdue Pharma L.P.,* No. 7:25-cv-10327, ECF No. 18 at 2 (S.D.N.Y. Dec. 23, 2025) (arguing that the Plan was improperly confirmed based on alleged misclassification of claims)"). Some, but not all, of the Appellants thereafter filed merits briefs.

## ARGUMENT

### I. THE PLAN WAS PROPERLY CONFIRMED BY THE BANKRUPTCY COURT

As a joint Appellee, the MDT incorporates by reference and joins the arguments made by the Debtors and the UCC in their contemporaneously filed opposition brief in these appeals. The MDT re-emphasizes here several features of the Plan that justified its confirmation under the so-called "*Iridium* factors" and pursuant to Section 1129 of the Bankruptcy Code: the unprecedented scope and rigor of the

Plan negotiations, the degree of creditors consensus and support, and the relative value received in exchange for claim releases.

Pursuant to Bankruptcy Code Section 1129(a), a court "shall confirm a plan only if" it meets the various confirmation requirements set out in that statute's following subsections, including that the plan has been proposed in good faith, that each holder of an impaired claim will receive as much as it would in a chapter 7 liquidation, and that at least one impaired class of claims has accepted the plan. 11 U.S.C. § 1129(a). Here, the Bankruptcy Court found all requirements met because, *inter alia*, (1) the Plan appropriately classified claims and interests, (2) "channel[ling] opioid claims to respective Creditor Trusts that will either fund abatement programs . . . or make cash distributions to creditors pursuant to trust distribution procedures . . . is consistent with numerous mass tort and other large-scale Chapter 11 plans involving multi-trust distribution frameworks," and (3) the Plan Injunction and Channeling Injunction were implemented pursuant to "only consensual non-debtor releases" such that "the Plan Injunction and Channeling Injunction [would] not have the effect of releasing any creditor's claim absent consent." MBR at 42-43, 46. In coming to that conclusion, the Bankruptcy Court also found that fairness and equity (as determined by application of the *Iridium* Factors) weighed "overwhelmingly" in favor of approving the settlements incorporated in the Plan. *Id.* at 35-41.

That reasoning was correct. The appeals now at issue are not framed with reference to the requirements of any particular section of the Bankruptcy Code or the *Iridium* Factors. But to the extent the Appellants mean to argue that the Plan was "not properly confirmed," if they are to prevail, they must demonstrate some defect in the Bankruptcy Court's analysis of Section 1129 or application of the *Iridium* Factors. They completely fail to do so.

**A. THE INTERCREDITOR ALLOCATION IS FAIR**

To the extent the Appellants argue that the intercreditor allocations fail to satisfy the Iridium Factors, they have not succeeded. In the Second Circuit, settlements in a Chapter 11 plan of reorganization are subject to the same standards applied to settlements under Rule 9019 of the Federal Rule of Bankruptcy Procedure. *See In re Chemtura Corp*., 439 B.R. 561, 593 (Bankr. S.D.N.Y. 2010). To evaluate such settlements, the Second Circuit's *Iridium* decision directs courts to balance seven interrelated factors in deciding whether a settlement is fair and equitable: "(1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest

support the settlement; (5) the competency and experience of counsel supporting, and [t]he experience and knowledge of the bankruptcy court judge reviewing the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).

*i. The Plan's Distributions Result from Unprecedented Negotiations*

In applying the *Iridium* Factors, the Bankruptcy Court held that "[t]he third, fourth, fifth and seventh *Iridium* factors are satisfied given the clear value of the settlements to all stakeholders, the fact that these settlements were reached after fierce negotiations among parties with sophisticated and highly competent counsel and that the settlements have the support of every single organized creditor group in these Chapter 11 cases." MBR at 41. Nothing in the Appellants' various filings remotely undermines that conclusion.

The Plan's distributions are the result of extensive, arm's length negotiations overseen for years by skilled mediators, where each major constituency was represented by sophisticated counsel. As set forth in the confirmation briefs and *supra* herein, the Plan is the result of painstaking negotiations among nearly a dozen well-represented stakeholder groups representing thousands of creditors. These negotiations took years and tens of thousands of hours to conclude. Following an

opt-in process by which States and territories were given the chance to evaluate the settlement and Plan, every single eligible State and territory elected to move forward with the global settlement. The voting results display a staggering level of support for the Plan and its related settlements. Consistent with the universal State and Territory support, there has been overwhelming local government support as well—over 99.6% of the eligible local governments have opted into the settlement. MBR at 29. And well over 3,000 of these Class 4 claimants (representing 99.75% of Class 4) voted to accept the Plan. *Id.* This remarkable level of consensus should come as no surprise given the extensive involvement that each creditor group had in the negotiation and formulation of the Plan.

Thus the *Iridium* Factors were correctly applied in this respect and the Appellants fail to establish that the Plan should be overturned on this basis.

*ii. The Release of Claims Against the Sacklers Provides Unprecedented Value to Creditors and is Vastly Superior to Litigation*

The Bankruptcy Court also held that "All of the settlements satisfy the first two *Iridium* factors," and that Bankruptcy Code Section 1123(b)(3)(A) was satisfied because, "absent the releases by the Debtors, the Sackler Parties would not contribute the billions in value to the Debtors and their creditors, and the estates would be forced to pursue the Sackler Parties in uncertain litigation that would likely take years before realizing any recovery." MBR at 39, 45-46. Again, nothing in the Appellants' filings provides reason to disturb this finding.

The releases consensually delivered in connection with the Plan and its related settlements unlock billions of dollars immediately, instead of requiring years of delay for uncertain outcomes. At least $6.5 billion is being contributed by the Sackler Parties for the benefit of the Debtors' creditors, including through a resolution of the Estates' claims against the Sacklers.

The alternative—fractious litigation that would go on for years in many jurisdictions—would involve substantial risks, as set forth at length in the confirmation briefs and as addressed by the Bankruptcy Court in the MBR. *See, e.g.*, MBR at 39. To summarize those risks again here, they include: uncertainty over whether claims against scores of differently situated Sackler individuals and trusts would be successful at all; time delay; uncertainty in collecting judgments with respect to foreign assets; and costs and fees associated with all of the above. That is, absent the Plan, the UCC or another estate representative could bring claims for (among other things) fraudulent transfer, breach of fiduciary duty, and unjust enrichment. But each of those claims faced potentially substantial hurdles from statutes of limitations, the need to demonstrate insolvency, and factual and legal concerns about showing lack of reasonably equivalent value received in exchange for the particular transfers alleged to be fraudulent and unjust. *Id.*; Original Confirmation Op. at 89–95. In addition, any actual litigation of these claims to judgment and collection would have taken years—further delaying compensation to

the many victims who have in some cases already waited more than a decade for compensation. In a nutshell, the benefits outweighed the risks many times over. Thus, here too, the *Iridium* Factors were correctly applied and the Appellants fail to establish that the Plan should be overturned.

### B. THE TRUST DISTRIBUTION PROCEDURES ARE EFFICIENT, TRANSPARENT, AND FAIR

Further, the Bankruptcy Court was also correct when it found that "[t]he Plan here satisfies Section 1123(a)(4) of the Bankruptcy Code because each class of claims or interests under the Plan receives the same opportunity to recover as every other claim or interest in such class." MBR at 43. As the Bankruptcy Court explained, "[f]or example, Classes 4 through 10(b) consist of different classes of opioid litigation claims, each of which will be channeled to separate Creditor Trusts where the claims in each such class will receive distributions consistent with the applicable trust distribution procedures." *Id.* at 43-44. The Bankruptcy Court also correctly concluded that "[t]he Plan also satisfies Section 1123(a)(5) of the Bankruptcy Code, which requires that a plan provide 'adequate means for its implementation.'" *Id.* at 44.

The Appellants appear to argue that the processes by which funds will flow to creditors, including personal injury claimants, are objectionable. But the Plan's means of implementation are far more than "adequate." The Plan accomplishes an admirable and long-sought goal by making substantial distributions from the estate

to each creditor group. States and local governments that bore and continue to bear tremendous costs from the opioid crisis from increased burdens on public health services and public services to assist affected families, and other collateral consequences of the crisis will receive money to remediate the damages caused by the crisis and fund ongoing public health efforts. Individual victims who suffered personal injury are eligible for evaluation of and swift compensation for their claims from the Personal Injury trusts. Healthcare providers, public schools, and other stakeholders, all of whom were and continue to be harmed by the opioid crisis, also are receiving distributions from the estate.

The scope of that harm caused by Purdue and the Sacklers means these commensurate distributions also require a significant scope of administration. The Plan managed to address that bureaucratic necessity in an economic fashion that minimizes overhead so that as much money as possible goes directly into the hands of creditors. It does that through the TDPs. Those TDPs cohere through one clearinghouse the payments of billions of dollars by ten different Sackler family groups, all of whom are obligated to make numerous and variously sized payments over the course of several years (*See* MSA Exhibit M) to the MDT (and the corresponding creditor trusts). Under the TDPs, Sackler Settlement payments flow first to the MDT, which then distributes applicable monies to the other eight trusts: the Governmental Remediation Trust, Tribe Trust, Public School Trust, PI Trust,

Healthcare Provider Trust, TPP Trust, ERP Trust, Plan Administrator Trust. Plan Article V. In turn, those trusts then distribute money to creditors consistent with each of their duties. The MDT thus facilitates the exchange of value to creditors for global peace by creating a single entity to coordinate the billions of dollars of distributions to the various creditor trusts (for further distribution in accordance with those creditor trusts' applicable TDPs) while simultaneously protecting estate assets (*inter alia*, claims against the released parties).

This single point of contact system avoids disputes and logistical inefficiencies that would arise if each individual trust had to facilitate payment individually from each different Payment Party and Knoa (as applicable), or independently navigate disputes with the Payment Parties should they arise. The Plan also protects the public trust in the integrity and efficiency of their management, with comprehensive reporting requirements regarding the Strategic Operating Reserve, IACs, collateral management, and trust activities. In short, the Plan sets a new bar for efficiency against which other plans will now be measured.

To be sure, the TDPs do not, and cannot, wholly rectify the extensive harm caused by Purdue and the Sacklers. In a case with asserted claims aggregating tens of trillions of dollars (A.010004 at A.010006), but total combined Purdue and

Sackler assets worth but a tiny fraction of that amount,[6] it is simply—and regrettably—impossible to satisfy all claims in full. But the plan, which was negotiated by the creditors, for the creditors, represents the best possible outcome under the circumstances.

Finally, several of the Appellants appear to object to certain TDP structures, although their objections are not entirely clear. Nothing about the structure or content of the TDPs warrants reversal of the Plan. The TDPs appropriately establish procedures to structure and evaluate individual personal injury claims. A.008051; A.008064. To facilitate the same, the Plan also provides for an injunction that channels claims against the Debtors to the Creditor Trusts as provided for under the Plan and the TDPs**.** Plan Article 10.8; A.006232; A.008051; A.008064. Certain Appellants apparently complain of the scheduled value of their claims pursuant to this structure. It is standard practice to use such matrices, and the values in this case were developed with the oversight of the PI Group. Ed Gentle, who is now the trustee administering the TDP on behalf of the claimants, provided testimony at confirmation to explain this very issue. Among other things, Mr. Gentle explained that the TDP was designed to be implemented expeditiously and provide money to holders of valid claims quickly. A.009855 at ¶¶ 10 *et seq*. And, as with the Plan as

---

[6] For instance, at the time of the Original Confirmation Decision, Judge Drain found that "the Sacklers, as a family, are worth–again, in the aggregate—approximately $11 billion. . . ." Original Confirmation Op. at 88.

a whole, the TDPs for each creditor trust—including the trusts for private creditors—were created by, or with substantial input from, representatives of the creditors themselves.

## II. THE APPEALS SHOULD BE DISMISSED AS EQUITABLY MOOT

The MDT also joins the Debtors' and the UCC's arguments that these appeals should be dismissed as equitably moot. "Equitable mootness is a prudential doctrine under which a district court may in its discretion dismiss a bankruptcy appeal 'when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'" *Beeman v. BGI Creditors' Liquidation Trust (In re BGI, Inc.)*, 772 F.3d 102, 107 (2d Cir. 2014) (citation omitted). Courts in the Second Circuit "apply a presumption of equitable mootness when . . . the debtor's reorganization plan has been substantially consummated." *Sei Insieme LLC v. 307 Assets LLC (In re 307 Assets LLC)*, 2025 WL 2751373, at *1 (2d Cir. Sept. 29, 2025) (quoting *In re BGI, Inc.*, 772 F.3d 102, 108 (2d Cir. 2014)). As set forth in greater detail in the Debtors' and the UCC's briefs, many distributions have already been made under the Plan and cannot be unwound. Moreover, 100% of Purdue's assets have been transferred to Knoa and Purdue has been criminally sentenced. The appeals should therefore also be denied on this additional basis.

## CONCLUSION

The Plan represents the best, and perhaps only, mechanism to swiftly deliver value to all of Purdue's stakeholders, which has repeatedly been delayed to this point. The MDT joins with the other Plan supporters in these appeals and respectfully requests that the Court affirm the Plan.

Dated: July 23, 2026 Respectfully submitted

/s/ *Rachael Ringer*
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
HERBERT SMITH FREEHILLS KRAMER (US) LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Email: Kenneth.Eckstein@hsfkramer.com
Rachael.Ringer@hsfkramer.com
David.Blabey@hsfkramer.com

*Attorneys for the Purdue Master Disbursement Trust*

**CERTIFICATE OF SERVICE**

I, Rachael Ringer, certify that on July 23, 2026, I caused the foregoing Memorandum to be served on all Appellants, through the law firm Davis Polk & Wardwell LLP, by electronic delivery via email or by physical delivery via certified mail.

## WORD COUNT CERTIFICATION

This document complies with the word limits prescribed by Fed. R. Bankr. P. 8015(a)(7)(B)(i) because it contains 5,521 words, excluding the parts exempted by Fed. R. Bankr. P. 8015(g). This document complies with the typeface and type-style requirements of Fed. R. Bankr. P. 8015(a)(5)(A) because it has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font.

Dated: July 23, 2026

Respectfully submitted

/s/ *Rachael Ringer*

Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
HERBERT SMITH FREEHILLS KRAMER (US) LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Email: Kenneth.Eckstein@hsfkramer.com
Rachael.Ringer@hsfkramer.com
David.Blabey@hsfkramer.com

*Attorneys for the Purdue Master Disbursement Trust*