# Exhibit C

**Brief of Appellee the Official Committee of Unsecured Creditors of Purdue Pharma L.P.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re**<br><br>**PURDUE PHARMA L.P., *et al.*,**<br><br>**Debtors/Appellees.**[1] | **Case No. 25-cv-09681 (NSR)**<br>**Case No. 25-cv-10158 (NSR)**<br>**Case No. 25-cv-10282 (NSR)**<br>**Case No. 25-cv-10327 (NSR)**<br>**Case No. 25-cv-10420 (NSR)**<br>**Case No. 25-cv-10427 (NSR)**<br>**Case No. 25-cv-10433 (NSR)**<br>**Case No. 25-cv-10646 (NSR)**<br>**Case No. 26-cv-00045 (NSR)** |

# BRIEF OF APPELLEE THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PURDUE PHARMA L.P.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P.,* et al.

[1] The Debtors/Appellees in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 2
- A. THE INITIAL PHASES OF THE CHAPTER 11 CASES ........ 2
- B. THE PRIOR PLAN ........ 4
- C. THE PRESENT PLAN ........ 5

ARGUMENT ........ 9
- I. THE THIRD-PARTY RELEASES IN THE PLAN ARE CONSENSUAL AND APPROPRIATE ........ 9
  - A. *The Third-Party Releases Are Consensual* ........ 10
  - B. *The Deemed Allowance of Settling Claims Is an Appropriate Exercise of the Debtors' Discretion* ........ 11
  - C. *Ms. Walker Is Not Uniquely Situated with Respect to Her Direct Claims* ........ 14
- II. THIS COURT SHOULD HOLD IN THE ALTERNATIVE THAT THESE APPEALS ARE EQUITABLY MOOT ........ 15
  - A. *An Equitable Mootness Determination Is Warranted Here Because Creditors Would Be Harmed by Reversal Following Substantial Consummation of the Plan* ........ 16
  - B. *Prudential Considerations Favor a Decision on the Merits of These Appeals* ........ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ..... 14

*Costaglio v. Glob. Clean Energy Holdings, Inc. (In re Glob. Clean Energy Holdings, Inc.)*,
No. H-25-3616, 2026 U.S. Dist. LEXIS 114522 (S.D. Tex. May 25, 2026) ..... 13

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024) ..... 7, 11, 13

*In re Chassix Holdings, Inc.*,
533 B.R. 64 (Bankr. S.D.N.Y. 2015) ..... 10

*In re Heating Oil Partners*,
422 F. App'x 15 (2d Cir. 2011) ..... 16

*Mercy Health Network v. Mercy Hosp.*,
No. 25-1654, 2026 U.S. App. LEXIS 17034 (8th Cir. June 12, 2026) ..... 13

*In re Purdue Pharma L.P.*,
633 B.R. 53 (Bankr. S.D.N.Y. 2021) ..... 5

**Statutes**

11 U.S.C. § 362 ..... 16

11 U.S.C. § 502(a) ..... 15

11 U.S.C. § 1123(a)(4) ..... 15

11 U.S.C. § 1123(b)(3)(A) ..... 14

11 U.S.C. § 1123(b)(6) ..... 14

11 U.S.C. § 1126(c) ..... 6

**Other Authorities**

Fed. R. Bankr. P. 9019 ..... 14, 15

Fed. R. Civ. P. 23 ..... 12

## Preliminary Statement

1. These appeals challenge a plan of reorganization (the "Plan")[2] that provides finality and monetary recoveries for the Debtors' vast creditor body after more than six years of highly complex and uniquely difficult bankruptcy proceedings, including the reversal of the first confirmed plan. The Official Committee was an active participant throughout these proceedings, starting with its appointment by the Department of Justice in the second week of the chapter 11 cases as the sole statutory fiduciary for all unsecured creditors. Given the absence of any funded debt in the Debtors' capital structure, this role has meant that the Official Committee's work related predominantly to the various categories of litigation claimants: serving as a representative for the creditor groups collectively where their interests were aligned, and helping to mediate among these groups where their interests diverged, all while demanding transparency from the Debtors and investigating and pursuing estate claims against the Sacklers for the benefit of all claimants.

2. The Official Committee leaves in large part to the Debtors themselves the task of explaining why confirmation of the Plan was appropriate under applicable law. The Official Committee writes separately to underscore why, from the perspective of litigation claimants and other creditors as a whole, and in light of the failure of the first plan put forward in these cases, certain features of the Plan with which the Appellants have taken issue were necessary and beneficial to creditors and to the Debtors' ultimate emergence as a public benefit company.

3. In short, each of the features of the Plan to which the Appellants appear to object most strenuously—the consensual settlement of claims against the Sacklers in exchange for additional value, the waiver of legal objections to settling claims and the simplified trust

[2] The "Plan" is the *Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 8233], which begins at page 8081 of the Appellees Appendix served and filed contemporaneously herewith (A.008081). Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to such terms in the Plan.

distribution procedures—serves, in the unusual landscape of these cases, to increase the value available to creditors as a whole, preserve that value for the holders of legally valid claims against the Debtors and Sacklers, minimize delay and lower the evidentiary burden that would otherwise be placed on plaintiffs like the Appellants themselves. For the reasons discussed herein and in the other Appellees' briefs, this Plan, which has already gone effective and begun to provide concrete benefits to claimants, should be upheld, and the Bankruptcy Court's decision confirming the Plan should be affirmed.

## Background

### A. The Initial Phases of the Chapter 11 Cases

4. The bankruptcy cases below were precipitated by the crushing litigation facing the Debtors as a result of their production and marketing of opioid products, including most notoriously the blockbuster drug OxyContin. The nearly-incomprehensible scope of the damage done by these products and practices—which harmed not only individuals and families, but also a wide range of institutions, ranging from health insurance plans to the State and federal governments themselves—led to lawsuits and claims by a vast array of claimants from each of the above categories, among others.[3]

5. From the beginning, the unique background of these cases presented three overarching challenges: (i) maximizing the overall value available to compensate for these harms; (ii) reaching an agreement on how to divide that value among the various competing claimants;[4] and (iii) protecting the public and the public health from further harm.

---

[3] At the time the cases were commenced, the cost of this litigation to the Debtors was approximately $2 million each ***week***, without accounting for settlements or judgments. *See* A.005584 (*Disclosure Statement for Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 7637] at 56).

[4] Although it is largely not the subject of these appeals, it is important to note that a lack of agreement among creditor classes regarding how to allocate value between and among themselves was, at certain times, the most likely failure state for these cases, with the prospect of a *bellum omnia contra omnes* never far from the minds of all involved. When, for example, early in these cases certain groups of creditors attempted to proceed on a class basis in light of

6. In terms of overall distributable value, one of the key issues at play was the Debtors' possession of valuable claims against their then-owners, the Sackler family. Over the years prior to bankruptcy, the Sacklers had withdrawn substantial amounts of cash from the Debtors, giving rise to enormous potential fraudulent transfer claims against all who received those funds, as well as claims for breach of fiduciary duty and other claims against those Sacklers and others who had served on the Debtors' boards or as officers.[5] One of the Official Committee's central roles was monetizing these Estate Claims for the benefit of creditors. The Official Committee conducted a comprehensive investigation involving "the most extensive discovery process . . . any court in bankruptcy has ever seen"[6] and was prepared to litigate the Estate Claims for the benefit of all creditors.

7. Ultimately, following extensive negotiations and rounds of mediation, the Official Committee and other parties in interest negotiated a settlement structure premised on then-

---

the impending bar date, these class motions were the subject of emphatic objections not only by the Debtors, but also by other creditors, and it was the intervention of the Official Committee that helped to forge a path forward to preserve parties' rights without litigating these issues. *See* A.000033 (*Motion by Public School Districts for an Order Allowing them to Proceed with a Class Proof of Claim and Certifying a Class* [ECF No. 1211]); A.000313 (*Motion of the Private Insurance Class Claimants for Leave to File Class Proofs of Claim* [ECF No. 1321]); A.000661 (*Hospital Claimants' Motion Pursuant to Fed. R. Bankr. P. 9014 and 7023 for an Order Making Fed. R. Civ. P. 23 Applicable to These Proceedings, Permitting them to File a Class Proof of Claim and Granting Related Relief* [ECF No. 1330]); A.001070 (*Motion by NAS Guardians on Behalf of the NAS Children's Abatement Class Action Claimants for Entry of an Order Pursuant to Fed. R. Bankr. P. 9014 and 7023 Permitting them to File a Class Proof of Claim and Granting Related Relief* [ECF No. 1362]); A.001996 (*Motion by Cheyenne & Arapaho Tribes and Certain Other Indian Tribes Claimants Pursuant to Fed. R. Bankr. P. 9014 and 7023 to Permit the Filing of a Class Proof of Claim* [ECF No. 1363]); A.002089 (*Motion to Permit the Filing of a Class Proof of Claim* filed by Tiffany Dunford [ECF No. 1408]); A.002089 (*The State of Florida's Omnibus Objection to the Request by the Hospital Claimants, the Private Insurance Class Plaintiffs, the Independent Public School Districts, the NAS Guardians, and the Cheyenne and Arapaho Tribes for Leave to File Motions for Class Relief* [ECF No. 1415]); A.002105 (*Debtors' Omnibus Objection to Motions by Certain Claimants for an Order Allowing them to Proceed with a Class Proof of Claim and Certifying a Class* [ECF No. 1421]); A.002166 (*The Ad Hoc Group of Individual Victims' Statement in Support of Debtors' Omnibus Objection to Motions by Certain Claimants for an Order Allowing them to Proceed with a Class Proof of Claim and Certifying a Class* [ECF No. 1423]); A.002188 (*Public Claimants' Omnibus Objection to Motions for Leave to File Class Proofs of Claim* [ECF No. 1431]); A.002170 (*The Official Committee of Unsecured Creditors' Response to and Request for Adjournment of Class Claim Motions Until Conclusion of Mediation* [ECF No. 1425]).

[5] The claims assertable on behalf of the Debtors against the Sacklers, their affiliates and their other related entities and alleged co-conspirators are referred to herein as the "Estate Claims."

[6] *In re Purdue Pharma L.P.*, 633 B.R. 53, 85-6 (Bankr. S.D.N.Y. 2021) ("Purdue I") (opinion confirming prior plan).

permitted non-consensual third-party releases: *i.e.*, a plan that would settle, by supermajority[7] vote, both the Debtors' Estate Claims against the Sacklers and any "direct" claims against the Sacklers held by creditors, insofar as such claims were tied to Purdue and its conduct.[8] As the Official Committee made clear at the time, the principle behind these releases was not generosity towards the Sacklers; rather, the Official Committee (like many others) viewed these "direct" releases as essential to protect the interests of claimants themselves.[9] Most obviously, a global settlement could deliver a "peace premium" and thus free up the most value possible to be distributed ratably among all creditors. But perhaps more importantly, the settlement of direct claims minimized execution risk: the continued existence of such claims meant the continued possibility that the Sacklers could be forced to pay large judgments (or choose to incur large legal fees) in respect of those claims, jeopardizing their ability to pay their obligations to all claimants.

**B. The Prior Plan**

8. On the back of the Official Committee's investigation, such a plan was developed and put to a vote of the Debtors' creditors, to overwhelming approval.[10] Because the prior plan contemplated a settlement of all claims against the Sacklers that would be made binding on any

---

[7] Bankruptcy Code section 1126(c) requires acceptance of a plan by creditors holding "two-thirds in amount and more than one-half in number" in a class. Where, as here, the claims in a class are unliquidated and estimated for voting purposes at equal values, these requirements merge into a simple 2/3 requirement.

[8] *See generally* A.002592 (*Disclosure Statement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 2983]) (the "2021 Disclosure Statement").

[9] *See* A.003129 (*Statement of the Official Committee of Unsecured Creditors In Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3459]) ¶ 60; A.010937 (*Brief of Appellee the Official Committee of Unsecured Creditors of Purdue Pharma L.P.* [Case No. 21-7532; ECF No. 162] (S.D.N.Y. Nov. 15, 2021)); A.010995 (*Page Proof Brief of Appellant the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.* [Case No. 22-110; ECF No. 362] (2d Cir. Feb. 15, 2022)); A.010865 (*Brief for Respondent the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*, [Case No. 23-124] (U.S. Oct. 20, 2023)).

[10] *See* A.009437 (*Final Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3372]), Exh. A (final voting results, including acceptance by over 98% of voting claimants in the Appellants' class of adult personal injury claimants).

non-accepting minority, it treated the payments to be made by the Sacklers as one unit paid over time, without assigning relative values to the settlements of estate and direct claims. The prior plan also contemplated a settlement by the Debtors of their potential objections to creditors' claims against ***them***. Specifically, as is common in mass tort scenarios, the full-fledged legal evaluation of these disputed claims was to be replaced by an agreement that upon effectiveness a trustee for each class would assign each claim in that class a relative value based on an agreed rubric (collectively "Trust Distribution Procedures" or "TDPs") and give to each claim its share of the trust's distributable assets according to those TDP values.[11] Supporting these key planks in the web of interdependent settlements was agreement among the various creditor groups on an allocation between the various classes, resulting from arduous mediation among representatives of each class.[12] This structure was largely carried over into the current Plan.

**C. The Present Plan**

9. Unfortunately, and as all parties are aware, the prior plan never reached effectiveness. Although the Bankruptcy Court confirmed the prior plan on September 17, 2021, this confirmation order was vacated on December 16, 2021, reinstated by the Second Circuit on May 30, 2023 and finally rendered permanently inoperative by the Supreme Court on June 27, 2024.[13] The Supreme Court's rationale was that the Bankruptcy Code does not authorize non-consensual releases of direct claims: *i.e.*, that to the extent a plan contemplates a settlement of creditors' claims against a non-debtor third party, such settlement must rest on the consent of each affected creditor.[14]

---

[11] *See* A.002607-19 (2021 Disclosure Statement).

[12] *See* A.002620 (2021 Disclosure Statement ).

[13] *See Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). This recounting of the history omits many significant events that are not relevant to the issues on appeal, including a supplemental settlement resolving the appeals of certain formerly objecting governmental units over the objection of the formerly supportive governmental units.

[14] *See Harrington*, 603 U.S. at 227.

10. Immediately following this setback, the parties set to work to develop the present Plan. This Plan, like the prior one, also rests on substantial payments from the Sacklers over a period of years in exchange for the settlement of claims against them by both the Debtors and their creditors. ***Unlike*** the prior plan, however, this Plan—as required by the Supreme Court's decision—did not accomplish this settlement with the stroke of a Bankruptcy Judge's pen that made a supermajority vote binding on all creditors. Instead, the Plan itself automatically settled only the Debtors' Estate Claims against the Sacklers and others, while creating a structure for the resolution of creditor claims against the Debtors and providing each claimant in certain classes[15] the ***opportunity*** to settle their claims against the Sacklers.

11. In other words, while maintaining the other elements of the prior plan to the extent possible, the settlement with the Sacklers was bifurcated into two settlements, with separate payments contemplated for the release of direct and estate claims.[16] The payments for the Estate Claims were mandatory and fixed, given the Debtors' ability to deliver (with Bankruptcy Court oversight and approval) a full settlement and release of the claims that they owned.[17] Because the settlement of the creditors' claims against the Sacklers, on the other hand, was left to the option of each claimant, the value the Sacklers would be obligated to deliver for a settlement of third-party direct claims was entirely dependent on the relative number of claims in each class that agreed to participate in such settlement.[18]

---

[15] The holder of claims against Purdue that did not implicate the Sacklers' misconduct, such as trade claims, were not included in this opportunity.

[16] A.008152 (Plan § 5.2).

[17] *See id*.

[18] *See* A.008160 (Plan § 5.2(e)).

12. It is a key feature of the Plan and bears emphasis that all holders of ***Allowed*** claims,[19] regardless of their election in respect of the third-party release, in each class are entitled to their share (as determined by a TDP) of the Debtors' estates, which include value from the Estate Claims settlement.[20] For the holder of an Allowed claim, the difference is only that—just as would be the case outside of bankruptcy—those who do not agree to settle their direct claims against the Sacklers do not receive the incremental consideration on offer for that settlement.[21]

13. It remained the case, however, that each outstanding individual claim against the Sacklers represented (and continues to represent now) an outsized risk to claimants relying on a shared pot of value for their recoveries. Critically, the value to be realized under the Debtors' Estate Claims settlement with the Sacklers depends on the Sacklers' continued ability to make the required payments. Indeed, "jackpot" judgments against some or all of the Sacklers on any non-settled claims could deplete the assets of the relevant portion of the Sackler family, wiping out their ability to make such future payments, as could significant enough litigation costs. In addition, however, various members of the Sackler family have alleged that they are the beneficiaries of purported indemnification obligations by the Debtors.[22] The Official Committee was prepared during the course of the chapter 11 cases to argue that these obligations were invalid, and the Official Committee understands that the successors to the Debtors under the Plan are likewise

---

[19] An Allowed claim, as relevant here, includes one that is recognized as allowed under the Bankruptcy Code by a court order, including the Confirmation Order. *See* A.008088 (Plan definition of "Allowed"). In the case of claimants who participate in the release, the Confirmation Order immediately provides such recognition. *See* A.008321 (Confirmation Order ¶ 10) (approving the "resolution of any potential objections to the Allowance of Settling Creditors' Claims"). In the case of claimants who do not participate in the release, the Plan (as approved by the Confirmation Order) renders such claims Allowed if no objections are interposed within 18 months (in the case of PI Claims) or two years (in the case of all other disputed claims of the Effective Date. A.008228 (Plan § 7.9(a)).

[20] A.008227 (Plan § 7.7(b)).

[21] *Id.*

[22] *See* A.003121 (*Mortimer D. Sackler Family's Response to Plan Objections and Statement in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3442] ¶ 36 (discussing alleged Sackler family indemnity rights)).

prepared to make this argument if the Sacklers attempt to claim this purported indemnity. But the litigation required to nullify the Sacklers' purported indemnity could be costly, even if successful, and the costs and risks to the Debtors that would be imposed by such litigation would fall, again, on the heads of those entitled to a share of estate value.

14. For this reason, as well, the Debtors and their creditors alike stood to benefit from the release of claims against the Sacklers. To minimize associated risks and provide the most no-strings-attached value to creditors, the Debtors, with the support of the Official Committee and every other organized creditor group in these cases, agreed to a mechanism whereby the Debtors, the Sacklers and other parties supporting the Plan would waive their legal objections to any claim the holder of which released the Sacklers, with the settlement of the claims themselves—after which an objection by any party would be untimely—to be approved as part of confirmation. The Plan extends this open offer to all litigants, automatically and ***immediately*** deeming such claims "Allowed" and entitling the holders of those claims to whatever value, if any, they were allotted under the applicable TDP based on the evidentiary support for the underlying injury.[23] Significantly, neither the Plan nor any other element of the integrated settlements ***dis***allows the claims of those who decline to grant the releases. Rather, such claims are treated—as they have been before and throughout the chapter 11 cases—as disputed and subject to the full scope of potential legal and factual objections and defenses.[24] Furthermore, if no such objections are interposed within a set timespan (18 months for personal injury claims and two years for all others), the Plan provides that such non-settling claims, as well, will be deemed automatically Allowed.[25]

[23]A.008088 (Plan definition of "Allowed").

[24] A.008225 (Plan § 7.3(c)).

[25] A.008228 (Plan § 7.9(a)).

15. This Plan, like the prior plan, received overwhelming creditor support, including acceptance by 99.6% of voting Non-NAS[26] PI Claimants.[27] On November 12, 2025, six years after the chapter 11 cases were commenced, the Plan went before the Bankruptcy Court for confirmation. Thereafter, on November 18, 2025, the Bankruptcy Court entered an order confirming the Plan, and the Plan went effective on May 1, 2026.[28]

## Argument

16. This Brief, as discussed *supra*, does not attempt to address every issue raised in each filing by the various Appellants, many of which appear not to relate to the subject of these appeals at all. Rather, the Official Committee intends to make two broad points: (i) the release structure used in the Plan, including the deemed allowance of settling claims, is appropriate under applicable law and provides the best possible outcome for creditors; and (ii) this Court has a basis to dismiss these appeals as equitably moot, but would be better served by doing so as an alternative holding.

### I. The Third-Party Releases in the Plan Are Consensual and Appropriate.

17. The Appellants, in their various filings, raise three different arguments against the third-party releases in the Plan. *First*, they make allegations, unsupported by the facts and contrary to the plain text of the Plan, that the releases are non-consensual in violation of the Supreme Court's *Harrington* holding. *Second*, they assert, without any legal support, that it is improper for

---

[26] A "Non-NAS PI Claim," the class to which each Appellant belongs, is a claim for personal injury or wrongful death other than a claim arising from alleged *in utero* exposure (resulting in conditions including those referred to as Neonatal Abstinence Syndrome (NAS) or Neonatal Opioid Withdrawal Syndrome (NOWS)).

[27] A.009677 (*Supplemental Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding Service and Publication of the Confirmation Hearing Notice and the Solicitation of Votes and Tabulation of Ballots Cast on the Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 8173]), Exh. A. (stating total accepting vote for Class 10(b) Non-NAS PI Claims).

[28] *See* A.008314 (*Findings of Fact, Conclusions of Law, and Order Confirming the Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 8263]); A.008845 (*Notice of (I) Occurrence of Effective Date, (II) Final Deadlines for Filing Administrative Claims, and (III) Expiration of the Preliminary Injunction* [ECF No. 9133]).

individuals to receive value as consideration for their agreement to grant the releases. *And third*, one Appellant argues, without any legal ***or*** factual basis, that her claim is uniquely situated with respect to the Sacklers and therefore she ***alone*** should receive value.

*A. The Third-Party Releases Are Consensual.*

18. A straightforward reading of the Plan confirms what several of the Appellants refuse to see, despite extensive prior explanation: the third-party releases in the Plan are ***consensual*** and, thus, entirely consistent with the Supreme Court's mandate. Specifically, the Plan provides that the releases are binding only on those personal injury claimants who opted in to grant them.[29] As the Bankruptcy Court noted, "a clearer form of consent [than opt-in releases] can hardly be imagined."[30] In fact, only one of the Appellants, Mr. Redwood, has granted the releases, and he does not take issue with them. The direct claims against the Sacklers of each other Appellant have all survived confirmation and consummation of the Plan, and—now that the preliminary injunction has terminated[31]—they are free to pursue those claims in whatever forum they may prefer. That fact alone should resolve any pending disputes on the releases.

19. It is perhaps because they are on such shaky ground in asserting an injury imposed by the releases that the Appellants almost immediately conflate their arguments about consent with arguments about purported coercion. Appellants allege, in short, that the consent to the releases provided by ***other*** claimants is void because ***other*** claimants received consideration for settling

---

[29] Plan § 10.6(b) ("[T]he releases set forth in this [s]ection . . . shall not apply to . . . Holders of Claims who do not opt-in to the releases through their applicable ballots . . . ."). For several classes, including hospitals, emergency room physicians and public schools, the Plan does not directly implement the settlement of claims against the Sacklers. Rather, such classes are subject to separate opt-out class actions pursuant to Rule 23.

[30] A.009064 (*Modified Bench Ruling Granting Confirmation of the Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 8270])(citing *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015)).

[31] *See* A.008845 (*Notice of (I) Occurrence of Effective Date, (II) Final Deadlines for Filing Administrative Claims, and (III) Expiration of the Preliminary Injunction* [ECF No. 9133]).

their direct claims against the Sacklers.[32] But *Harrington* requires that a release must be ***consensual***, that is, freely chosen. It does not require that a release be ***gratuitous***, or given without consideration, which would be at odds with the most basic principles of contract law. In any event, the Appellants lack standing to argue on behalf of other claimants.[33] The Appellants' attempts to make *Harrington* foreclose precisely the course the Supreme Court mandated is without merit and should be rejected.

*B. The Deemed Allowance of Settling Claims Is an Appropriate Exercise of the Debtors' Discretion.*

20. As described *supra*, the Debtors and the Official Committee recognized the existential threat that could be posed to the global settlement—and in particular to the value distributable to creditors—if a large number of holdouts were to pursue their individual direct claims against the Sacklers. To avoid this doomsday scenario, and to recognize the benefit conferred directly on the Debtors' estates and creditors by each claimant that agreed to participate in the third-party release, the Plan included an open offer: the Debtors and the other parties

[32] *See Appellant's Opening Brief and Special Appendix*, filed by Laurie Danielle Pitts-Tillman on June 7, 2026; *Rosemary's Brief* [Case No. 25-09681; ECF No. 9], filed by Rosemary Walker on December 4, 2025; *Rosemary Walker's Supplemental Brief* [Case No. 25-09681; ECF No. 39], filed by Rosemary Walker on December 22, 2025; *Memorandum of Understanding* [Case No. 25-10327; ECF No. 53], filed by Keith Redwood on June 1, 2026*; Ellen Isaacs Opening Consolidated Brief* [Case No. 25-10427; ECF No. 44], filed by Ellen Isaacs on February 3, 2026; *Brief of Appellant Amanda Morales*, filed by Amanda Morales on June 11, 2026.

[33] The argument would appear to run that the Plan was confirmed only because such other claimants were incentivized to grant the releases, but (i) the ballots distributed to claimants gave them the right to vote against the Plan but nevertheless grant the releases (*see* A.005083 (separate selection boxes on Class 10(a) NAS PI Claim Ballot, approved as Ex. 2H to *Order Approving (I) Disclosure Statement for Thirteenth Amended Chapter 11 Plan, (II) Solicitation And Voting Procedures, (III) Forms Of Ballots, Notices and Notice Procedures In Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 7615]), A.005120 (same on Class 10(b) Non-NAS PI Claims Ballot)), meaning that this incentive did not directly promote confirmation itself; and (ii) courts have generally not permitted such attenuated theories of standing in the context of bankruptcy appeal. *See, e.g.*, *Costaglio v. Glob. Clean Energy Holdings, Inc. (In re Glob. Clean Energy Holdings, Inc.)*, No. H-25-3616, 2026 U.S. Dist. LEXIS 114522, at *21 (S.D. Tex. May 25, 2026) (appellant "cannot obtain standing to challenge these [third-party release] provisions [that do not bind him] by relabeling them as challenges under §1129"); *see also Mercy Health Netw'k v. Mercy Hosp.*, No. 25-1654, 2026 U.S. App. LEXIS 17034, at *9–10 (8th Cir. June 12, 2026) ("[W]e agree with our sister circuits . . . that unsecured creditors do not have standing to appeal a bankruptcy court order when it is only theoretically possible that they would benefit from their appeal.") (internal quotation marks omitted).

supporting the Plan would agree not to prosecute any potential objections to the claims of Settling Claimants, and would treat the confirmation hearing as a hearing on the settlement of the claims themselves.[34]

21. This settlement, embodied in the "deemed allowance" provisions of the Plan, was put before the Bankruptcy Court and all parties in interest at confirmation and was approved as a settlement of these potential objections. No party, including the Appellants, objected to the allowance of any claim under this provision as an unreasonable settlement with respect to such claims.[35] Instead, the Appellants objected to their not receiving the same consideration as Settling Claimants, notwithstanding their presumably considered decisions not to provide their fellow creditors with the same benefit. The Appellants continue this logically and legally flawed approach before this Court, asserting that they should be provided with the same benefits as those who agreed to settle, despite not giving up the same rights.[36]

22. The problem with this argument, of course, is that it fundamentally misconstrues the nature of the Appellants' claims, and of claims generally. The Appellants implicitly assume: (i) that each claimant has a right, free of any objection, to an allowed claim; (ii) that such allowance constitutes the "treatment" the claim receives under a plan; and (iii) that such "treatment" must be equal among members of the same class of claims. But none of these is the case.

---

[34] A.008088 (Plan definition of "Allowed," as described *supra*).

[35] In the Second Circuit, settlements in a chapter 11 plan of reorganization are subject to the same standards applied to the settlements under Rule 9019 of the Federal Rule of Bankruptcy Procedure, which require that a settlement be "in the best interests of the estate" and turn on whether the settlement "falls below the lowest point in the range of reasonableness." *See In re Chemtura Corp.*, 439 B.R. 561, 593–94 (Bankr. S.D.N.Y. 2010); *id.* at 608. Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Bankruptcy Code section 1123 allows a chapter 11 plan to include a settlement of any claim belonging to the debtors that is appropriate and not inconsistent with the Bankruptcy Code. 11 U.S.C. § 1123(b)(3)(A), (b)(6).

[36] *See Rosemary's Brief* [Case No. 25-09681; ECF No. 9], filed by Rosemary Walker on December 4, 2025; *Rosemary Walker's Supplemental Brief* [Case No. 25-09681; ECF No. 39], filed by Rosemary Walker on December 22, 2025; *Memorandum of Understanding* [Case No. 25-10327; ECF No. 53], filed by Keith Redwood on June 1, 2026*; Ellen Isaacs Opening Consolidated Brief* [Case No. 25-10427; ECF No. 44], filed by Ellen Isaacs on February 3, 2026;

23. In the first instance, allowance of a claim is a legal question as to the enforceability of an alleged debt or obligation, whereas treatment is what the holder of that debt—once it is allowed and enforceable—will obtain through the bankruptcy process. Bankruptcy Code section 502 makes clear that unliquidated or disputed claims are always subject to objection and, further, that ***every*** party in interest in a bankruptcy case has a statutory right to object to a claim unless and until it is allowed.[37] The open offer to claimants in the Plan proposed a settlement with each claimant that elected to take the Debtors up on the offer, and each claimant—including the Appellants—was free to take it. Indeed, once the universe of Settling Claimants was known, and the settlement of potential objections was before the Bankruptcy Court at confirmation, each Appellant was free at that time to object to the settlement of any given claim as unwarranted, just as each party in interest remains free to object to the claims of the Appellants. They did not do so, and the Bankruptcy Court approved the settlement and deemed allowance of such claims as a reasonable bargain to avoid extended and costly litigation.[38]

24. None of these issues around allowance relates to the question of treatment, which addresses the value to be provided to the Allowed claims in each class. With the question properly framed, it is clear that the Plan provides Non-NAS PI Claims like those of the Appellants with precisely the equal treatment mandated by Bankruptcy Code section 1123(a)(4). Each holder of an Allowed claim in the Appellants' class receives (i) their allocable share of the estate value (including the value of settled Estate Claims) assigned to the class and (ii) the opportunity to settle their claims against the Sacklers in exchange for additional value. It is significant here that the

---

[37] 11 U.S.C. § 502(a).

[38] *See* A.008321-22 (Confirmation Order ¶ 10) (approving resolution of potential objections to Settling Creditors' Claims). That these settlements were finalized in connection with confirmation, rather than an ordinary motion under Bankruptcy Rule 9019, only further emphasizes this point: the confirmation process demands the broadest possible notice and scrutiny of any event in a chapter 11 case, and it is despite that broad notice that no party came forward to object to any of these claim objection settlements.

Plan may put the non-releasing Appellants in the same position, albeit on a delayed timeline: they have declined the invitation to settle with the Sacklers, but if no objections are raised to their claims within 18 months after the Effective Date, their claims as well will be deemed Allowed and they will be entitled to whatever estate value the applicable TDP would have assigned their claim had they settled before confirmation.

25. In short, the deemed allowance provisions of the Plan and the associated settlement of claim objections were put forth as reasonable settlements and approved by the Bankruptcy Court in recognition of the benefits those settlements provided to the Debtors and their creditors.

*C. Ms. Walker Is Not Uniquely Situated with Respect to Her Direct Claims.*

26. One Appellant, Rosemary Walker, appears to argue that she, alone, among the tens of thousands of individuals who filed proofs of claim against the Debtors, has a valid claim against the Sacklers. Starting from this premise, she treats the other claimants as interlopers, giving up claims that they never possessed in exchange for additional value that should belong to her alone. There is no basis for the distinction Ms. Walker claims.

27. As an initial matter, Ms. Walker's view of her own status appears premised on the fact that, rather than filing a timely proof of claim against the Debtors as required by the Bankruptcy Code, she commenced state court litigation against the Sacklers and the Debtors in 2023.[39] This litigation was commenced in violation of the automatic stay imposed by Bankruptcy Code section 362 and the Bankruptcy Court's preliminary injunction, and could have been treated as void *ab initio*.[40] Instead, it—like the hundreds of other lawsuits pending against the Debtors

[39] *Walker v. Purdue Pharmaceuticals L.P., et al.*, Case No. 23-CV-3393 (Or. Cir. Ct., Marion Cnty.) She is not unique even in this respect; various litigants commenced improper litigation in violation of the automatic stay and the Preliminary Injunction during the past seven years and had such litigation stayed.

[40] *See In re Heating Oil Partners*, 422 F. App'x 15, 18 (2d Cir. 2011) (litigation against a debtor that proceeded in violation of the automatic stay was void).

and the Sacklers—was stayed. Nevertheless, Ms. Walker appears to argue[41] that the pendency of her lawsuit, which she commenced in direct violation of federal law and a court order, elevates her claims against Sacklers over others. On the issue of factual support for this allegation, it suffices to note that Ms. Walker has never obtained a judgment in her favor against the Sacklers or the Debtors, rendering her situation in this respect precisely the same as that of any other claimant.[42]

28. But in a more fundamental sense, there is no set of facts that could support Ms. Walker's objection on these grounds because she appeals to a version of the law that does not—and cannot—exist. Again, while the Plan is complex and contains numerous interdependent components, the settlement of direct claims is a straightforward consensual exchange of a release for value. If courts were required to find that a plaintiff had a valid claim before signing off on a settlement, it would vitiate the entire notion of compromise. Ms. Walker's claims are not uniquely valuable, and her frequently offensive attacks on her fellow claimants are baseless from a legal perspective. Her special pleading notwithstanding, her arguments should be discarded and the confirmation order affirmed.

## II. This Court Should Hold in the Alternative that These Appeals Are Equitably Moot.

29. The Official Committee understands that the Debtors intend to argue in the alternative that these appeals should be dismissed as equitably moot because the Plan has been substantially consummated. The Official Committee agrees that this would be an appropriate means to dispose of these appeals, but writes separately to emphasize two points: (i) the hardship that would be wrought on creditors by forcing them into attempts to unravel the progress made so far unquestionably justifies dismissal as equitably moot; and (ii) nevertheless, and in light of the

[41] *See Rosemary Walker's Supplemental Brief* [Case No. 25-09681; ECF No. 39] at 38-39.

[42] Or worse; on July 1, 2026, the Bankruptcy Court issued an opinion and order denying Ms. Walker's motion to have her late proof of claim, which she did not submit until August 25, 2025 and September 23, 2025, two years after she commenced her already-delayed lawsuit, treated as timely.

prudential nature of equitable mootness, to the extent the Court is prepared to rule on the merits of the appeals it ought to do so.

*A. An Equitable Mootness Determination Is Warranted Here Because Creditors Would Be Harmed by Reversal Following Substantial Consummation of the Plan.*

30. In the first instance, the difficulties that would be faced in undoing the consummation of the Plan are enormous and not limited to personal injury claimants. The Debtors emphasize certain considerations, including a federal guilty plea that prevents the company that existed prior to effectiveness from operating in the pharmaceutical industry. What may not be clear is that being forced back into bankruptcy as a company no longer able to conduct business would diminish the value available to creditors by more than the lost business income. The structure of the intercreditor allocation under the Plan involves fixed amounts for the classes of so-called "private" creditors, which were set before any broad-based settlement with the Sacklers had been reached.[43] These classes include personal injury claimants as well as hospitals, third-party payors and others.[44] These settlements left the "upside" value of the business and the claims against the Sacklers—which at the time remained uncertain—to the "public" creditors such as States, Tribes and municipalities. But the ability to make these fixed payments to private creditors in turn relied on the value of Purdue's operating assets. In other words, without the value of Purdue as a business, the entire intercreditor settlement could unravel, meaning the loss of value to intercreditor litigation and negotiations could far exceed the cost of lost business capacity.

31. Moreover, and as the Court may be aware, it was at the urging of the Official Committee that the Bankruptcy Court so-ordered a stipulation binding the Sacklers during the course of the chapter 11 cases to broad so-called "anti-secretion" obligations, forbidding various

[43] *See* A.008151-52 (Plan §§ 4.7(a), 4.8(a), 4.9(a), 4.10(a)) and associated definitions.
[44] *Id.*

transfers of assets to preserve access to their funds (as well as a clean snapshot of their ability to pay) in connection with the Official Committee's investigation and any potential attempts to collect on judgments or settlements.[45] With the effectiveness of the Plan, those obligations under the stipulation have fallen away[46] and the Sacklers have been free for the first time in close to a decade to engage in financial transactions limited only by the terms of the settlement documents, which include significant but more limited anti-circumvention obligations. These new requirements prohibit only acts and omissions that would frustrate the purpose of the specific settlements under the Plan, rather than creditors' access more generally. It was in reliance on the effectiveness of the Plan Documents, and not in respect of any trust owed to the Sacklers, that they were permitted this freedom. To return to the drawing board and craft a new settlement after the Sacklers were allowed to engage in financial maneuvering could require the Official Committee to re-conduct significant portions of its investigation and re-assess the access to the Sacklers' assets that creditors would be able to achieve without the benefit of the Plan Settlements.

32. In addition, of course, the various trusts contemplated by the Plan have now been funded and begun their work. While the Official Committee will leave it in large part to the MDT to address the status of this process, it nevertheless is compelled to emphasize to the Court what a hardship it would inflict on creditors, including those individuals who have finally received cash after nearly seven years of bankruptcy, were an appellate court to make them give it back.

33. Finally, a word about closure. The Official Committee has been the point of contact for individuals reaching out about the status of their claims for the past half-decade, and both its members and professionals have heard too many heartbreaking stories of loss to count. One

---

[45] A.000022-23 (*Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518] ¶¶ 13–16).

[46] A.008240 (Plan § 10.3(b)).

recurring feature of these stories has been that the pendency of the chapter 11 cases, forcing claimants to dwell in their loss for these long years, has felt like a form of revictimization, an open wound that, only now, with the Plan effective and payments soon to commence, may begin to heal. The pain claimants will feel if these still-fresh scabs are ripped off may not be strictly cognizable under the equitable mootness framework, but the Official Committee would be remiss in its duties not to mention it.

34. For these reasons, the Official Committee agrees with the Debtors that the Court would be entitled to dismiss these appeals as equitably moot.

*B. Prudential Considerations Favor a Decision on the Merits of These Appeals.*

35. With all that said, the Official Committee nevertheless urges the Court to adopt equitable mootness only as an alternative basis to leave the Plan in place. The merits of these appeals are not complex or difficult, and a single ruling addressing all possible bases limits the number of further appeals that may be taken as of right (and the further depletion of value that otherwise could be used in abating the opioid crisis defending against such appeals). In short, the inevitable appeals from this Court's decision to the Second Circuit should be the long-delayed final word on the matter.

36. In the interest of finally letting these cases end, the Official Committee respectfully asks this Court to affirm the Confirmation Order on the merits and, in the alternative, hold that the appeals should be dismissed.

[*The remainder of this page has been left blank intentionally.*]

Dated: July 23, 2026
New York, New York

AKIN GUMP STRAUSS HAUER & FELD LLP

By: */s/ Arik Preis*__________

Arik Preis
Mitchell P. Hurley
Sara L. Brauner
Katherine Porter
Theodore James Salwen
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
apreis@akingump.com
mhurley@akingump.com
sbrauner@akingump.com
kporter@akingump.com
jsalwen@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*