# Exhibit A

**"Formatted Reply with Certificate of Service" filed by Laurie Danielle Pitts-Tillman**

**Laurie Danielle Pitts-Tillman**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

Laurie Danielle Pitts-Tillman

Appellant,

v.

PURDUE PHARMA L.P., et al., Debtors-Appellees.

Case No. 25-cv-09681

Consolidated Case Nos. 25-cv-09681, 25-cv-10158, 25-cv-10282, 25-cv-10327, 25-cv-10420, 25-cv-10427, 25-cv-10433, 25-cv-10646, 26-cv-00045

Bankruptcy Case No. 19-23649

Appellant proceeds on the original record under Federal Rule of Appellate Procedure 10(a), including the pleadings, objections, exhibits, transcripts, and orders presented below. Because Appellant proceeds pro se, her filings must be liberally construed according to their substance rather than their technical form. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). Thus, the Court must fairly consider the constitutional, jurisdictional, accounting, and double-recovery objections Appellant actually raised to the fullest extent, even if she did not identify each objection below by its precise legal label.

The original record also supports Appellant's objection that the Plan violates pro tanto principles by permitting governmental and institutional claimants to recover without a transparent, dollar-for-dollar credit for amounts already received from Purdue, the Sacklers, insurers, distributors, pharmacies, and other opioid defendants for the same alleged injuries. "Pro tanto" means "to that extent"; accordingly, prior compensation for an overlapping injury must reduce any later recovery to that extent. Without a complete accounting and appropriate offsets, the Court could not determine whether the Plan permits duplicative recovery, skewed voting blocks, artificially dilutes personal-injury claims, or satisfies the Bankruptcy Code's confirmation requirements.

**RECORD CORRECTIONS AND TRANSCRIPT MATERIALITY**

**PRELIMINARY STATEMENT REGARDING THE ACCURACY OF APPELLANT'S PRIOR FILINGS AND THE RECORD**

Appellant respectfully provides this clarification because the accuracy of the record bears directly upon arguments made by Appellees concerning preservation, waiver, consent, and the scope of this appeal. Appellant is proceeding pro se and prepared her filings electronically using her cellular telephone. Appellant states unequivocally that portions of both her initial merits brief and her initial motion for stay pending appeal were altered electronically before Appellant was able to print and preserve paper copies. Appellant does not presently represent to this Court that she can identify the person, mechanism, or cause responsible for those changes. She does represent, based upon her personal knowledge of what she authored, that certain language appearing in the resulting documents was not written, intended, or authorized by her.

This clarification is particularly important concerning a statement appearing in Appellant's prior brief suggesting that the Bankruptcy Court informed Appellant that she would

be surrendering her right to a jury trial in an Article III court. That statement is incorrect and was not authored or authorized by Appellant.

Appellant's position is the opposite: the Bankruptcy Court did not advise Appellant that treatment of her personal-injury claim through the confirmed Plan and Trust implicated or surrendered any right she possessed to adjudication of her personal-injury claim before an Article III court or to a jury trial. Appellant therefore expressly withdraws and corrects any contrary statement appearing in her prior filing.

This is not an attempt to manufacture a new appellate theory after briefing. Appellant's earlier filings repeatedly challenged the Bankruptcy Court's jurisdiction and authority, Supreme Court having original jurisdiction, the involuntary effect of the Plan and claim-channeling mechanism, the legality of third-party releases, the overlapping, duplicative, and derivative claims resulting in unjust enrichment and skewed voting, lack of offsets, separation of powers, lack of full accounting, violation of due process and Takings clause, and the deprivation of an Article III forum. Indeed, Appellant's prior reconsideration filing expressly asserted that the Plan restricted her ability to pursue claims in an Article III forum. Final reconsider.pdf Appellant's earlier stay motion likewise challenged the Bankruptcy Court's jurisdiction, statutory and constitutional authority and asserted that the releases exceeded the authority Congress granted.

Emergency motion for stay pending appeal(1).pdf

Appellant accordingly asks the Court to evaluate her arguments based upon the actual record, her contemporaneous objections, and the transcripts of the proceedings—not upon an electronically altered sentence that contradicts the position Appellant has consistently maintained.

The November 13, 2025 confirmation hearing is especially important because Appellant personally addressed the Bankruptcy Court concerning her objections on that date. Appellant expressly requested that transcript in her repeated motions for transcripts, identifying the November 13 hearing concerning her objections as necessary to this appeal.

Motion for transcripts(4).pdf

Yet that particular proceeding was not initially supplied to Appellant as part of the transcripts authorized at government expense. The omission matters because the November 13 proceeding provides objective evidence of what Appellant actually said, what objections she preserved, what the Bankruptcy Court told her, and—equally important—what the Bankruptcy Court did not tell her.

Appellant's contention is straightforward. The Bankruptcy Court did not inform her during that exchange that she possessed and was relinquishing any applicable right to adjudication of her personal-injury claim in an Article III forum or any applicable jury-trial right.

In fact the Judge told Appellant she would retain her rights to sue the Sacklers which is a lie when her claim is channeled to the trust despite Appellant reserving all rights nunc pro tunc ab initio. Consequently, any assertion that Appellant knowingly relinquished those rights should be tested against the actual transcript rather than against the erroneous sentence identified above.

The circumstances surrounding the transcript are additionally relevant because Appellant sought the transcript through the established process based upon her indigency and the necessity of the proceedings to appellate review. Her written request specifically stated that the November 12–20 proceedings, including November 13, were necessary because the Bankruptcy Court's oral findings could not adequately be reconstructed from written orders alone.

Motion for transcripts(4).pdf

Appellant further advises the Court that, notwithstanding the initial exclusion of the November 13 transcript on expense grounds, counsel subsequently transmitted transcripts to Appellant electronically by email. To the extent an already-prepared transcript was available for electronic transmission, Appellant respectfully presents that the Court should ensure that the November 13 transcript is included in the appellate record rather than allow the absence of that critical proceeding to prejudice a pro se appellant. Alternatively, Debtors' counsel was granted access to the transcript and they refer to it in their brief so it should already be entered into the evidence as well as the Judge should be able to review it for the Judge's statement as well.

Federal Rule of Appellate Procedure 10(e) expressly provides a mechanism for resolving disputes concerning whether the record accurately reflects what occurred and for correcting material omissions or misstatements. Appellant therefore requests that the record be conformed to accurately reflect the proceedings material to this appeal.

## PRELIMINARY STATEMENT

The Debtors' response confirms rather than cures the central defects raised by Appellant.

The Plan did not merely settle claims against Purdue. It dissolved the criminally sentenced debtor, transferred substantially all operating assets all undisclosed non-cash assets and $135 million in cash to Knoa Pharma, transferred roughly $910 million to the Master Disbursement Trust ("MDT"), and distributed roughly $880 million from the MDT together with approximately $1.1 billion in Sackler payments to creditor trusts. Debtors-Appellees' Brief ("DB") 26–27. They then invoke the resulting transfers—and their assertion that "there is no practical way to trace" the current location of all estate dollars—as a reason appellate review should end. DB 27, 50–54.

That is not an answer on the merits. Substantial consummation does not eliminate Article III jurisdiction, excuse compliance with 11 U.S.C. § 1129, or make every form of targeted relief inequitable. Nor does the fungibility of money establish that an accounting is impossible. Banks, trustees, the MDT, Knoa, and the creditor trusts necessarily maintain ledgers, transfer records, opening balance sheets, reserve schedules, and distribution reports. Appellant does not ask the Court to identify particular dollar bills. She asks whether the Plan's classifications, allocations, liquidation assumptions, and treatment of overlapping public and institutional claims were supported by findings adequate for appellate review. Appellant would also like to have a full forensic accounting done. If Debtors counsel is unable to trace funds one is required so that it may be traced giving a full value compared with a chapter 7 liquidation which is a mandatory requirement prior to confirmation of any Chapter 11 plan.

Counsel's argument is not a substitute for evidence. If the Debtors contend that transferred estate property cannot be traced, they should identify the trusts, amounts transferred, present balances, distributions already made, recipients, outstanding payment obligations, and the specific transactions they claim cannot be reversed. Without that evidence, "untraceability" is a conclusion—not an established fact.

The response also mischaracterizes Appellant's objection as merely an attack on releases she did not grant. DB 36–38. Appellant did not opt into the Sackler releases. Her injury nevertheless arises from the Confirmation Order itself: the Order transferred estate value, fixed the allocation architecture, subordinated the practical recovery available to personal-injury victims, and created the consummation defense Debtors now assert. Appellant may challenge confirmation requirements that determine the value and treatment of her own claim even if she is not bound by another creditor's release.

Finally, Appellant does not contend that every governmental or institutional claim is necessarily invalid. She contends that the record and findings do not permit meaningful review of whether those claims are direct, nonduplicative claims of the asserting entities; whether prior settlements, insurance, Medicaid or Medicare payments, grants, appropriations, and other reimbursements were credited; and whether the same underlying injuries were used repeatedly to justify distributions to federal, state, local, school, hospital, insurer, and physician constituencies while individual victims receive materially smaller awards. The proper remedy is at least a targeted remand for findings, disclosure, and preservation of feasible relief—not dismissal based on transactions undertaken while appellate challenges were pending.

**APPELLANT HAS BOTH CONSTITUTIONAL AND BANKRUPTCY STANDING TO CHALLENGE CONFIRMATION**

Appellees' assertion that Appellant lacks standing is legally untenable. To establish appellate standing in a bankruptcy proceeding, a litigant must demonstrate that they are a "person aggrieved" whose proprietary interests are directly and adversely affected by the challenged order. In *re E.C. Ernst, Inc., 2 B.R. 757, 760 (S.D.N.Y. 1980*). Under Article III of the United States Constitution, a litigant must show an injury-in-fact that is concrete, particularized, and actual or imminent; traceable to the challenged conduct; and redressable by a favorable judicial decision. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992); TransUnion LLC v.*

*Ramirez*, 594 U.S. 413, 423 (2021). Appellant fully satisfies both legal standards.

A. Concrete, Particularized Personal Injuries and Direct Traceable Harm Appellant's standing is anchored in severe, concrete personal, physical, and financial injuries resulting from opioid dependency caused by being prescribed OxyContin and other opioid medications beginning in or about 2005/2006. These harms include:

- Socioeconomic Devastation: The direct loss of a stable sales job, health insurance, loss of gainful employment opportunities, loss of personal property, money, time, rights, freedom, loss of vehicles and housing.
- Incarceration : An arrest on November 25, 2007, in front of her two children, resulting in being jailed in Glynn County, Georgia, for approximately ten days without bond for possession of methadone while attempting to overcome opioid dependency. Following a $15,000.00 bond release, Appellant was subjected to continuing court supervision, pre-trial probation fees, pre-trial reporting requirements, drug testing, and mandatory attendance at AA meetings three times or more per week. This case was placed on a dead docket on August 18, 2008, where it remains open to this day, held over Appellant's head for close to 18 years.
- Severe Physical and Bodily Harm: Countless episodes of severe opioid withdrawal, intense physical pain, mental and emotional distress, prolonged detoxification, and grand mal seizures suffered after discontinuing opioids and benzodiazepines. These injuries caused a permanent loss of past memories, loss of partners, loss of a sense of self, ongoing dental problems resulting from opioid addiction, and continue to severely affect Appellant's health.
- Traumatic Disruption of Parental Relationships: The loss of time with her children and catastrophic disruption of parental relationships, causing Appellant to miss major milestones, her baby's first birthday, and her other daughters' 15th and 13th birthdays. Based on an unrelated, untrue allegation by a DFACS caseworker named Mr. Parsons, Appellant was summoned to court where custody of her nine-month-old baby was given to a stranger, and custody of her two other daughters was given to their father who in the past was abusive to Appellant causing her further distress. This all happened over a single drug test showing

Suboxone, which Appellant obtained through alternative means and was actively taking in an attempt to get off of OxyContin. Prior to this, Mr. Parsons twice brought law enforcement to Appellant's home seeking an emergency removal, which officers refused because the home was clean, well-stocked with food and baby equipment, and a forced physical strip-search of the baby revealed no signs of abuse or neglect. It required countless drug tests, court dates, home visits, and DFACS meetings for over a year to regain custody. B. Direct Appellate Grievance Caused by the Confirmation Order Appellant's injury arises directly from the operation of the Confirmation Order itself. Appellant never knowingly, voluntarily, or expressly consented to the release, waiver, transfer, or extinguishment of her personal injury claims. She expressly opted out of third-party releases, conditioned her ballot on receiving a full accounting, and repeatedly reserved all rights nunc pro tunc ab initio. While Appellees claim Appellant retains a nominal right to sue the Sacklers, this remedy is economically illusory. The Plan proponents failed to disclose that the Estate of Jonathan D. Sackler was concurrently declared insolvent and collateralized, forcing unsecured personal-injury tort claims into the lowest possible category under Connecticut General Statutes § 45a-365, to be paid proportionately only after preferred claims and settlement-collateral obligations are satisfied. The confirmation order directly diminishes Appellant's recovery by:

1. Dissolving the debtor, transferring operating assets, undisclosed non-cash assets, and $135 million in cash to Knoa Pharma, and invoking the resulting transfers as a defense against appellate review.

2. Forcibly routing her unliquidated tort claim into an exclusive Trust mechanism, where Knoa claims administrators—not an Article III court or a jury—control its valuation and payment.

3. Prioritizing billions of dollars in overlapping public and institutional claims over individual personal-injury victims without requiring a recipient-level reconciliation or accounting. Because the plan's classification, allocation models, and trust mechanics directly diminish the value and enforceability of Appellant's private tort claim, she is an aggrieved party under 11 U.S.C. § 1129(a)(7) and § 1123(a)(4). Appellant proceeds on the original record developed below and relies on the pleadings, objections, exhibits, transcripts, orders, and other materials properly before the Bankruptcy Court. See Fed. R. App. P. 10(a). As a self-represented litigant, Appellant's filings must be liberally construed and evaluated by their substance rather than technical labels. *Erickson v. Pardus, 551 U.S. 89, 94 (2007*); *Haines v. Kerner, 404 U.S. 519, 520–21 (1972*). Liberal construction does not require the Court to create an argument for Appellant, but it does require the Court to fairly address the constitutional and jurisdictional objections she actually raised and preserved. Appellant's objections—including lack of subject-matter jurisdiction, deprivation of due process, impairment of her jury-trial rights, and the channeling of her personal-injury claim without consent or just compensation—were raised before confirmation and are established or supported by the original record. Those objections cannot be avoided merely because Appellant, proceeding pro se, did not use the precise terminology later preferred by opposing counsel. Subject matter jurisdiction may be challenged at anytime and is not subject to waiver or consent. The Federal Rules of Evidence and the governing appellate-record rules require consideration of the record as a whole; they do not permit material objections or evidence to be disregarded solely because of a self-represented party's imperfect form of presentation. limits and constitutional law.

4. The Statutory Contradiction: The Paradox of Power to Channel Cannot Be Estimated If the Bankruptcy Code and controlling law explicitly dictate that a bankruptcy judge cannot adjudicate the merits of the underlying claim nor estimate its value, the court is stripped of any foundational statutory authority to dispose of that claim entirely. The Greater-Includes-the-Lesser Fallacy: It is a foundational maxim of law that a court cannot possess greater indirect power where it lacks lesser direct power. If the Bankruptcy Code bars the court from evaluating, validating, or estimating the worth of a claim, it defies logic and statutory construction to claim it holds the inherent power to forcibly redirect, cap, or nullify it.

5. The Trust Channeling Shell Game: Forcing an unliquidated claim into a post-confirmation trust that unilaterally caps or restricts recovery is a backdoor adjudication. A court cannot achieve through a channeling injunction and a fabricated administrative cap what it is statutorily prohibited from doing through direct estimation or trial. Constitutional Violations: Article III Separation of Powers and the Seventh Amendment Beyond statutory boundaries, the court's administrative maneuvers trample upon bedrock constitutional protections: Unconstitutional Expansion of Article I Authority *(Stern v. Marshall*): Bankruptcy judges are Article I adjuncts, not Article III judges. Under established Supreme Court precedent, an Article I tribunal lacks the constitutional authority to enter final judgments on private-law rights or claims that fall outside the narrow confines of core bankruptcy administration. Forcing an unliquidated private claim into a trust framework to dictate its fate is an unlawful expansion of Article I judicial power. Destruction of the Seventh Amendment Right to a Jury Trial: The Seventh Amendment preserves the right to a civil jury trial at common law. A claimant cannot be stripped of this constitutional guarantee

simply because a debtor filed for bankruptcy. Bypassing a jury trial to lock a claim into a trustee-managed, capped recovery vehicle completely subverts constitutional protections.

**SUPREME COURT ORIGINAL JURISDICTION OVER INTERSTATE CONTROVERSIES**

Any attempt to justify this sweeping judicial overreach by invoking supreme federal authority or "original jurisdiction" fundamentally misstates constitutional law:

Strictly Limited Original Jurisdiction: Under Article III, Section 2 of the United States Constitution, the Supreme Court's original jurisdiction is restricted to rare, specialized disputes—such as those in which a state shall be party.

**THE PURPORTED RIGHT TO SUE THE SACKLERS WAS MATERIALLY MISLEADING AND ECONOMICALLY ILLUSORY BECAUSE THE ESTATE OF JONATHON D. SACKLER WAS COMMITTED TO THE SETTLEMENT , COLLATERALIZED, AND DECLARED INSOLVENT WITHOUT DISCLOSURE TO APPELLANT**

The Plan proponents repeatedly represented that claimants who declined to release the Sacklers would retain their claims against the Sacklers and their estates. The Confirmation Decision likewise stated that the Plan did not compel victims to surrender their claims and that declining the releases would not prevent a claimant from voting for the Plan or receiving a distribution.

See Confirmation Decision, Dkt. 8270, at 56-57. Those representations were materially incomplete because they described the formal survival of Appellant’s claims while withholding facts that determined whether those claims had any practical value.

Appellant affirmatively declined the Sackler releases. She was therefore entitled to evaluate the actual legal and economic value of the remedy she supposedly retained. Yet before confirmation and the Plan's Effective Date, Appellant was not informed that the Estate of Jonathan D. Sackler would be bound to the Purdue settlement, required to execute related " Credit Support and Collateral Agreements," declared insolvent, and subjected to Connecticut's insolvent-estate distribution system.

On January 23, 2026, Garett Lynam, Executor of the Estate of Jonathan D. Sackler, sought approval from the Connecticut Probate Court of the Purdue Settlement agreements and the estate's related credit-support and collateral agreements. The Executor simultaneously petitioned to have the Estate declared insolvent. Following a March 19, 2026 hearing, the Greenwich Probate Court approved both requests on March 31, 2026. The Raymond Sackler Family filed those decrees in this Court on April 1, 2026. See Dkt. 8992 and Exhibits A-B. The Purdue Plan subsequently became effective on May 1, 2026.

The insolvency decree expressly found that the estate's assets were "not more than sufficient" to pay funeral expenses, taxes, allowed claims, and expenses in full. It ordered distributions under Connecticut General Statutes §45a-365. But neither the decree nor the materials supplied to the Appellant disclosed the estate's gross assets, prior distributions, liabilities, creditor schedule, settlement reserve, collateral value, or projected recovery for non-releasing personal-injury claimants.

That omission was material. Under §45a-365, an ordinary personal-injury claim ordinarily falls within the seventh and final category -"all other claims"- which are paid proportionately only after funeral expenses, estate-administration expenses, expenses of the

decedent's final illness, governmental taxes and claims, specified wage claims, and other legally preferred claims.

Secured or collateralized obligations may also be paid from the property securing them before unsecured creditors share in any remaining assets. See Conn. Gen. Stat. §§ 45a-365 and 45a-379.

Connecticut law therefore made the estate's asset base and creditor priorities central to the value of retained claim. Section 45a-365 does not merely establish an administrative procedure. It determines the order in which estate property is distributed Section 45a-379 separately recognizes the priority of valid secured claims against collateral thus once the estate was declared insolvent and property was allegedly pledged or reserved for settlement, obligations recovery dependent on facts that the plan proponents did not disclose the amount of the validity and perfection of the security interests, the value of unencumbered assets, and the claims remaining ahead of ordinary, unsecured creditors Accordingly, Appellant's supposedly preserved claim was not merely subject to ordinary litigation risk. It was directed toward an estate that had already been declared insolvent, where Appellant would likely be treated as a lowest priority, unsecured and forced to compete for whatever assets remained after professional expenses, government obligations, preferred claims, and the Purdue settlement's secured or collateralized obligations.

## THE CONFIRMATION ORDER IS VOID BECAUSE THE BANKRUPTCY COURT ACTED WITHOUT AUTHORITY OVER APPELLANT'S PERSONAL-INJURY CLAIM AND WITHOUT JURISDICTION TO RESOLVE INTERSTATE CONTROVERSIES

This was not merely an error made while exercising lawful jurisdiction. The Bankruptcy Court exercised power it did not possess. It took Appellant's independent personal-injury claim, bound it to a trust, restricted where and against whom it could be asserted, and imposed a substitute compensation process without ever trying, valuing, or lawfully adjudicating the claim. Because jurisdiction was lacking, those provisions of the Confirmation Order are void. Court has **"original and exclusive jurisdiction of all controversies between two or more States."28 U.S.C 1251 (a) states the Supreme Court has "original and exclusive jurisdiction of all controversies between two or more States." Here every state was involved and had controversies the Judge resolved thru the plan. He did not have the jurisdoction to do so. The plan is Void ab initio. It cannot stand.**

Congress drew an unmistakable jurisdictional boundary. Under 28 U.S.C. § 157(b)(2)(B), the liquidation or estimation of personal-injury tort claims for purposes of distribution is excluded from the bankruptcy court's core authority. Section 157(b)(5) commands that personal-injury claims "shall be tried" in an Article III district court. The Bankruptcy Court could not evade those restrictions by replacing the words "trial" and "adjudication" with "confirmation," "channeling," "classification," or "trust administration." A court cannot accomplish indirectly through a plan what Congress forbids it from doing directly through adjudication.

Appellant's claim is her private property and personal cause of action. It never became property of Purdue's bankruptcy estate. Purdue did not own it, the Sacklers did not own it, the States did not own it, and the Bankruptcy Court had no jurisdiction to transfer its control to a settlement trust. Bankruptcy jurisdiction over Purdue's estate did not create jurisdiction over Appellant's independent claims against nondebtors. A bankruptcy petition is not a constitutional license to seize and restructure the private causes of action of nonconsenting injured persons.

No jurisdiction arose through consent. Appellant did not surrender her claim, accept the releases, waive an Article III tribunal, or waive her Seventh Amendment jury right. She voted against the releases, reserved her rights nunc pro tunc ab initio, and conditioned her vote upon an accounting that was never produced. There was no knowing, voluntary, and informed consent.

Silence, plan participation, or the filing of a proof of claim could not confer jurisdiction to adjudicate claims against nondebtors that were never property of the estate.

Under Stern v. Marshall, 564 U.S. 462, 482–503 (2011), an Article I bankruptcy judge cannot exercise the judicial power reserved to Article III courts by finally determining private rights merely because those rights affect a bankruptcy proceeding. Appellant's tort claim presents the classic private-right controversy: the liability of one private party to another for personal injuries and money damages. Only an Article III court—with the jury demanded and preserved by the Seventh Amendment—could enter a binding adjudication of that controversy.

The Bankruptcy Court therefore crossed three independent jurisdictional boundaries:

6. It exercised core authority that § 157(b)(2)(B) expressly withholds over the liquidation or estimation of personal-injury claims for distribution.

7. It displaced the Article III district court in which § 157(b)(5) requires personal-injury claims to be tried.

8. It exercised final judicial power over Appellant's private rights without her consent, contrary to Article III, Stern, and the Seventh Amendment. The multistate structure creates an additional and equally fundamental jurisdictional defect. More than twenty-two States—and ultimately all fifty States—participated as claimants or asserted sovereign interests in a limited pool of Purdue assets. Their interests were not necessarily identical. They competed over allocation, priority, abatement control, releases, ownership of claims, and the division of finite settlement proceeds. When one State's requested recovery necessarily reduces another State's recovery, and the States assert conflicting legal entitlements to the same property or fund, the controversy is not merely administrative; it is a controversy between States. Article III places controversies "between two or more States" within the judicial power of the United States. Congress made the Supreme Court's original jurisdiction over such controversies exclusive. 28 U.S.C. § 1251(a). Consequently, to the extent the Plan actually adjudicated conflicting legal rights between adverse States, the Bankruptcy Court never possessed jurisdiction over those controversies. Neither referral under § 157, bankruptcy jurisdiction under § 1334, consolidation, plan voting, nor party consent could transfer the Supreme Court's exclusive jurisdiction to an Article I tribunal. The Bankruptcy Court could not place all fifty States into one bankruptcy proceeding, resolve their competing sovereign claims to a finite fund, bind them through a confirmation order, and then declare that no interstate controversy existed merely because the disputes were processed under the title "bankruptcy." Constitutional jurisdiction depends upon the substance of the controversy, not the caption assigned to it. Jurisdiction cannot be created by necessity, convenience, party agreement, creditor vote, substantial consummation, or equitable considerations. It must exist before the court acts. Where it does not exist,

implementation cannot cure the defect, reliance cannot validate the order, and equitable mootness cannot insulate the unlawful exercise of judicial power from review. The Confirmation Order did not merely regulate Purdue's property. It asserted dominion over Appellant's property, extinguished or restricted rights against nondebtors, displaced an Article III tribunal, bypassed a jury, and potentially resolved controversies among sovereign States. No provision of the Bankruptcy Code supplied jurisdiction to do so. Accordingly, the affected provisions of the Confirmation Order are void ab initio. They must be vacated, not merely modified. Appellant's personal-injury claim, causes of action against nondebtors, jury demand, and right to an Article III adjudication must be restored in full.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2026, I served a true and correct copy of the foregoing Appellant's Reply upon the following counsel of record by EMAIL SERVICE to debtors counsel per  Judges orders.

Dated: August 23, 2026

Respectfully presented,

/s/ Laurie Danielle Pitts-Tillman
LAURIE DANIELLE PITTS-TILLMAN
Appellant,
% 5116 Georgia Highway 99
Brunswick Georgia[